William J. Ohle (OSB 913866)†
SCHWABE, WILLIAMSON & WYATT P.C.
PacWest Center
1211 SW Fifth Avenue, Suite 1900
Portland, OR  97204
Phone:   (503) 222-9981
E-mail:   wohle@schwabe.com

Samuel B. Gedge (VA Bar No. 80387)*
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, VA  22203
Phone:   (703) 682-9320
E-mail:   sgedge@ij.org

*Attorneys for Plaintiff*

†   Designated local counsel
*   Admitted *pro hac vice*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### PORTLAND DIVISION

| | |
|---|---|
| MATS JÄRLSTRÖM, | Case No.: 3:17-cv-00652-SB |
| Plaintiff, | |
| v. | **PLAINTIFF JÄRLSTRÖM'S MOTION FOR PRELIMINARY INJUNCTION** |
| CHRISTOPHER D. ALDRIDGE, WILLIAM J. BOYD, DAREN L. CONE, SHELLY MC DUQUETTE, JASON J. KENT, LOGAN T. MILES, RON SINGH, DAVE M. VAN DYKE, SEAN W. ST. CLAIR, AMIN WAHAB, and OSCAR J. ZUNIGA JR., in their official capacities as members of the Oregon State Board of Examiners for Engineering and Land Surveying, | **REQUEST FOR ORAL ARGUMENT** |
| Defendants. | |

Pursuant to Local Rule 7-1(a), counsel for Plaintiff contacted Christina Beatty-Walters, counsel for Defendants, by telephone and e-mail in a good-faith attempt to resolve this dispute. The parties conferred by telephone on April 27, May 3, and May 9, and communicated by e-mail on May 10, May 11, May 12, May 15, and May 16, but they have so far not been able to resolve this motion for a preliminary injunction.  Plaintiff Mats Järlström will continue to discuss in good faith with Defendants the possibility of an agreed resolution that could address the issues raised by this motion for a preliminary injunction.  But he cannot wait any longer to file this motion given the ongoing injury to his First Amendment rights.

In accordance with Federal Rule of Civil Procedure 65, Plaintiff Järlström moves the Court for a preliminary injunction enjoining Defendants from enforcing Oregon's engineering-practice laws—Or. Rev. Stat. §§ 672.005(1)(a)-(b), 672.007(1), 672.020(1), and 672.045(1) and Or. Admin. Rs. 820-010-0730(3) and 820-040-0030—against Plaintiff Järlström during the pendency of this case.

Plaintiff Järlström also moves the Court for a preliminary injunction enjoining Defendants from enforcing Oregon's title laws—Or. Rev. Stat. §§ 672.002(2), 672.007(1), 672.020(1), and 672.045(2) and Or. Admin. R. 820-010-0730(3)—against Plaintiff Järlström for describing himself using the word "engineer" during the pendency of this case.

This Motion for Preliminary Injunction is based on the Complaint, the accompanying memorandum of law, and the declarations with exhibits attached thereto.

Dated: May 17, 2017.

William J. Ohle (OSB 913866)†
Jill S. Gelineau (OSB 852088)
SCHWABE, WILLIAMSON & WYATT P.C.
PacWest Center
1211 SW Fifth Avenue, Suite 1900
Portland, OR  97204
Phone: (503) 222-9981
Fax:     (503) 796-2900
E-mail: wohle@schwabe.com
             jgelineau@schwabe.com

Kelly M. Walsh (OSB 993897)
SCHWABE, WILLIAMSON & WYATT PC
700 Washington Street Suite 701
Vancouver, WA  98660
Phone: (360) 694-7551
Fax:     (360) 693-5574
E-mail: kwalsh@schwabe.com

Respectfully submitted,

/s Samuel B. Gedge
Samuel B. Gedge (VA Bar No. 80387)*
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, VA  22203
Phone: (703) 682-9320
Fax:     (703) 682-9321
E-mail: sgedge@ij.org

Wesley Hottot (WA Bar No. 47539)*
Institute for Justice
10500 NE 8th Street, Suite 1760
Bellevue, WA  98004
Phone: (425) 646-9300
Fax:     (425) 990 6500
E-mail: whottot@ij.org

*Attorneys for Plaintiff*

† Designated local counsel

* Admitted *pro hac vice*

William J. Ohle (OSB 913866)†
SCHWABE, WILLIAMSON & WYATT P.C.
PacWest Center
1211 SW Fifth Avenue, Suite 1900
Portland, OR  97204
Phone:   (503) 222-9981
E-mail:   wohle@schwabe.com

Samuel B. Gedge (VA Bar No. 80387)*
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, VA  22203
Phone:   (703) 682-9320
E-mail:   sgedge@ij.org

*Attorneys for Plaintiff*

†    Designated local counsel
*    Admitted *pro hac vice*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| MATS JÄRLSTRÖM, | Case No.: 3:17-cv-00652-SB |
| Plaintiff, | |
| v. | **MEMORANDUM IN SUPPORT OF PLAINTIFF JÄRLSTRÖM'S MOTION FOR PRELIMINARY INJUNCTION** |
| CHRISTOPHER D. ALDRIDGE, WILLIAM J. BOYD, DAREN L. CONE, SHELLY MC DUQUETTE, JASON J. KENT, LOGAN T. MILES, RON SINGH, DAVE M. VAN DYKE, SEAN W. ST. CLAIR, AMIN WAHAB, and OSCAR J. ZUNIGA JR., in their official capacities as members of the Oregon State Board of Examiners for Engineering and Land Surveying, | **REQUEST FOR ORAL ARGUMENT** |
| Defendants. | |

## <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

TABLE OF AUTHORITIES ............................................................................. iv

CERTIFICATE OF COMPLIANCE ................................................................ x

INTRODUCTION ........................................................................................... 1

BACKGROUND ............................................................................................. 3

     A.    Plaintiff Mats Järlström discusses traffic lights with policymakers, government officials, and the media ........................................ 3

     B.    The Board conducts a two-year investigation of Järlström for talking about traffic lights ........................................................... 6

     C.    The Board fines Järlström $500. ................................................... 7

     D.    The threat of future enforcement deters Järlström from speaking ............ 11

ARGUMENT ................................................................................................. 12

   I.    Plaintiff Is Likely to Prevail on the Merits ......................................... 13

     A.    The Speech Clause of the First Amendment protects Järlström's right to talk about traffic lights .......................................... 13

          1.    Oregon's prohibition on "engineering" speech is content-based and therefore subject to strict scrutiny ........................................... 14

          2.    Oregon's prohibition on "engineering" speech violates the Speech Clause under any level of scrutiny ........................... 19

     B.    Under the Speech Clause of the First Amendment, Järlström has the right to call himself an "engineer" .......................................... 23

          1.    Outlawing truthful use of the title "engineer" is content-based and therefore subject to strict scrutiny ........................................... 24

          2.    Oregon's restriction on the use of the word "engineer" violates the Speech Clause under any level of scrutiny ........................... 27

     C.    Oregon's speech restrictions also violate the Petition Clause as applied to speech directed at government officials ........................... 32

**PAGE**

II.      The Remaining Criteria for a Preliminary Injunction Have Been Satisfied ..........32

III.     The Bond Requirement Should Be Waived...........................................................34

CONCLUSION......................................................................................................................35

CERTIFICATE OF SERVICE ............................................................................................36

## <u>TABLE OF AUTHORITIES</u>

<span style="float:right;">P<small>AGE(S)</small></span>

<u>C<small>ASES</small></u>

*Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury*,
    686 F.3d 965 (9th Cir. 2012) ........................................................................... 17

*Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*,
    564 U.S. 721 (2011) ........................................................................................ 27

*Associated Press v. Otter*,
    682 F.3d 821 (9th Cir. 2012) ........................................................................... 33

*Bates v. State Bar of Ariz.*,
    433 U.S. 350 (1977) ........................................................................................ 23

*BE & K Constr. Co. v. NLRB*,
    536 U.S. 516 (2002) ........................................................................................ 32

*Bible Club v. Placentia-Yorba Linda Sch. Dist.*,
    573 F. Supp. 2d 1291 (C.D. Cal. 2008) ......................................................... 34

*Borough of Duryea  v. Guarnieri*,
    564 U.S. 379 (2011) ........................................................................................ 32

*Conant v. Walters*,
    309 F.3d 629 (9th Cir. 2002) ........................................................................... 23

*Conant v. McCaffrey*,
    No. 97-cv-139, 2000 WL 1281174 (N.D. Cal. Sept. 7, 2000),
    *aff'd* 309 F.3d 629 (9th Cir. 2002) ................................................................. 23

*Doe v. Harris*,
    772 F.3d 563 (9th Cir. 2014) ................................................................. 12, 32, 33

*Edwards v. Staton*,
    No. 14-cv-531, 2015 WL 350635 (D. Or. Jan. 26, 2015) .................................. 6

*Elizondo v. City of Junction City*,
    No. 15-cv-1853, 2016 WL 659082 (D. Or. Feb. 16, 2016),
    *aff'd*, No. 16-35129, --- F. App'x ----, 2016 WL 6092405 (9th Cir. Oct. 19, 2016) .......... 6

**PAGE(S)**

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010)......................................................................................16, 17, 18, 19

*Iowa State Bd. of Eng'g Examiners v. Elec. Eng'g Co.*,
    154 N.W.2d 737 (Iowa 1967) ...........................................................................29

*Johnson v. Couturier*,
    572 F.3d 1067 (9th Cir. 2009) ..........................................................................34

*King v. Governor, N.J.*,
    767 F.3d 216, 228 (3d Cir. 2014)......................................................................18

*Melendres v. Arpaio*,
    695 F.3d 990 (9th Cir. 2012) ............................................................................33

*McCullen v. Coakley*,
    134 S. Ct. 2518 (2014)......................................................................................15

*Nat'l Ass'n for Advancement of Psychoanalysis v. Cal. Bd. of Psychology*,
    228 F.3d 1043 (9th Cir. 2000) ..........................................................................22

*N.M. Bd. of Licensure for Prof'l Eng'rs and Prof'l Surveyors v. Turner*,
    303 P.3d 875 (N.M. App. 2013) .................................................................21, 23

*N.Y. Times Co. v. Sullivan*,
    376 U.S. 254 (1964)..........................................................................................27

*Ocheesee Creamery LLC v. Putnam*,
    851 F.3d 1228 (11th Cir. 2017) ...................................................................25, 31

*Peel v. Attorney Registration & Disciplinary Comm'n of Ill.*,
    496 U.S. 91 (1990)............................................................................................31

*Pickup v. Brown*,
    740 F.3d 1208 (9th Cir. 2013) ..........................................................................18

*Reed v. Town of Gilbert*,
    135 S. Ct. 2218 (2015)..........................................................................14, 15, 19

*Rosemond v. Markham*,
    135 F. Supp. 3d 574 (E.D. Ky. 2015) ....................................................16, 19, 30

PAGE(S)

*Save Our Sonoran, Inc. v. Flowers*,
    408 F.3d 1113 (9th Cir. 2005) ...................................................................................34

*Serafine v. Branaman*,
    810 F.3d 354 (5th Cir. 2016) ...................................................................16, 28, 29, 30

*Smith v. California*,
    336 F.2d 530 (9th Cir. 1964) ...................................................................................31

*Snyder v. Phelps*,
    562 U.S. 443 (2011)................................................................................................31

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011)................................................................................................21

*Topaz v. Or. State Bd. of Exam'rs for Eng'g & Land Surveying*,
    297 P.3d 498 (Or. Ct. App. 2013).......................................................................26, 28

*Thomas v. Collins*,
    323 U.S. 516 (1945).......................................................................................19, 22, 28

*Turner Broad. Sys. v. F.C.C.*,
    512 U.S. 622 (1994).............................................................................................20, 27

*United States v. Alvarez*,
    132 S. Ct. 2537 (2012).............................................................19, 20, 25, 26, 27, 28

*United States v. Playboy Entm't Grp.*,
    529 U.S. 803 (2000)................................................................................................18

*United States v. Swisher*,
    811 F.3d 299 (9th Cir. 2016) ...................................................................................20

*Valle Del Sol Inc. v. Whiting*,
    709 F.3d 808 (9th Cir. 2013) ...................................................................................31

*Whitney v. California*,
    274 U.S. 357 (1927)................................................................................................23

*Widmar v. Vincent*,
    454 U.S. 263 (1981)................................................................................................28

*Wollschlaeger v. Governor, Fla*,
    848 F.3d 1293 (11th Cir. 2017) ...............................................................................18

**PAGE(S)**

*Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio,*
    471 U.S. 626 (1985)..............................................................................................31

**STATUTORY AND REGULATORY PROVISIONS**

18 U.S.C. § 2339A(b)(3)............................................................................................17

18 U.S.C. § 2339B(b)(1)............................................................................................17

Fed. R. Civ. P. 65(c) ..................................................................................................34

Or. Rev. Stat. §§ 672.002, *et seq.* ..............................................................................1

Or. Rev. Stat. § 161.615.............................................................................................14

Or. Rev. Stat. § 161.635.............................................................................................14

Or. Rev. Stat. § 672.002(2).........................................................................................24

Or. Rev. Stat. § 672.005(1)(a)........................................................................8, 13, 14, 15

Or. Rev. Stat. § 672.005(1)(b)...........................................................8, 13, 14, 15, 16, 18

Or. Rev. Stat. § 672.007(1).........................................................................................14

Or. Rev. Stat. § 672.007(1)(b).....................................................................................25

Or. Rev. Stat. § 672.007(1)(c)....................................................................8, 10, 15, 25

Or. Rev. Stat. § 672.020(1).............................................10, 13, 14, 15, 20, 23, 25, 31

Or. Rev. Stat. § 672.045(1)...............................................................................13, 14, 15

Or. Rev. Stat. § 672.045(2)................................................................................10, 25

Or. Rev. Stat. § 672.098.............................................................................................14

Or. Rev. Stat. § 672.325.............................................................................................14

Or. Rev. Stat. § 672.991.............................................................................................14

**PAGE(S)**

Or. Admin. R. 820-010-0730(3) ...............................................................10, 13, 14, 15

Or. Admin. R. 820-010-0730(3)(a) ...........................................................................25

Or. Admin. R. 820-010-0730(3)(c) .............................................................................7

Or. Admin. R. 820-010-1000 .....................................................................................14

Or. Admin. R. 820-010-1020 .....................................................................................14

Or. Admin. R. 820-040-0030 ..........................................................................13, 14, 15

**OTHER AUTHORITIES**

Nat'l Council of Exam'rs for Eng'g & Surveying, *FE exam*,
    http://ncees.org/engineering/fe/ .........................................................................14

Nat'l Council of Exam'rs for Eng'g & Surveying, *NCEES engineering exam registration –*
    *Oregon*,
    http://ncees.org/engineering/#oregon .................................................................14

Or. Op. Att'y Gen. OP-5904, 1985 WL 200039 (1985) ..............................................8

Or. Op. Att'y Gen. OP-5483, 1983 WL 165673 (1983) ............................................25

Or. State Bd. of Exam'rs for Eng'g & Land Surveying, *Fees*,
    http://www.oregon.gov/OSBEELS/pages/fees.aspx) ..........................................14

Anthony Ramirez, *William LeMessurier, 81, Structural Engineer, Dies*,
    N.Y. Times, June 21, 2007 ..................................................................................21

Paul M. Spinden, *The Enigma of Engineering's Industrial Exemption to Licensure: The*
    *Exception That Swallowed a Profession*,
    83 UMKC L. Rev. 637 (2015) .....................................................................2, 24, 25

Christopher K. Walker, Note, *Red-Light Cameras: How States Jeopardize Safety by*
    *Manipulating Yellow-Light Intervals to Earn A Quick Buck*,
    7 J. Legal Tech. Risk Mgmt. 222 (2014) .............................................................22

Webster's II New College Dictionary (3d ed. 2005) ..................................................24

Webster's New World Dictionary (4th ed. 2003) ......................................................24

**PAGE(S)**

Webster's New World Telecom Dictionary (2008)........................................................24

Caroline Whitbeck, *Ethics in Engineering Practice and Research* (2d ed. 2011) ......................20

YourDictionary.com,
　　http://www.yourdictionary.com/engineer ...........................................................24

U.S. Dep't of Labor, Bureau of Labor Statistics, *Occupational Employment and Wages, May 2016: 53-4011 Locomotive Engineers*,
　　https://goo.gl/qP4Yn4 ...........................................................................24

## CERTIFICATE OF COMPLIANCE

This brief complies with the applicable word-count limitation under LR 7-2(b), 26-3(b), 54-1(c), or 54-3(e) because it contains 10,946 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

/s Samuel B. Gedge
Samuel B. Gedge (VA Bar No. 80387)*
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, VA  22203
Phone: (703) 682-9320
Fax:    (703) 682-9321
E-mail: sgedge@ij.org

* Admitted *pro hac vice*

## INTRODUCTION

The fairness of traffic lights and red-light cameras has long been a subject of nationwide discussion.  Plaintiff Mats Järlström would like to be a part of that debate; he wants to speak and write publicly about the math behind traffic-light timing.  If he does so in his home state of Oregon, however, he will be exposed to investigations, civil penalties, and even criminal prosecution.  This is not hypothetical.  Between February 2015 and January 2017, the Oregon State Board of Examiners for Engineering and Land Surveying (Board) investigated and punished Järlström for "critiquing" the standard formula used to calculate traffic-light timing and for communicating those ideas to "members of the public"—local and national media outlets, policymakers, and the Board itself.  Talking publicly about the math behind traffic lights, the Board ruled, amounted to the unlicensed "practice of engineering," which is illegal under Oregon's Professional Engineer Registration Act, Or. Rev. Stat. §§ 672.002, *et seq.*

For this extraordinary law, Oregon has offered an extraordinary justification: According to the Board, speech about technical topics is "clearly not protected speech."  Gedge Decl. ¶ 3 & Ex. 1, at 17.  Yet nothing could be further from the truth.  The First Amendment guarantees that Americans are free to debate anything, including issues related to "engineering."  Whatever interests Oregon may have in regulating the electrical wiring for a school or the plumbing system for a courthouse, the government has no legitimate interest in restricting who can *talk* about electricity or who can *critique* plumbing principles.  No matter how complex the subject, the government cannot restrict the free exchange of ideas to a small set of people whom the government deems experts.

Oregon's Professional Engineer Registration Act also violates the First Amendment by prohibiting the use of the title "engineer" by anyone other than state-licensed professional engineers.  In common usage, the word "engineer" can signify any number of jobs, credentials,

accomplishments, or skills—for example, car-engine designers, software developers, engineering professors, locomotive drivers—none of which require licensure as a professional engineer.  In fact, "an overwhelming majority of engineers—somewhere around eighty percent—do not pursue licensing as a professional engineer."  Paul M. Spinden, *The Enigma of Engineering's Industrial Exemption to Licensure: The Exception That Swallowed a Profession*, 83 UMKC L. Rev. 637, 638-39 (2015) (footnotes omitted).  Yet within Oregon's borders, it is unlawful for any of these people to call themselves an "engineer."  The word is reserved for licensed professional engineers alone, and the penalties for misusing the word include up to $1,000 in civil penalties, up to $6,250 in criminal fines, and up to one year in jail.

Mats Järlström learned all this the hard way.  To the average English-speaker, Järlström is an "engineer" by education, training, and experience.  He earned the equivalent of an American Bachelor of Science in electrical engineering, in Sweden, and he has decades of experience in technical engineering fields—from serving as an airplane-camera mechanic in the Swedish Air Force to helping design audio products in Portland.  Like most people, however, Järlström is not an Oregon-licensed professional engineer.  Thus, when he truthfully described himself as an engineer in e-mails to media outlets—and even in communications with the Board itself—the Board warned him that his word choice was illegal.  Järlström Decl. ¶ 24 & Ex. 11, at ¶¶ 4, 7, 15, 17; *see also id.* ¶ 16 & Ex. 2, at 1 ("[S]top any further references until you become registered with the Board.").  But the government cannot police the dictionary.  Quite the opposite; laws declaring certain words off-limits are presumptively unconstitutional.

Moreover, Oregon's enforcement history shows exactly why such content-based laws are suspect.  In recent years, the Board has launched investigations based on speech in voter guides, court testimony, comments at a public council meeting, a retiree's complaint letter, even the

"Oregon Woman 2015" edition of *Portland Monthly*.  And as of today, May 17, the Board has spent 342 days investigating whether a gubernatorial candidate misused the word "engineer" *in a political ad*.

The First Amendment exists to prevent precisely this sort of censorship.  This Court should grant a preliminary injunction to ensure that Plaintiff Järlström can truthfully use the word "engineer" to describe himself and that he can engage fully in the debate over traffic lights (or any other engineering topic) without fear of additional punishment.

## BACKGROUND

### A.    Plaintiff Mats Järlström discusses traffic lights with policymakers, government officials, and the media.

In May 2013, Mats Järlström's wife drove her Volkswagen through the intersection of Allen Boulevard and Lombard Avenue in Beaverton, Oregon.  In due course, she received a red-light-camera ticket in the mail.  Järlström Decl. ¶ 9.  That sparked her husband's fascination with traffic-light timing.  *Id.*

Mats Järlström is a Swedish-born and -educated electronics engineer.  *Id.* ¶ 2.  He has the equivalent of an American Bachelor of Science in electrical engineering.  *Id.* ¶ 3.  After serving as an airplane-camera mechanic in the Swedish Air Force, he worked in research and development for Luxor Electronics, before moving to the United States in 1992.  *Id.*  Järlström holds a Green Card and has lived in Oregon for decades.  *Id.* ¶¶ 4, 31.   In the early 1990s, he headed the electronics department at Triad Speakers, in Portland, where he helped design a new line of products, including satellite speakers and powered subwoofers for audio and home-theater use.  *Id.* ¶ 5. He is now self-employed, testing audio products and repairing, upgrading, and calibrating test instruments.  *Id.* ¶ 7.

Since 2013, Järlström has devoted his spare time to studying traffic-light timing. *Id.* ¶¶ 9-10. In his view, the leading mathematical formula for calculating the proper length of yellow lights (dating back to 1959) is incomplete. *Id.* ¶¶ 10-11. Put simply, although the standard formula accounts for drivers who respond to a yellow light by stopping or by continuing straight through the intersection, it does not account for the extra time it takes for drivers who slow down to make a turn at the intersection. *Id.* ¶ 11. Applying basic mathematical and physics principles, Järlström has developed a modified formula for calculating the timing of yellow lights, which is based on the 1959 model but also factors in the time needed for vehicles to decelerate and clear an intersection when they turn. *Id.* ¶ 12.

As a private citizen, Järlström has no power to alter traffic lights anywhere, just as he has no power to uproot stop signs or repaint pavement markings. What he has done, rather, is express his views on traffic lights publicly, and he has received generally positive responses. For example, he has corresponded with Dr. Alexei Maradudin, one of the developers of the original 1959 formula. *Id.* ¶ 13. A local news station has aired several pieces about his theories. *Id.* Last summer, he even presented his findings in Los Angeles, at the annual meeting of the Institute of Transportation Engineers. *Id.* ¶ 14 & Ex. 1.

Järlström also shared his ideas with the Oregon State Board of Examiners for Engineering and Land Surveying (Board). In the first of several e-mails the agency would later rule unlawful, Järlström sent a message to the Board's general e-mail account in September 2014. He told the Board that, in his view, the city engineers in his home-town of Beaverton had miscalculated the timing for the local traffic lights. *Id.* ¶ 16 & Ex. 2, at 2. He wrote, "I would like to have your support and help to investigate and present the laws of physics related to

transportation engineering in the State of Oregon," and he offered to present his new theories to the Board "for your review and comments."  *Id.*

A Board investigator responded two days later.  He told Järlström that the Board has no authority over traffic lights but *does* have authority over professional-engineering laws, and that Järlström was breaking those laws by his "use of the title 'electronics engineer' and the statement 'I'm an engineer.'"  *Id.* ¶ 16 & Ex. 2, at 1.  Because Järlström is not an Oregon-licensed professional engineer, the investigator warned him to "stop any further references until you become registered with the Board."  *Id.*

Over the following months, Järlström continued to publicize his ideas on traffic-light timing.  In January 2015, for example, he sent an e-mail to several people—including Dr. Maradudin, the *60 Minutes* news program, and a representative of the National Council of Examiners for Engineering and Surveying.  *Id.* ¶ 17 & Ex. 3.  This e-mail described Järlström's new formula and why he believed it would improve the timing of yellow lights.  *Id.*  Järlström sent the same e-mail to the Board investigator with whom he had corresponded.  *Id.*  The investigator did not reply.  *Id.* ¶ 17.

Later that month, Järlström sent an e-mail to representatives of Portland's KOIN 6 news.  Järlström introduced himself as "a Swedish engineer living in Beaverton."  *Id.* ¶ 18 & Ex. 4, at 1.  He explained that he had "developed an improved traffic light change interval timing formula" and included a document detailing his formula.  *Id.*  Järlström again forwarded his e-mail to the Board investigator.  In a cover message, he explained that "[y]ou might enjoy seeing this too" and stated "I'm an excellent **engineer** . . . ."  *Id.* ¶ 18 & Ex. 5, at 1 (emphasis in original).  Again, the investigator did not respond.  *Id.* ¶ 18.

Two months after that, in March, Järlström e-mailed the Sheriff of Washington County. He wrote, "I have researched the yellow light timing issues for almost two years now and I have actually invented and publicly released a new extended solution to the original problem with the amber signal light in traffic flow which was first solved in 1959." *Id.* ¶ 19 & Ex. 6, at 1. He included a chart illustrating that the majority of red-light-camera tickets issued by the City of Beaverton capture drivers turning right on red; this, in Järlström's view, demonstrated that "the yellow lights are too short for a vehicle making a safe right hand turn." *Id.* Järlström forwarded this e-mail to, among others, the Board's general e-mail address. *Id.* ¶ 19 & Ex. 7, at 1. No one from the Board responded. *Id.* ¶ 19.

### B. The Board conducts a two-year investigation of Järlström for talking about traffic lights.

On February 12, 2015, the Board's Law Enforcement Committee voted to open an investigation of Järlström. Gedge Decl. ¶ 4 & Ex. 2, at 20.[1] Järlström was notified of the investigation nearly two months later. Järlström Decl. ¶ 20 & Ex. 8, at 1. He was told that "the allegations are that you . . . continued to use the title 'engineer' in your communications with Board staff and, of more concern, are the documents you provided that indicate you may have engaged in unlicensed engineering work in Oregon." *Id.* He was invited to prepare a written response, "to provide the Board with information from your perspective." *Id.*

Järlström replied that he had previously sought to clarify the law's application to him but had received no response from the Board at that time. *Id.* ¶ 21 & Ex. 9, at 1. He further stated

---

[1] The Board's meeting minutes, publications, and Facebook posts cited in this memorandum and attached to the Gedge Declaration are self-authenticating under Fed. R. Evid. 902(5), and the agency order attached as Exhibit 1 to the Gedge Declaration is self-authenticating under Fed. R. Evid. 902(1). Alternatively, all these materials are subject to judicial notice, and Plaintiff Järlström requests that the Court take judicial notice of them under Fed. R. Evid. 201(b)(2) and (c)(2). *See Elizondo v. City of Junction City*, No. 15-cv-1853, 2016 WL 659082, at *2 n.1 (D. Or. Feb. 16, 2016), *aff'd*, 669 F. App'x 855 (9th Cir. 2016); *Edwards v. Staton*, No. 14-cv-531, 2015 WL 350635, at *2 (D. Or. Jan. 26, 2015).

that, based on his view of Oregon law, "you should understand *why* I am exempt from needing to be a licensed Professional Engineer, PE in the State of Oregon and *why* I can call myself an 'Engineer.'" *Id.* ¶ 21 & Ex. 9, at 1 (emphasis in original).  In another response, sent a few days later, Järlström reiterated his concerns, and included as exhibits prior e-mail correspondence with the Board.   One of those exhibits contained some of his writings about traffic lights.  *Id.* ¶ 22 & Ex. 10.

After acknowledging having received Järlström's responses, the Board did not contact him again for more than one year.  *Id.* ¶ 23.

### C.    The Board fines Järlström $500.

In August 2016—18 months after voting to investigate Järlström—the Board's Law Enforcement Committee voted to assess him a $500 penalty.  Gedge Decl. ¶ 5 & Ex. 3, at 4-5. Two and a half months after that, Järlström received the agency's penalty notice, which, for the first time, explained how his e-mails were unlawful.  Järlström Decl. ¶ 24 & Ex. 11.  By sending e-mails talking about his traffic-light theories, the Board announced, Järlström had violated two separate statutory prohibitions on several occasions, both by talking about engineering-related subjects and by stating (or, in some instances, merely implying) that he was an "engineer."

*First*, talking about traffic lights amounted to the unlicensed practice of engineering, a violation of Or. Rev. Stat. §§ 672.020(1) and 672.045(1) and Or. Admin. R. 820-010-0730(3)(c). Under section 672.020(1), "no person shall practice or offer to practice engineering in this state unless the person is registered and has a valid certificate to practice engineering issued" by the Board.  Section 672.045(1) likewise prohibits anyone from "[e]ngag[ing] in the practice of engineering . . . without having a valid certificate or permit to so practice issued" by the Board. "A person is practicing or offering to practice engineering if the person . . . [p]urports to be able to perform, or who does perform, any service or work that is defined by ORS 672.005 as the

practice of engineering." Or. Rev. Stat. § 672.007(1)(c). And "practice of engineering" covers "any professional services or creative work requiring engineering education, training and experience." *Id.* § 672.005(1)(a). "Practice of engineering" also includes "[a]pplying special knowledge of the mathematical, physical and engineering sciences to such professional services or creative work as [1] consultation, [2] investigation, [3] testimony, [4] evaluation, [5] planning, [6] design and [7] services during construction, manufacture or fabrication for the purpose of ensuring compliance with specifications and design, in connection with any public or private utilities, structures, buildings, machines, equipment, processes, works or projects." *Id.* § 672.005(1)(b).[2]

As the Oregon Attorney General's Office has concluded, Section 672.005(1) embodies "a broad definition which may have a particular meaning to those persons trained and knowledgable in engineering but may be unclear to anyone else." Or. Op. Att'y Gen. OP-5904, 1985 WL 200039, at *1 (1985). Applying the law in Järlström's case, the Board ruled that he engaged in the unlicensed "practice of engineering" when he sent five different e-mails:

1. Järlström's first e-mail to the Board, in which he explained that he was researching traffic-light timing and expressed general concerns with this issue in Oregon. Järlström Decl. ¶ 24 & Ex. 11, at ¶¶ 2, 13.

2. Järlström's January 13, 2015 e-mail to *60 Minutes*, the National Council of Examiners for Engineering and Surveying, Dr. Maradudin, and the Board itself. *Id.* ¶ 24 & Ex. 11, at ¶¶ 3, 12. The Board reasoned that "[b]y reviewing, critiquing, and altering an engineered ITE [Institute of Transportation Engineers] formula" and then sending his "critique and

---

[2] The Board has held that the phrase "during construction, manufacture or fabrication for the purpose of ensuring compliance with specifications and design" modifies only "services," the immediately preceding word. Gedge Decl. ¶ 3 & Ex. 1, at 7.

calculations . . . to members of the public," Järlström applied "special knowledge of the mathematical, physical, and engineering sciences to such creative work as investigation, evaluation, and design in connection with public equipment, processes and works." *Id.* ¶ 24 & Ex. 11, at ¶ 14.  The Board also stated that "[b]y doing so through the use of algorithms for the operation of traffic control systems, and through the use of the science of analysis, review, and application of traffic data systems to advise members of the public on the treatment of the functional characteristics of traffic signal timing, Jarlstrom engaged, specifically, in traffic engineering under OAR 820-040-0030(1)(b) and (2)(a)." *Id.*

3.  Järlström's January 15, 2015 e-mail to KOIN 6, the local news station.  *Id.* ¶ 24 & Ex. 11, at ¶¶ 4, 15.  The Board similarly reasoned that "[b]y again providing the public with his traffic engineering calculations for the modification of Beaverton's traffic signal timing, Jarlstrom again engaged in the practice of engineering and, specifically, the practice of traffic engineering."  *Id.* ¶ 24 & Ex. 11, at ¶ 15.

4.  Järlström's March 6, 2015 e-mail expressing his concerns to the Sheriff of Washington County.  *Id.* ¶ 24 & Ex. 11, at ¶¶ 5, 16.  This e-mail spoke in general terms about why Järlström thinks the current system for administering traffic lights suffers from legal and mathematical flaws.  *Id.*; *see also id.* ¶ 19 & Ex. 6.  But because the e-mail noted that Järlström had "publicly released" theories on traffic lights, the Board ruled that sending the e-mail was "the practice of engineering."  *Id.* ¶ 24 & Ex. 11, at ¶ 16.

5.  Järlström's response to the Board's notice of investigation, which included, as an exhibit, e-mail correspondence with the Board in which Järlström sought to understand how the engineering statute might apply to him.  *Id.* ¶ 24 & Ex. 11, at ¶¶ 7, 17.  Because two of

those e-mails had also included some of Järlström's writings about traffic lights, the Board ruled that including them with his response again amounted to the unlicensed practice of engineering. *Id.* ¶ 24 & Ex. 11, at ¶ 17.

*Second*, the Board noted that Järlström had separately violated Oregon's title law. Under this law, only Oregon-licensed professional engineers may publicly describe themselves using the word "engineer." Or. Rev. Stat. §§ 672.007(1)(c), 672.020(1), 672.045(2); Or. Admin. R. 820-010-0730(3). The Board stated that Järlström broke this law four times:

1. Because his original e-mail to the Board indicated that he was studying traffic-light issues, he "purported to be able to perform engineering services or work and represented that he was authorized to perform engineering work." Järlström Decl. ¶ 24 & Ex. 11, at ¶¶ 2, 13. Thus, he violated the title law without ever using the word "engineer."

2. Järlström broke the law a second time when he introduced himself to KOIN 6 by saying "I'm a Swedish engineer" and when he sent the Board an e-mail calling himself "an excellent **engineer**." *Id.* ¶ 18 & Ex. 5, at 1. "By asserting to a public body in correspondence that he is an ('excellent') engineer, and asserting to the public media in correspondence that he is a ('Swedish') engineer," the Board stated, "Jarlstrom held himself out as, and implied that he is, an engineer." *Id.* ¶ 24 & Ex. 11, at ¶¶ 4, 15.

3. E-mailing the Washington County Sheriff amounted to a third violation. Even though Järlström did not use the word "engineer," the Board stated that he "again purported to be authorized to engage in . . . the practice of engineering" because he talked with confidence about traffic lights. *Id.* ¶ 24 & Ex. 11, at ¶¶ 5, 16.

4. Lastly, Järlström violated the title law a final time by telling the Board why he thought the title law did not apply to him. *Id.* ¶ 24 & Ex. 11, at ¶¶ 7, 17.

All told, the Board listed nine separate violations of the Professional Engineer Registration Act.  While the notice advised Järlström that the agency intended to assess a total penalty of $500, it also made clear that "the Agency may impose a maximum civil penalty of $1,000 per violation against Jarlstrom without amending its notice."  *Id.* ¶ 24 & Ex. 11, at ¶ 22. That meant Järlström could potentially be subject to thousands of dollars in penalties without warning.  He paid the $500.  *Id.* ¶ 25.  After nearly another two months, the Board closed its investigation.  *Id.* ¶ 26 & Ex. 12.  Case No. 2929—*In the Matter of MATS JARLSTROM*—had remained open for 1 year, 10 months, and 29 days.

### D.    The threat of future enforcement deters Järlström from speaking.

Järlström wishes to resume discussing his ideas about traffic-light timing with the academic and scientific communities, policymakers, government officials, and the public at large, in and around Portland, in Oregon more broadly, and nationwide.  *See id.* ¶ 27.  He also wants to continue truthfully calling himself an "engineer" in a range of settings.  *Id.* ¶ 29.  For example, Järlström is working on a paper about his traffic-light theories and wishes to publish his findings in academic and trade journals and in other forums; in doing so, he would naturally identify himself as an "engineer."  *Id.* ¶¶ 15, 29.

The threat of sanctions under Oregon's Professional Engineer Registration Act prevents Järlström from speaking in these ways.  Because communicating his ideas and referring to himself as an engineer will expose him to further enforcement under Oregon law, Järlström cannot speak freely without fear of punishment.  *Id.* ¶¶ 28, 30.  As a result, he has refrained from sharing his ideas with policymakers, media outlets, and the public in Oregon.  *See id.*  He is also refraining from publishing a paper detailing his theories.  *Id.*  And he has stopped referring to himself as an "engineer."  *See id.* ¶¶ 29-30.  In short, Oregon's engineering laws have silenced

him, and for that reason, a preliminary injunction should be entered protecting his right to speak out while he brings this lawsuit to vindicate his First Amendment rights.

## ARGUMENT

A preliminary injunction is necessary.  Plaintiff Järlström has much to say about the fairness and accuracy of traffic lights—an issue of ongoing public debate—but the threat of government punishment is preventing him from sharing his ideas.  Likewise, calling himself an "engineer" is an important part of Järlström's professional and personal identity.  Yet the State of Oregon has outlawed his accurate use of that word.

Järlström meets all the requirements for a preliminary injunction.  *See Doe v. Harris*, 772 F.3d 563, 570 (9th Cir. 2014).  Foremost, he is likely to prevail on the merits (Section I, below). Oregon's engineering-practice law amounts to a content-based ban on his right to speak and to petition the government (Sections I.A & C, below).  Under the First Amendment, the government may silence Järlström in this way only if it proves that its restrictions on speech are narrowly tailored to serve a compelling state interest.  Here, the Board cannot possibly meet this burden, or any other level of First Amendment review.

Oregon's title law likewise imposes an unconstitutional ban on Järlström's speech (Sections I.B & C, below).  As past enforcement against Järlström shows, the title law controls his word choice in communications with media outlets, policymakers, and the general public.  In fact, the Board appears to enforce this law almost *exclusively* against speakers engaged in core First Amendment activity.  The government has no legitimate interest in dictating what words are allowed or forbidden—particularly where, as here, the Board is outlawing speech that is objectively true and punishing it as though it were fraud.  Put simply, the First Amendment fully protects Järlström's right to use the word "engineer" in describing his education, background,

and skills.  As with his challenge to the engineering-practice law, Järlström is likely to prevail on the merits of his challenge to the title law.

The overwhelming constitutional interest in free speech and petitioning is dispositive of the remaining preliminary-injunction factors (Section II, below), and the Court should waive the bond requirement or set the bond at the nominal amount of $1 (Section III, below).

I.    **Plaintiff Is Likely to Prevail on the Merits.**

    A.    **The Speech Clause of the First Amendment protects Järlström's right to talk about traffic lights.**

The First Amendment protects every word Järlström has written and said about traffic lights.  Oregon law, however, has declared the entire topic of engineering off-limits for almost everyone in the state.  Communicating about "algorithms,"  "critique[s]," "calculations," or other views relating to traffic-light timing amounts to the "practice of engineering," which Oregon reserves for state-licensed professional engineers alone.  Järlström Decl. ¶ 24 & Ex. 11, at ¶¶ 14, 17; Or. Rev. Stat. §§ 672.007(1), 672.020(1), 672.045(1); Or. Admin. R. 820-010-0730(3); *see generally* Or. Rev. Stat. § 672.005(1)(a)-(b) (defining "practice of engineering"); Or. Admin. R. 820-040-0030 (defining "traffic engineering").

To speak lawfully about his ideas on traffic lights, therefore, Järlström first must become an Oregon-licensed professional engineer.  That would entail (1) passing a six-hour "Fundamentals of Engineering" examination ($225); (2) passing an eight-hour branch-specific "Principles and Practice of Engineering" examination ($350); (3) submitting an application to the Board, along with $360 and five references (three of whom must be registered professional engineers); and (4) demonstrating "a Board approved combination of education and experience," which generally entails between four and twelve years of work under a registered professional

engineer.[3]  Unless Järlström complies with these licensing requirements, every single time he talks about traffic lights he will be exposed to protracted government investigations, $1,000 in civil penalties, $6,250 in *criminal* fines, and up to one year in jail.  Or. Rev. Stat. §§ 672.325, 672.991, 161.615, 161.635.

This regulatory regime violates the First Amendment.  Järlström wishes to speak about a matter of public import and nationwide significance; to do so effectively, he must convey his ideas to organizations, government officials, and the public at large.  The State of Oregon cannot require Järlström to become a licensed professional engineer before exercising his core First Amendment rights in this way.  As applied to him, Or. Rev. Stat. §§ 672.005(1)(a)-(b), 672.007(1), 672.020(1), and 672.045(1) and Or. Admin. Rs. 820-010-0730(3) and 820-040-0030 are content-based restrictions on speech, which trigger strict scrutiny.  Because the laws do not survive strict scrutiny (or any other First Amendment standard), the Board should be enjoined from enforcing them against Järlström.

> ### 1.    *Oregon's prohibition on "engineering" speech is content-based and therefore subject to strict scrutiny.*

Laws that restrict speech based on its content are presumptively unconstitutional, and Oregon's engineering-practice law is just such a law because whether it applies to Järlström "depend[s] entirely on the communicative content" of his speech.  *See Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015).  Under the law, Järlström can send e-mails, publish articles, and speak publicly about virtually any topic imaginable—unless his speech communicates "special knowledge of the mathematical, physical and engineering sciences" relating to "any public or

---

[3] Or. Rev. Stat. § 672.098; Or. Admin. Rs. 820-010-1000, -1020 (detailing additional degree requirements); Nat'l Council of Exam'rs for Eng'g & Surveying, *FE exam*, http://ncees.org/engineering/fe/; Nat'l Council of Exam'rs for Eng'g & Surveying, *NCEES engineering exam registration – Oregon*, http://ncees.org/engineering/#oregon; Or. State Bd. of Exam'rs for Eng'g & Land Surveying, *Fees*, http://www.oregon.gov/OSBEELS/pages/fees.aspx.

private utilities, structures, buildings, machines, equipment, processes, works or projects."  Or. Rev. Stat. § 672.005(1)(b); *see also id.* § 672.005(1)(a) (defining "practice of engineering," even more broadly, to include "[p]erforming any . . . creative work requiring engineering education, training and experience."); Or. Admin. R. 820-040-0030.  Thus, if Järlström talks with others about why he thinks yellow traffic lights are unreasonably short, he will be liable for "[p]urport[ing] to be able to perform" or "perform[ing]" "work that is defined . . . as the practice of engineering."  *See* Or. Rev. Stat. § 672.007(1)(c); *see also id.* §§ 672.020(1), 672.045(1); Or. Admin. R. 820-010-0730(3).

A law that applies in this way is content based.  "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed."  *Reed*, 135 S. Ct. at 2227.  And a sure sign of content-based regulation is when a law "require[s] 'enforcement authorities' to 'examine the content of the message that is conveyed to determine whether' a violation has occurred."  *McCullen v. Coakley*, 134 S. Ct. 2518, 2531 (2014) (citation omitted).  Here, statutory text, backed by enforcement history, demonstrates that Oregon's engineering-practice law draws "obvious" content-based distinctions.  *See Reed*, 135 S. Ct. at 2227.  The engineering-practice law requires the Board to undertake a granular content-based examination to determine whether speech is regulated. Järlström's speech, for example, triggered regulation under the law because the Board determined that the content of his e-mails included "algorithms," "critique[s]," "calculations," and, more broadly, "'special knowledge of the mathematical, physical and engineering sciences.'"  Järlström Decl. ¶ 24 & Ex. 11, at ¶¶ 3, 14, 17 (quoting Or. Rev. Stat. § 672.005(1)(b)).  In another case, the Board ruled that an activist's public testimony and statements opposing a power plant broke the law because he "made assertions as to the

engineering analysis faults of a licensed acoustical engineer's report" and "made several arguments as to the inaccuracy" of a noise study.  Gedge Decl. ¶ 3 & Ex. 1, at 5.  Those are textbook content-based determinations.

In this way, Oregon's law is similar to a Kentucky law that was ruled unconstitutional less than two years ago.  In *Rosemond v. Markham*, 135 F. Supp. 3d 574 (E.D. Ky. 2015), the Kentucky Board of Examiners of Psychology claimed that a law regulating the unauthorized practice of psychology could restrict the speech of a nationally syndicated advice columnist who wrote about behavioral issues.  The court held that application of the law unconstitutional.  Even though the law was part of a licensing scheme, the court ruled, that did not change the fact that "the Board sought to silence [the columnist] because of the content of his speech."  *Id.* at 581.  "Only because [the columnist] provided individualized advice was he subject to the Board's action," and "[t]his is, by definition, content-based."  *Id.*; *cf. Serafine v. Branaman*, 810 F.3d 354, 369-70 (5th Cir. 2016) (holding Texas psychologist-licensing statute unconstitutional where it "limit[ed] the ability of individuals to dispense personal advice about mental or emotional problems based on knowledge gleaned in a graduate class in practically any context").  Likewise here, Oregon's engineering-practice law applies to Järlström because of his speech's content.  Like the Kentucky law, Oregon's statute "is content-based, and only constitutional if it survives strict scrutiny."  *Rosemond*, 135 F. Supp. 3d at 585.

It is no answer to assert—as the Board has declared elsewhere—that "reports, commentary, and testimony" about technical topics "are clearly not protected speech" but are merely "conduct."  Gedge Decl. ¶ 3 & Ex. 1, at 17.  In fact, the Supreme Court has rejected that argument unequivocally, most recently in *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010).  In *Holder*, U.S. citizens and domestic organizations wished to provide individualized

training and advice to designated terrorist groups, but doing so would have violated a federal statute that forbids giving terrorist groups "material support," including "training" and "expert advice." 18 U.S.C. §§ 2339A(b)(3), 2339B(b)(1). Like the Board, the federal government defended the statute on the theory that it governed only conduct, not speech. 561 U.S. at 26-27.

The Supreme Court emphatically and unanimously rejected that argument. *See id.* at 28 (majority opinion); *id.* at 42, 45 (Breyer, J., dissenting). The plaintiffs "want to speak," the Court reasoned, "and whether they may do so under § 2339B depends on what they say." *Id.* at 27. If their speech imparted a "specific skill" or conveyed advice derived from "specialized knowledge"—training on international law, for example—then it would be barred. *Id.* By contrast, if their speech conveyed "general or unspecialized knowledge," it would be lawful. *Id.* In other words, the only "conduct" at issue consisted of communicating a message containing particular content. For that reason, the Court applied the "demanding" scrutiny reserved for content-based restrictions on speech. *See id.* at 28; *Al Haramain Islamic Found., Inc. v. U.S. Dep't of the Treasury*, 686 F.3d 965, 996 (9th Cir. 2012) ("The Court [in *Holder*] held that strict scrutiny applied because, at least on the facts of that case, the statute regulated speech because of its content.").

The same reasoning applies here. Järlström wishes to send e-mails, circulate writings, and speak publicly about traffic-light timing. And just as the plaintiffs in *Holder* were barred from communicating about "specialized knowledge," Järlström cannot speak freely about "special knowledge" involving "mathematical, physical and engineering sciences." Or. Rev. Stat. § 672.005(1)(b). If his message conveys "analysis and critique of an engineered traffic signal formula"—or even talks about "algorithms" or "the science of analysis, review, and application of traffic data systems"—he will be exposed to government punishment. Järlström

Decl. ¶ 24 & Ex. 11, at ¶¶ 14, 17.  That is precisely the sort of content-based restriction *Holder* singled out for strict scrutiny.  And strict scrutiny applies even though Oregon's ban arises from a licensing code.  As the law applies to Järlström, it regulates a speaker who is "constitutionally equivalent to soapbox orators and pamphleteers" and whose "speech receives robust protection under the First Amendment."  *See Pickup v. Brown*, 740 F.3d 1208, 1227, 1228 (9th Cir. 2013).[4] Thus, however the law might apply elsewhere, as applied to Järlström "the conduct triggering coverage under the statute consists of communicating a message."  *See Holder*, 561 U.S. at 28.

In fact, the Board has admitted as much.  In a similar case, the agency freely acknowledged that Oregon's engineering-practice law targets the persuasive impact a speaker's words might have on listeners.  In voting to fine an activist $1,000 for presenting testimony at a public meeting, the Board announced that "[m]aking public statements about a major public works project without licensure has the potential to allow for significant impact to the welfare of the residents . . . ."  *See* Gedge Decl. ¶ 6 & Ex. 4, at 4.  Here, too, the Board's regulation of Järlström's speech necessarily "focuses *only* on the content of the speech and the direct impact that speech has on its listeners."  *United States v. Playboy Entm't Grp.*, 529 U.S. 803, 811 (2000) (citation omitted).  In this way, Oregon's engineering-practice law is no different from the Kentucky psychology law in *Rosemond*, which placed content-based restrictions on behavioral

---

[4] The panel in *Pickup* contrasted "communication in the public sphere," like Järlström's, with speech occurring "within the confines of a professional relationship."  740 F.3d at 1228, 1230. This second category of speech, the court said, enjoys "somewhat diminished" First Amendment protection, with certain speech-related medical services enjoying weaker protections still.  *Id.* at 1228, 1229.  In minimizing the First Amendment dimensions of "professional" speech, these aspects of *Pickup* are in tension with the Supreme Court's *Holder* decision, and they have been questioned by courts of appeals in two other Circuits.  *Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1309 (11th Cir. 2017) (en banc); *King v. Governor, N.J.*, 767 F.3d 216, 228, 235 (3d Cir. 2014); *see also Pickup*, 740 F.3d at 1215-16 (O'Scannlain, J., dissenting from denial of rehearing en banc).  As applied to Järlström, Oregon's engineering-practice law bans even the "public dialogue" that *Pickup* reaffirmed "lies at the core of First Amendment values," *Pickup*, 740 F.3d at 1227.

advice.  135 F. Supp. 3d at 581.  It is also no different from the Texas law struck down in *Serafine*, which placed content-based restrictions on personal counseling.  810 F.3d at 369-70.  And it is no different from the federal law in *Holder*, which placed content-based restrictions on conveying "specialized knowledge."  *See* 561 U.S. at 27.  As applied to Järlström, the law amounts to a "prohibition of public discussion of an entire topic."  *Reed*, 135 S. Ct. at 2230 (citation omitted).  That is a content-based restraint and thus triggers strict scrutiny.

> **2.    *Oregon's prohibition on "engineering" speech violates the Speech Clause under any level of scrutiny.***

Because Järlström's speech is fully protected by the First Amendment, Oregon's restrictions face a presumption of unconstitutionality, which the government can rebut only with evidence demonstrating both a compelling interest and narrow tailoring.  *See id.* at 2226.  Under strict scrutiny—or any other First Amendment standard—the government cannot carry its burden, meaning that Järlström's Speech Clause claim is likely to prevail.

*First*, Oregon has no interest, compelling or otherwise, in regulating Järlström's speech about traffic lights.  Whether Järlström's ideas are sound or flawed, "it cannot be the duty, because it is not the right, of the state to protect the public against false doctrine."  *Thomas v. Collins*, 323 U.S. 516, 545 (1945) (Jackson, J., concurring); *see also United States v. Alvarez*, 132 S. Ct. 2537, 2547-48 (2012) (plurality opinion).  Järlström wishes to communicate ideas about matters of public note with willing listeners.  Järlström Decl. ¶ 27.  He also wishes to convey those ideas to policymakers and to government officials.  *Id.*  These peaceful exercises of core freedoms under the Speech and Petition Clauses are not subject to government licensure; they are a foundational part of our free society.

*Second*, whatever governmental interests might support engineering regulations in other contexts, applying the engineering-practice law to Järlström's speech is not tailored to those interests under strict scrutiny or any other standard of constitutional review.  By its terms, Oregon's Professional Engineer Registration Act requires licensure "[i]n order to safeguard life, health and property."  Or. Rev. Stat. § 672.020(1).  But Oregon cannot regulate Järlström's speech simply by claiming that those interests are "important in the abstract."  *See Turner Broad. Sys. v. F.C.C.*, 512 U.S. 622, 664 (1994) (plurality opinion).  Under strict scrutiny, "[t]he First Amendment requires that the Government's chosen restriction on the speech at issue be 'actually necessary' to achieve its interest."  *Alvarez*, 132 S. Ct. at 2549.  And even if Oregon's engineering-practice law were content-neutral, rather than content-based, the government still would need to "demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way."  *Turner Broad. Sys.*, 512 U.S. at 664; *see generally United States v. Swisher*, 811 F.3d 299, 311-12 (9th Cir. 2016) (en banc) (discussing difference between standards of scrutiny applicable to content-based and content-neutral laws).

Oregon can meet neither standard here, because censoring speech like Järlström's is not even arguably tailored to "safeguard[ing] life, health and property."  *See* Or. Rev. Stat. § 672.020(1).  Even if those interests might justify regulating the city employee tasked with setting traffic-light times, they are not served by regulating everyone who expresses *views* on traffic-light times.  If anything, the opposite is true.  To give one canonical example, a design flaw in Citigroup Center—one of New York's tallest skyscrapers—was spotted not by the building's renowned structural engineer, but by an undergraduate writing her senior thesis.  *See* Caroline Whitbeck, *Ethics in Engineering Practice and Research*, 129-31 (2d ed. 2011); *see also*

Anthony Ramirez, *William LeMessurier, 81, Structural Engineer, Dies*, N.Y. Times, June 21, 2007 ("Mr. LeMessurier was first alerted to the problem by someone he regarded as a nettlesome engineering student . . . .").

      The lesson is plain: The government's legitimate interest in regulating *engineering* is not advanced by outlawing *debate* about engineering. Quite the opposite; public safety is only undermined when the government stifles debate about engineering topics. This broader principle applies with full force to Järlström's speech. No matter how much he talks, Järlström will not change the timing of a single traffic light. Nor will he jeopardize the "life, health and property" of a single person. The most he might achieve is to persuade someone that his ideas have merit. Perhaps he will convince people in power to change the way traffic lights are timed. But the fact that Järlström might convince someone he is right is not a reason to censor his speech; it is a reason to protect it. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 576 (2011) ("[T]he fear that speech might persuade provides no lawful basis for quieting it.").

      Recently, the New Mexico Court of Appeals held exactly that, in a case involving a similarly expansive engineering law. In *New Mexico Board of Licensure for Professional Engineers and Professional Surveyors v. Turner*, 303 P.3d 875 (N.M. App. 2013), New Mexico's engineering board fined a local official for presenting a report on irrigation ditches at a district meeting. The appeals court reversed. "Plainly," the court held, "life, health, property, and the public's welfare were not jeopardized in the least by [the speaker's] discussion of this engineering issue . . . in a public forum." *Id.* at 881. For that reason, the law violated the First Amendment as applied to him. "[I]t punishes [the speaker] for participating in public discourse about technical aspects of engineering matters," the court reasoned. *Id.* And "[a]t its worst," the law "results in a targeted topical elimination of [the speaker's] right to freedom of speech." *Id.*

The New Mexico court was right to speak in such forceful terms.  Whatever governmental interests may be served by engineering laws in other circumstances, those interests cannot translate into a general warrant to censor speech.  Justice Jackson, for example, took for granted that even if a state bar might "forbid one without its license to practice law as a vocation," it "could not stop an unlicensed person from making a speech about the rights of man or the rights of labor."  *Thomas*, 323 U.S. at 544 (Jackson, J., concurring), *quoted in Nat'l Ass'n for Advancement of Psychoanalysis v. Cal. Bd. of Psychology*, 228 F.3d 1043, 1055 (9th Cir. 2000).  Similarly, even if "the state may prohibit the pursuit of medicine as an occupation without its license," it would be obviously unconstitutional to "make it a crime publicly or privately to speak urging persons to follow or reject any school of medical thought."  *Id.*

Oregon's engineering-practice law brings to life just such an outlandish scenario.  Järlström faced a two-year investigation, fines, and potential criminal charges for "critiquing" how traffic lights on public thoroughfares are timed—a topic that has fueled nationwide debate.  *See generally* Christopher K. Walker, Note, *Red-Light Cameras: How States Jeopardize Safety by Manipulating Yellow-Light Intervals to Earn A Quick Buck*, 7 J. Legal Tech. Risk Mgmt. 222 (2014).  Another speaker in Oregon was investigated for four years, and fined $1,000, because he submitted comments at a city-council meeting explaining why he thought a power plant would be too loud for nearby residents.  Gedge Decl. ¶ 3 & Ex. 1, at 3-5, 18.  In a counterpoint to the lesson of New York's Citigroup Center, one Board member has even said that a passerby who publicly voices "calculations and conclusions" about whether a construction site is safe would be courting sanctions in Oregon.  *Id.* ¶ 7 & Ex. 5, at 12 ("[T]hat person was not examined or tested by the Board, so their qualifications are unknown.").

This type of debate about public issues is at the very heart of the First Amendment; "[i]n the marketplace of ideas, few questions are more deserving of free-speech protection than whether regulations affecting health and welfare are sound public policy." *Conant v. Walters*, 309 F.3d 629, 634 (9th Cir. 2002) (quoting *Conant v. McCaffrey*, No. 97-cv-139, 2000 WL 1281174, at *14 (N.D. Cal. Sept. 7, 2000)). Left unregulated, Järlström's speech will not endanger "life, health and property," Or. Rev. Stat. § 672.020(1), and censoring his speech is not narrowly (or even closely) tailored to those interests. As the New Mexico court reasoned in *Turner*, the government simply "has no proprietary interest in the words and concepts of the general field of engineering when professional work is not afoot." 303 P.3d at 881. Yet Oregon's Professional Engineer Registration Act vests the Board with just such a state monopoly on ideas. Far from being tailored to a sufficient state interest, a law that applies in this way violates the First Amendment at a foundational level. If speech like Järlström's conveys flawed thinking, "the remedy to be applied is more speech, not enforced silence." *Whitney v. California*, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring). For "[t]he choice between the dangers of suppressing information and the dangers arising from its free flow" is "precisely the choice 'that the First Amendment makes for us.'" *Bates v. State Bar of Ariz.*, 433 U.S. 350, 365 (1977). Under any level of First Amendment review, Järlström is likely to prevail in his claim that Oregon's engineering-practice law is unconstitutional.

**B.    Under the Speech Clause of the First Amendment, Järlström has the right to call himself an "engineer."**

Oregon's regulation of the word "engineer" is equally content-based. The title law prohibits Järlström from referring to himself as an "engineer" in speech directed to policymakers, the media, and the public at large. In effect, the state has claimed the word "engineer" as its own, redefined it, and now punishes anyone who deviates from the state's idiosyncratic

definition.  As above, this law imposes a content-based ban on speech that fails strict scrutiny
and any other level of First Amendment review.

###### 1. *Outlawing truthful use of the title "engineer" is content-based and therefore subject to strict scrutiny.*

To most English-speakers, the noun "engineer" might signify many things.  The Board,
for instance, has celebrated the official state animal, the beaver, as "one of Oregon's most
admirable engineers of intelligence, industry, and ingenuity."  Gedge Decl. ¶ 8 & Ex. 6.  For
humans, the word can connote any number of jobs, skills, credentials, or accomplishments.  The
word can signify that someone earned a degree in engineering.  It can signify that they are
"trained or professionally engaged in a branch of engineering."  Webster's II New College
Dictionary 381 (3d ed. 2005).  Or that they "operate[] or supervise[] the operation of engines or
technical equipment."  Webster's New World Dictionary 217 (4th ed. 2003).  Or that they are "a
specialist in planning and directing operations in some technical field."  YourDictionary.com,
http://www.yourdictionary.com/engineer.  Or that they are otherwise "skilled in the science of
putting scientific knowledge to practical use, specifically in the design, planning, construction, or
maintenance of manufactured things."  Webster's New World Telecom Dictionary 169 (2008).
Or that they operate a train.  *See* U.S. Dep't of Labor, Bureau of Labor Statistics, *Occupational
Employment and Wages, May 2016: 53-4011 Locomotive Engineers*, https://goo.gl/qP4Yn4.

Within Oregon's borders, however, people can refer to themselves as "engineers" *only* if
they are Oregon-licensed professional engineers.  By law, the state has decreed that "engineer"
means this and nothing else.  Or. Rev. Stat. § 672.002(2) ("'Engineer,' 'professional engineer' or
'registered professional engineer' means an individual who is registered in this state and holds a
valid certificate to practice engineering in this state . . . .").  So even though "an overwhelming
majority of engineers—somewhere around eighty percent—do not pursue licensing as a

professional engineer," Spinden, *supra* p. 2, at 638-39, the word is off-limits to all those people in Oregon.  If anyone other than a licensed professional engineer describes themselves publicly using the word "engineer," they are liable for "[p]urport[ing] to be able to perform . . . the practice of engineering," Or. Rev. Stat. § 672.007(1)(c), for unlawfully "impl[ying] that the person is an engineer or a registered professional engineer," *id.* § 672.007(1)(b), and for "[f]alsely represent[ing] . . . that the person is authorized to practice engineering," *id.* § 672.045(2); *see also id.* § 672.020(1).  On pain of civil and criminal sanctions, "using a title which implies that a person is an 'engineer' rather than a registered professional engineer nonetheless constitutes the 'practice of engineering,' which is prohibited without registration." Or. Op. Att'y Gen. OP-5483, 1983 WL 165673 (1983); *see also* Or. Admin. R. 820-010-0730(3)(a) ("Unless registered as a professional engineer in Oregon, no persons may . . . [h]old themselves out as an 'engineer' . . . .").

These provisions impose a content-based ban on speech; "[i]ndividuals who do not hold registration in Oregon cannot use any variation" of the word "engineer" to describe themselves. *See* Gedge Decl. ¶ 9 & Ex. 7.  Put differently, Oregon's lawmakers have redefined a word in common usage—engineer—then declared it illegal and false for anyone to use that word except in the government-approved manner.  But, as the Eleventh Circuit recently held in a similar case involving government redefinition of common terms, that is "self-evidently circular."  *Ocheesee Creamery LLC v. Putnam*, 851 F.3d 1228, 1238 (11th Cir. 2017).  It is also presumptively unconstitutional, for "[a]s a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Alvarez*, 132 S. Ct. at 2543 (citation omitted).

Nor is Oregon's title law confined to "the few categories of expression where content-based regulation is permissible." *See id.*; *see also id.* at 2544 (identifying defamation and fraud as among these categories of historically unprotected speech); *id.* at 2555 (Breyer, J., concurring in the judgment) ("[I]n virtually all these instances limitations of context, requirements of proof of injury, and the like, narrow the statute to a subset of lies where specific harm is more likely to occur."). Rather, Oregon's law restricts—and is regularly deployed against—fully protected First Amendment activity. Järlström, for instance, was investigated because he called himself an engineer in e-mails to the media and to the Board itself. Järlström Decl. ¶ 24 & Ex. 11, at ¶¶ 4, 15. Even trying to explain to the Board "why I can call myself an 'Engineer'" was deemed unlawful. *Id.* ¶ 24 & Ex. 11, at ¶¶ 7, 17.

And Järlström's experience is not unique. The Board's enforcement history illustrates vividly "the substantial and expansive threats to free expression posed by [these] content-based restrictions." *See Alvarez*, 132 S. Ct. at 2544. In recent years, the Board fined a retiree $350 for calling himself a "PE" in a letter complaining about water damage to his home. *Topaz v. Or. Bd. of Exam'rs for Eng'g & Land Surveying*, 297 P.3d 498, 500 (Or. Ct. App. 2013) (affirming). It fined another retiree $500 for stating in court testimony that "he has been a mechanical engineer for over 40 years . . . , without stating that his registration was in retirement status." Gedge Decl. ¶ 10 & Ex. 8, at 10. It investigated a professor "for use of the PE title" in "a series of research papers," in "public presentations," and on personal and university webpages. *Id.* ¶ 11 & Ex. 9, at 16-17; *Id.* ¶ 12 & Ex. 10, at 1-2. It investigated an entrepreneur based on an article referring to her as an engineer in the "Oregon Woman 2015" edition of *Portland Monthly*. *See id.* ¶ 13 & Ex. 11, at 8. It has launched investigations—twice—based on references to "engineers" in county voter guides. *Id.* ¶ 4 & Ex. 2, at 14-15; *Id.* ¶ 14 & Ex. 12, at 11. And currently, it is in its

eleventh month of investigating whether a candidate in last year's Republican gubernatorial primary misused the word *in a political ad*. *Id.* ¶ 11 & Ex. 9, at 18-19; *id.* ¶ 15 & Ex. 13, at 4.

History thus confirms what the law makes clear: Oregon's title law is a content-based ban on uses of the word "engineer," and it restricts all manner of speech that is fully protected by the First Amendment. As with any other content-based law, it is subject to strict scrutiny.

### 2. Oregon's restriction on the use of the word "engineer" violates the Speech Clause under any level of scrutiny.

Like the engineering-practice law, the title law fails strict scrutiny and any other level of First Amendment review. Oregon cannot meet its burden of "prov[ing] that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011) (citation omitted). Nor could it meet its burden under intermediate scrutiny even if that lower standard were available. *See Turner Broad. Sys.*, 512 U.S. at 664. That is because Oregon has no legitimate interest in regulating the truth or falsity of speech like Järlström's. And the title law is not even arguably tailored to the government's interest in consumer protection, since it bans speech that is both noncommercial and objectively true.

*First*, the government has no freestanding interest in policing the truth or falsity of speech. To the contrary, First Amendment precedent has "consistently refused to recognize an exception for any test of truth." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 271 (1964). As the Supreme Court explained more recently, to vest the government with an "interest in truthful discourse alone" would be to validate "a broad censorial power unprecedented in this Court's cases or in our constitutional tradition." *Alvarez*, 132 S. Ct. at 2547-48. Thus, in *Alvarez*, the Court invalidated a federal statute, the Stolen Valor Act, that made it a crime to lie about having received the Congressional Medal of Honor. The statute sought "to control and suppress all false

statements on this one subject in almost limitless times and settings," and it did so "entirely without regard to whether the lie was made for the purpose of material gain." *Id.* at 2547. Were the law to be upheld, the plurality reasoned, "there could be an endless list of subjects the National Government or the States could single out." *Id.*; *see also id.* at 2553 (Breyer, J., concurring in the judgment).

Oregon's title law breaks with the First Amendment at an even more fundamental level. Like the Stolen Valor Act, it covers speech "made to any person, at any time, in any context," and it purports to "target[] falsity and nothing more." *See id.* at 2545, 2546. But Oregon's law goes a step further, since it does more than just single out the "bald-faced lie." *Serafine*, 810 F.3d at 362. It takes speech that is *not* in fact false, *decrees* it false, and then punishes speakers who—wittingly or unwittingly—use the word "engineer" in a way that deviates from the government's favored meaning. *See Topaz*, 297 P.3d at 503 (holding that the title law has "no *mens rea* requirement").

Far from reflecting a compelling (or even legitimate) governmental interest, the title law thus inverts the "special constitutional solicitude" that First Amendment rights enjoy. *Widmar v. Vincent*, 454 U.S. 263, 276 (1981). The Framers "did not trust any government to separate the true from the false for us," *Thomas*, 323 U.S. at 545 (Jackson, J., concurring), and Oregon proves that mistrust to have been well-placed. In ordinary parlance, Järlström *is* an engineer: He has the equivalent of an American B.S. in electrical engineering; he served as an airplane-camera mechanic in the Swedish Air Force; he worked in research and development for Luxor Electronics; and he worked for Triad Speakers, in Portland, where he helped design professional and consumer products. Järlström Decl. ¶¶ 3, 5. But despite all this, if Järlström describes

himself as an "engineer," the State of Oregon will declare him a liar and punish him based on the state's idiosyncratic definition of the word.

Moreover, Järlström's situation reflects a broader problem: Many other speakers who have faced similar investigations are "engineers" under any reasonable understanding of that word.  Since 2014, for example, the Board has conducted title investigations against:

- A candidate for Portland City Commission who holds a B.S. in Environmental and Civil Engineering from Cornell University, an M.S. from the MIT School of Civil Engineering, and membership in the American Society of Civil Engineers.  Gedge Decl. ¶ 4 & Ex. 2, at 14-15.

- A candidate for city councilperson who holds undergraduate and graduate degrees in mechanical engineering, is licensed as a professional engineer in California, and spent 21 years in the U.S. Navy working with and managing engineers.  *See id.* ¶ 14 & Ex. 12, at 11.

- A gubernatorial candidate who holds a B.S. in Mechanical Engineering from Purdue University, former engineering jobs with Ford and Boeing, and a string of awards, including "Outstanding Mechanical Engineer" from his alma mater.  *Id.* ¶ 11 & Ex. 9, at 18-19; *see also id.* ¶ 16 & Ex. 14.

To any reasonable English-speaker, these accomplished professionals are all "engineers," and the government has no legitimate interest in preventing them from using that word to describe themselves.  *See, e.g.*, *Iowa State Bd. of Eng'g Exam'rs v. Elec. Eng'g Co.*, 154 N.W.2d 737, 740 (Iowa 1967) ("It must be conceded that 'engineer' and 'professional engineer' are not synonymous.  The use of one does not necessarily imply the other.").  Regardless of the setting in which people like Järlström wish to speak, the First Amendment fully protects their right to describe their educational and professional backgrounds using the word "engineer."

Recent authority bears this out.  Last year, for example, the Fifth Circuit held that the Texas State Board of Examiners of Psychologists could not enforce its title law against a political candidate who called herself a psychologist on her campaign website.  *Serafine*, 810 F.3d at 358-62.  The candidate had been a professor in the psychology departments at Yale and

Vassar and was a member of the American Psychological Association. *Id.* at 358. She was not, however, a Texas-licensed psychologist, which is why the state board "ordered her to cease using the title 'psychologist' on her campaign website (or in any other context)." *Id.* That violated the First Amendment. In the Fifth Circuit's words, the plaintiff in *Serafine* "was seeking votes, not clients," and the government's "power to restrict the use of titles in the commercial context" was entirely "inapplicable" to speech outside that limited sphere. *See id.* at 361.

Similarly, in *Rosemond*, the federal court in Kentucky held that the state's Board of Examiners for Psychology could not bar a newspaper columnist from using the word "psychologist" in a way the Board disfavored. *See* 135 F. Supp. 3d at 585-86, 587-89. "Even if . . . [the columnist] is potentially misleading readers by holding himself out as a psychologist," the court stated, "he retains the First Amendment right to make those statements in a non-commercial setting." *Id.* at 586. Here too, Järlström "retains the First Amendment right" to call himself an engineer. The State of Oregon's bare disagreement with his word usage is not a governmental interest justifying censorship.

*Second*, Oregon's title law is not tailored (narrowly or otherwise) to any other governmental interests. As already discussed, Oregon's licensing regime exists "to safeguard life, health and property." Or. Rev. Stat. § 672.020(1); *see* pp. 19-23, above. But the title law is not tailored to those consumer-protection interests because—as the Board's enforcement practices show—the law applies to speech where there are no consumers in need of protecting. When applied to speech like Järlström's (or to political ads, newspaper articles, voter guides, and the like), the First Amendment burden on the government is at its highest, while Oregon's means-end fit is at its weakest. *See Serafine*, 810 F.3d at 361.

Even in the context of commercial speech—speech, that is, "which does 'no more than propose a commercial transaction'"—the outright ban embodied in Oregon's title law is not tailored to the state's consumer-protection interests. *See Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 818 (9th Cir. 2013). Although commercial speech is held to enjoy "a lesser degree" of First Amendment protection than "core" speech, *id.*, the government still cannot "completely ban statements that are not actually or inherently misleading." *See Peel v. Attorney Registration & Disciplinary Comm'n of Ill.*, 496 U.S. 91, 110 (1990) (plurality opinion). And even though Oregon may of course "propose a definition for a given term" in a statute, "it does not follow that once a state has done so, any use of the term inconsistent with the state's preferred definition is inherently misleading" and subject to punishment. *See Ocheesee Creamery LLC*, 851 F.3d at 1238 (invalidating law that prohibited producers of skim milk from truthfully advertising their product as "skim milk"). That is doubly true of speech like Järlström's, which is *not* commercial speech and which "occupies the highest rung of the hierarchy of First Amendment values." *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (citation omitted). Just as the government cannot claim a monopoly on engineering principles, it cannot claim a monopoly on the word "engineer." Because Oregon's title law does just that, Järlström is likely to prevail on his claim that the law violates the Speech Clause of the First Amendment.[5]

---

[5] In 1964, the Ninth Circuit upheld the constitutionality of a California engineering-title law. *Smith v. California*, 336 F.2d 530 (9th Cir. 1964). That decision does not bear on this case for two reasons. First, the court viewed the California law as a restriction on commercial speech, *see id.* at 532, 534, for which the Supreme Court did not recognize First Amendment protection until more than a decade later. *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 629 (1985). Second, as the Board's enforcement history shows, Oregon's title law is not limited to commercial speech but extends to all manner of political advocacy, petitioning, and other noncommercial discourse.

**C.      Oregon's speech restrictions also violate the Petition Clause as applied to speech directed at government officials.**

Järlström wishes to communicate his ideas to government officials as well as private listeners.  *Compare* Compl. ¶¶ 103-14 (Claim 1) & *id.* ¶¶ 126-36 (Claim 3), *with id.* ¶¶ 115-25 (Claim 2), *and* ¶¶ 137-46 (Claim 4).  As applied to that speech, Oregon's engineering-practice law and title law violate his rights under the Petition Clause, as well as under the Speech Clause.  Although the Speech Clause and the Petition Clause are not "identical in their mandate or their purpose," they nonetheless "share substantial common ground" and secure "cognate rights."  *See Borough of Duryea v. Guarnieri*, 564 U.S. 379, 388 (2011).  Like the right to speak, the right to petition government officials is "one of the 'most precious of the liberties safeguarded by the bill of rights.'"  *BE & K Constr. Co. v. NLRB*, 536 U.S. 516, 524 (2002) (citation omitted).  Thus, for the reasons discussed in Sections I.A and I.B, above, the Petition Clause prohibits the Board from punishing Järlström for his communications with government officials.  Similarly, the Board cannot constitutionally prevent Järlström from describing himself as an "engineer" in those communications.

**II.      The Remaining Criteria for a Preliminary Injunction Have Been Satisfied.**

Järlström's likelihood of success on the merits is largely dispositive for the remaining preliminary-injunction factors.

*First*, Järlström will suffer irreparable injury without this Court's intervention.  "[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," and even "a 'colorable First Amendment claim' is 'irreparable injury sufficient to merit the grant of relief.'"  *Doe*, 772 F.3d at 583 (citation omitted).  That is especially true here.  Järlström would like to immediately begin disseminating his writings concerning traffic-light timing.  Järlström Decl. ¶ 27.  Järlström also wants to resume

communicating publicly about his ideas more broadly, including in his home state of Oregon.  *Id.* He is prevented from doing so, however, by the prospect of a fresh round of prolonged investigations and sanctions at the hands of the Board.  *Id.* ¶¶ 28, 29.

Likewise, Järlström is currently refraining from referring to himself truthfully as an "engineer," a term that is a meaningful part of his professional and personal identity.  *Id.* ¶¶ 28-30.  He would like to resume using this term in any number of settings: for example, in connection with his public discourse about traffic lights.  *Id.*  But without injunctive relief, the Board's enforcement practices leave no doubt that "prosecution is a likely possibility."  *Doe*, 772 F.3d at 583 (citation omitted).  Because even the most innocuous use of the word "engineer" will expose Järlström to protracted investigations and penalties, he is forced to "self-censor rather than risk the perils of trial," an unjust and unconstitutional result.  *See id.*

*Second*, any harm to the government is outweighed by the ongoing infringement of Järlström's First Amendment rights.  For the reasons discussed above (at 19-23), none of the interests that might support the Board's enforcement power in other contexts is implicated by Järlström's speech.  In fact, an injunction would cause the government no harm at all, for the state has no legitimate interest in enforcing an unconstitutional law.

*Third*, the public interest strongly favors an injunction.  "[I]t is always in the public interest to prevent the violation of a party's constitutional rights," *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (citation omitted), and "[c]ourts considering requests for preliminary injunctions have consistently recognized the significant public interest in upholding First Amendment principles," *Associated Press v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012).

**III.    The Bond Requirement Should Be Waived.**

The rules require that a party requesting preliminary injunctive relief provide security sufficient to "pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).  But the Court has discretion to "dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (citation omitted).

The Court should waive the security requirement in this case.  There is no danger that the Board's members will suffer financial damage if they are restrained from enforcing the Professional Engineer Registration Act against Järlström, and the courts of this Circuit follow "long-standing precedent that requiring nominal bonds is perfectly proper in public interest litigation." *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005).  That is particularly true where a case raises constitutional issues. *Bible Club v. Placentia-Yorba Linda Sch. Dist.*, 573 F. Supp. 2d 1291, 1302 (C.D. Cal. 2008).  Järlström therefore respectfully requests that the Court waive the security requirement for the preliminary injunction in this case. In the alternative, Järlström asks that security be required in the nominal amount of $1.

## CONCLUSION

For the foregoing reasons, the motion for a preliminary injunction should be granted.

Dated: May 17, 2017.

Respectfully submitted,

/s Samuel B. Gedge

Samuel B. Gedge (VA Bar No. 80387)*
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, VA  22203
Phone: (703) 682-9320
Fax:    (703) 682-9321
E-mail: sgedge@ij.org

William J. Ohle (OSB 913866)†
Jill S. Gelineau (OSB 852088)
SCHWABE, WILLIAMSON & WYATT PC
PacWest Center
1211 SW Fifth Avenue, Suite 1900
Portland, OR  97204
Phone: (503) 222-9981
Fax:    (503) 796-2900
E-mail:  wohle@schwabe.com
         jgelineau@schwabe.com

Wesley Hottot (WA Bar No. 47539)*
INSTITUTE FOR JUSTICE
10500 NE 8th Street, Suite 1760
Bellevue, WA  98004
Phone: (425) 646-9300
Fax:    (425) 990 6500
E-mail: whottot@ij.org

Kelly M. Walsh (OSB 993897)
SCHWABE, WILLIAMSON & WYATT PC
700 Washington Street Suite 701
Vancouver, WA  98660
Phone: (360) 694-7551
Fax:    (360) 693-5574
E-mail: kwalsh@schwabe.com

*Attorneys for Plaintiff*

† Designated local counsel

* Admitted *pro hac vice*

## CERTIFICATE OF SERVICE

I certify that I have on May 17, 2017, served a true and correct copy of this Motion for

Preliminary Injunction and Memorandum in Support, along with all accompanying declarations

and exhibits, on the following counsel for all Defendants through the Court's CM/ECF filing

system:

      Christina Beatty-Walters
      OREGON DEPARTMENT OF JUSTICE
      100 SW Market St.
      Portland, OR  97201
      tina.beattywalters@doj.state.or.us

                         /s Samuel B. Gedge           
                         Samuel B. Gedge (VA Bar No. 80387)*
                         INSTITUTE FOR JUSTICE
                         901 North Glebe Road, Suite 900
                         Arlington, VA  22203
                         Phone: (703) 682-9320
                         Fax:    (703) 682-9321
                         E-mail: sgedge@ij.org

                         * Admitted *pro hac vice*