William J. Ohle (OSB 913866)†
Schwabe, Williamson & Wyatt P.C.
PacWest Center
1211 SW Fifth Avenue, Suite 1900
Portland, OR  97204
Phone:   (503) 222-9981
E-mail:   wohle@schwabe.com

Samuel B. Gedge (VA Bar No. 80387)*
Institute for Justice
901 North Glebe Road, Suite 900
Arlington, VA  22203
Phone:   (703) 682-9320
E-mail:   sgedge@ij.org

*Attorneys for Plaintiff*

†    Designated local counsel
*    Admitted *pro hac vice*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### PORTLAND DIVISION

| | |
|---|---|
| MATS JÄRLSTRÖM, | Case No.: 3:17-cv-00652-SB |
| Plaintiff, | |
| v. | |
| CHRISTOPHER D. ALDRIDGE, WILLIAM J. BOYD, DAREN L. CONE, SHELLY MC DUQUETTE, JASON J. KENT, LOGAN T. MILES, RON SINGH, DAVE M. VAN DYKE, SEAN W. ST. CLAIR, AMIN WAHAB, and OSCAR J. ZUNIGA JR., in their official capacities as members of the Oregon State Board of Examiners for Engineering and Land Surveying, | **PLAINTIFF JÄRLSTRÖM'S MOTION FOR SUMMARY JUDGMENT AND SUPPORTING MEMORANDUM**<br><br>**REQUEST FOR ORAL ARGUMENT** |
| Defendants. | |

## TABLE OF CONTENTS

PAGE

MOTION.................................................................................................................1

MEMORANDUM IN SUPPORT OF MOTION ..................................................2

INTRODUCTION ................................................................................................2

BACKGROUND ..................................................................................................4

      A.     Legal background....................................................................4

             1.     The engineering-practice law........................................4

             2.     The engineer-title law ..................................................5

      B.     Mats Järlström's experience ..................................................11

      C.     Procedural background ..........................................................14

ARGUMENT.......................................................................................................17

  I.     Oregon's engineering-practice law and engineer-title law violate the First
       Amendment on their face ...................................................17

      A.     The engineering-practice law is facially invalid.......................17

             1.     The practice law poses a serious danger to the First Amendment
                  rights of countless speakers .........................................19

             2.     There is no limiting construction of the practice law that would
                  make it constitutional.................................................23

      B.     The engineer-title law is facially invalid .................................26

             1.     The title law restricts people's use of the word "engineer" in
                  every context imaginable. .........................................26

             2.     The title law is an impermissible content-based restriction on
                  speech........................................................................28

             3.     There is no limiting construction of the title law that would
                  make it constitutional.................................................30

      C.     The need for facial relief is pressing.........................................................31

II.      The engineering-practice law and the engineer-title law violate the First
           Amendment as applied to the speech Mats Järlström wishes to engage in ..........34

CONCLUSION.............................................................................................................37

# TABLE OF AUTHORITIES

PAGE(S)

CASES

*44 Liquormart, Inc. v. Rhode Island,*
    517 U.S. 484 (1996) ........................................................................................ 29

*Ashcroft v. Free Speech Coal.,*
    535 U.S. 234 (2002) .................................................................................. 23, 34

*Bd. of Airport Comm'rs v. Jews for Jesus, Inc.,*
    482 U.S. 569 (1987) ..................................................................... 18, 20, 22, 23

*Buckley v. Valeo,*
    424 U.S. 1 (1976) (per curiam) ...................................................................... 35

*City Council of L.A. v. Taxpayers for Vincent,*
    466 U.S. 789 (1987) ........................................................................ 20, 22, 24, 32

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach,*
    657 F.3d 936 (9th Cir. 2011) (en banc) ......................................................... 29

*Gooding v. Wilson,*
    405 U.S. 518 (1972) ........................................................................................ 31

*Jews for Jesus, Inc. v. Port of Portland,*
    No. 3:04-cv-00695-HU, 2005 WL 1109698
    (D. Or. May 5, 2005), *aff'd*, 172 F. App'x 760 (9th Cir. 2006) ...................... 18

*Lind v. Grimmer,*
    30 F.3d 1115 (9th Cir. 1994) .......................................................................... 17

*N.M. Board of Licensure for Prof'l Eng'rs and Prof'l Surveyors v. Turner,*
    303 P.3d 875 (N.M. App. 2013) ..................................................................... 22

*Ocheesee Creamery LLC v. Putnam,*
    851 F.3d 1228 (11th Cir. 2017) ...................................................................... 29

*Powell's Books, Inc. v. Kroger,*
    622 F.3d 1202 (9th Cir. 2010) ........................................................ 18, 22, 25, 27, 28

*Reed v. Town of Gilbert,*
    135 S. Ct. 2218 (2015) .................................................................................... 28

PAGE(S)

*Topaz v. Or. Bd. of Exam'rs for Eng'g & Land Surveying*,
297 P.3d 498 (Or. Ct. App.), *rev. denied*, 303 P.3d 943 (Or. 2013) ........................... 27, 31

*United States v. Alvarez*,
567 U.S. 709 (2012) .................................................................................................. 28, 29

*United States v. Stevens*,
559 U.S. 460 (2010) .............................................................................................. 18, 22, 23

*Virginia v. Hicks*,
539 U.S. 113 (2003) .................................................................................................. 3, 21, 32

**STATUTES AND RULES**

Or. Rev. Stat. § 161.615 ................................................................................................... 5

Or. Rev. Stat. § 161.635 ................................................................................................... 5

Or. Rev. Stat. § 672.002(2) ............................................................................................. 6

Or. Rev. Stat. § 672.005(1)(a) .................................................................................... 4, 19

Or. Rev. Stat. § 672.005(1)(b) .................................................................................... 5, 19

Or. Rev. Stat. § 672.007(1) ......................................................................................... 6, 26

Or. Rev. Stat. § 672.007(1)(a) ........................................................................................ 26

Or. Rev. Stat. § 672.007(1)(b) ................................................................................... 26, 31

Or. Rev. Stat. § 672.007(1)(c) ........................................................................................ 26

Or. Rev. Stat. § 672.020(1) ...................................................................................... 5, 6, 26

Or. Rev. Stat. § 672.045(1) .............................................................................................. 5

Or. Rev. Stat. § 672.045(2) ......................................................................................... 6, 26

Or. Rev. Stat. § 672.060(5) ............................................................................................. 25

Or. Rev. Stat. § 672.098 .................................................................................................. 4

Or. Rev. Stat. § 672.325(1) .............................................................................................. 5

Or. Rev. Stat. § 672.991 .................................................................................................. 5

P**AGE**(**S**)

Or. Admin. R. 820-010-0730(3)(a) .......................................................................... 30

Or. Admin. R. 820-010-1000 ..................................................................................... 4

Or. Admin. R. 820-010-1020 ..................................................................................... 4

Or. Admin. R. 820-040-0030 ................................................................................... 19

**O**THER **A**UTHORITIES

Andrea Beaty, *Rosie Revere, Engineer* (2013) .......................................................... 29

Answer Br., *Topaz v. Or. Bd. of Exam'rs for Eng'g & Land Surveying*,
 2011 WL 8270852 (Or. Ct. App. Dec. 8, 2011) ............................................... 25

Alexis de Tocqueville, *Democracy in America* (J.P. Mayer ed.; George Lawrence, trans., 1969)
 .................................................................................................................... 23

Nat'l Council of Exam'rs for Eng'g & Surveying, *FE exam*, http://ncees.org/engineering/fe/ ..... 4

Nat'l Council of Exam'rs for Eng'g & Surveying, *NCEES engineering exam registration –
 Oregon*, http://ncees.org/engineering/#oregon ................................................... 4

Or. State Bd. of Exam'rs for Eng'g & Land Surveying, *OSBEELS Fees*,
 http://www.oregon.gov/OSBEELS/pages/fees.aspx............................................. 4

Paul M. Spinden, *The Enigma of Engineering's Industrial Exemption to Licensure: The
 Exception That Swallowed a Profession*, 83 UMKC L. Rev. 637 (2015) .................. 29-30

Rachel Ritchie, *Marcela Alcantar's Incredible Journey*, Portland Monthly (Mar. 2, 2015),
 https://bit.ly/2IByJPp .......................................................................................... 32

U.S. Dep't of Labor, Bureau of Labor Statistics, *Occupational Employment and Wages, May
 2017: 53-4011 Locomotive Engineers*, https://bit.ly/2s1Uxxw ......................................... 29

## CERTIFICATE OF COMPLIANCE

The Memorandum supporting Plaintiff's Motion for Summary Judgment complies with the applicable word-count limitation under LR 7-2(b), 26-3(b), 54-1(c), or 54-3(e) because it contains 11,000 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

/s Samuel B. Gedge
Samuel B. Gedge (VA Bar No. 80387)*
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, VA  22203
Phone: (703) 682-9320
Fax:     (703) 682-9321
E-mail: sgedge@ij.org

* Admitted *pro hac vice*

## MOTION

In accordance with Local Rule 7-1(a), counsel for Plaintiff conferred by telephone with Christina Beatty-Walters, counsel for the members of the Oregon State Board of Examiners for Engineering and Land Surveying, on May 25, 2018, in a good-faith attempt to resolve the issues presented by this motion. The parties could not resolve this dispute.

In accordance with Federal Rule of Civil Procedure 56, Plaintiff Järlström moves the Court for entry of summary judgment

1. declaring that Oregon's engineering-practice law—Or. Rev. Stat. §§ 672.005(1)(a)-(b), 672.007(1), 672.020(1), and 672.045(1) and Or. Admin. Rs. 820-010-0730(3) and 820-040-0030 —violates the First Amendment's Speech Clause on its face and violates the First Amendment's Speech and Petition Clauses as applied to Järlström;

2. declaring that the restriction on use of the title "engineer" in Oregon's engineer-title law—Or. Rev. Stat. §§ 672.002(2), 672.007(1), 672.020(1), and 672.045(2) and Or. Admin. R. 820-010-0730(3)—violates the First Amendment's Speech Clause on its face and violates the First Amendment's Speech and Petition Clauses as applied to Järlström; and

3. converting the preliminary injunction currently in force (ECF 34) into a permanent injunction.

This Motion for Summary Judgment is based on the Court's file and records in this action, the following memorandum of law, and the declarations with attached exhibits.

**MEMORANDUM IN SUPPORT OF MOTION**

**INTRODUCTION**

Oregon's Professional Engineer Registration Act abridges First Amendment rights to a breathtaking degree. Under the engineering-practice law, it is illegal to convey "special knowledge" about engineering—in other words, to voice opinions—without a Board-issued professional-engineer license. Under the engineer-title law, it is illegal for unlicensed people even to use the word "engineer" to describe themselves. The Court should invalidate both laws as facially unconstitutional and also grant as-applied relief.

As Mats Järlström's experience shows, both the practice law and the title law break with the First Amendment at a bedrock level. Järlström—a Swedish-born electronics engineer—is fascinated by the math behind traffic-light timing. He has developed ideas on the subject and wants to share those ideas with the broadest possible audience. Between 2015 and 2017, however, the Oregon State Board of Examiners for Engineering and Land Surveying (Board) investigated and punished Järlström for "critiquing" the standard formula used to calculate traffic-light timing and for communicating his ideas to "members of the public"—for example, local and national media outlets, policymakers, and the Board itself. The Board also punished him for describing himself using the word "engineer."

Faced with this lawsuit, the Board has been quick to "admit liability on Plaintiff's as-applied challenges." Opinion & Order 2 (ECF 60). Yet the Board minimizes the need for facial relief with the promise that "there is little genuine danger that [its] statutes will compromise rights of third parties." Defs.' Mot. Entry J. 3 (ECF 43); *see also* Defs.' Supp. Br. Resp. Pl.'s Proposed J. 2 (ECF 59) ("No such danger exists here.").

That could not be more wrong. The engineering-practice law applies to all manner of "critique[s]," "reports, commentary, and testimony," "recommendations," and "calculations and

conclusions" about engineering topics. Järlström Decl. Ex. 15, at ¶ 14 (order); La Forest Decl. Ex. 1, at 17 (order); Gedge Decl. Ex. 1, at 12 (minutes). On that basis, the Board has repeatedly enforced—and continues to enforce—the practice law against people simply for criticizing public-works projects. The title law is no better. In recent years, it has been deployed against people who use the word "engineer" in voter pamphlets, ballot statements, business cards, e-mails, blogs, business names, corporate filings, websites, and even individual *photographs* on websites. Recent targets have included politicians, activists, companies, schools, associations, and ordinary people like Järlström. In fact, the Board's role as censor is something of a joke within the agency. Board members describe election periods as "our silly season," because "every single year" they enforce the title law against political candidates. Gedge Decl. Ex. 2, at 2:55:48-3:01:15. At other times, Board members have quipped about "tak[ing] down Dilbert" for being an unlicensed (cartoon) engineer. *Id.* Ex. 3, at 36:00-36:17; *see also id.* at 36:24-36:26 ("I'm not sure if Dilbert's licensed in the state of Oregon.").

In these circumstances, facial relief is essential. The Board's record shows an unflinching disregard for the rights of men and women in all walks of life. The record shows that the Board has routinely enforced Oregon's practice and title laws in arbitrary and discriminatory ways. The record further shows that people respond to these laws by "choos[ing] simply to abstain from protected speech." *Virginia v. Hicks*, 539 U.S. 113, 119 (2003). In short, this case spotlights why we do not entrust officials with an unconstitutional law in the hopes they will enforce it wisely. The Court should hold the practice law and the title law invalid on their face, so that no one's First Amendment rights (including Järlström's) are violated going forward. The Court should also grant Järlström the as-applied relief he seeks by converting the agreed preliminary injunction into a permanent one.

## BACKGROUND

**A.      Legal background**

### 1.      The engineering-practice law

People who engage in "the practice of engineering" in Oregon must have a professional-engineer license issued by the Board. To get that license, an applicant must (1) pass a five-hour "Fundamentals of Engineering" examination ($175); (2) pass an eight-hour branch-specific "Principles and Practice of Engineering" examination ($375); (3) submit an application to the Board, along with $400 and five references (three of whom must be licensed professional engineers); and (4) demonstrate "a Board approved combination of education and experience," which generally entails between four and twelve years of work under a licensed professional engineer.[1]

That much would be unremarkable for someone whose job is designing bridges or highways. What makes Oregon unusual is that "practice of engineering" is defined to cover *talking* about engineering. "Practice of engineering" encompasses "any professional service or creative work requiring engineering education, training and experience." Or. Rev. Stat. § 672.005(1)(a). It also includes "[a]pplying special knowledge of the mathematical, physical and engineering sciences to such professional services or creative work as consultation, investigation, testimony, evaluation, planning, design and services during construction, manufacture or fabrication for the purpose of ensuring compliance with specifications and

---

[1] Or. Rev. Stat. § 672.098; Or. Admin. Rs. 820-010-1000, -1020 (detailing additional degree requirements); Nat'l Council of Exam'rs for Eng'g & Surveying, *FE exam*, http://ncees.org/engineering/fe/; Nat'l Council of Exam'rs for Eng'g & Surveying, *NCEES engineering exam registration – Oregon*, http://ncees.org/engineering/#oregon; Or. State Bd. of Exam'rs for Eng'g & Land Surveying, *OSBEELS Fees*, http://www.oregon.gov/OSBEELS/pages/fees.aspx.

design, in connection with any public or private utilities, structures, buildings, machines, equipment, processes, works or projects." *Id.* § 672.005(1)(b).

As the Board has acknowledged, the scope of this practice law is "very broad." Gedge Decl. Ex. 4, at 2. In the Board's words, the law prohibits anyone without a Board-issued license from voicing "critique[s]," "reports, commentary, and testimony," "recommendations," or "calculations and conclusions" on engineering topics. Järlström Decl. Ex. 15, at ¶¶ 14, 17; La Forest Decl. Ex. 1, at 17; Gedge Decl. Ex. 1, at 12. As a result, people who criticize public-works projects have repeatedly found themselves targeted by the Board. Mats Järlström was punished for "critiquing" a traffic-light formula and sharing his ideas with "members of the public." Järlström Decl. Ex. 15, at ¶ 14. In 2015, another speaker was fined for objecting to the noise impact of a proposed power plant. La Forest Decl. Ex. 1, at 1-5, 18. Just last month, the Board voted to proceed against a geotechnical expert for authoring a paper that criticized a controversial plan to expand a landfill. Gedge Decl. Ex. 5, at 1-2, 4.

Moreover, the consequences of violating the practice law are grave. Practicing engineering without a license is illegal, Or. Rev. Stat. §§ 672.020(1), 672.045(1), and can lead to $1,000 in civil penalties, $6,250 in criminal fines, and up to 364 days in jail, *id.* §§ 672.325(1), 672.991, 161.615, 161.635; *see also* Gedge Decl. Ex. 6, at 1 (memorializing Board's discussion of option to "forward LE cases [Board cases] to the state police for prosecution").

### 2.    *The engineer-title law*

People without a professional-engineer license are not just prohibited from voicing opinions about engineering; they are also prohibited from using the word "engineer" to truthfully describe themselves. "In Oregon, 'Engineer' is a protected title and the use of this title requires registration with the Board as a professional engineer under ORS 672.020." Gedge Decl. Ex. 7, at 1. By statute, the word "engineer" means Oregon-licensed professional engineer. Or. Rev.

Stat. § 672.002(2). As a result, a non-licensee who describes herself using the word "engineer"

has—in the Board's eyes—proclaimed herself an Oregon-licensed professional engineer. That

violates the title law, under which "[a] person is practicing or offering to practice engineering if

the person":

> (a)    By verbal claim, sign, advertisement, letterhead, card or in any other way
>
>         implies that the person is or purports to be a registered professional
>
>         engineer;
>
> (b)    Through the use of some other title implies that the person is an engineer
>
>         or a registered professional engineer; or
>
> (c)    Purports to be able to perform . . . any service or work that is defined
>
>         by ORS 672.005 as the practice of engineering.

*Id.* § 672.007(1); *see also id.* §§ 672.020(1), 672.045(2) ("A person may not . . . [f]alsely

represent, by any means, that the person is authorized to practice engineering . . . .").

Like the practice law, the title law is backed by civil penalties, criminal fines, and jail

time. Also like the practice law, the title law has an unprecedented history of enforcement. To

illustrate "the gamut of unconstitutional applications," Opinion & Order 7 (ECF 60), below are a

dozen examples of the title law in action:

> ➢   The Board investigated Dan Saltzman, a candidate for Portland Commissioner,
>
>      because a voter pamphlet described his "occupational background" as
>
>      "Environmental Engineer." Gedge Decl. Ex. 8, at 1; *see also id.* Ex. 9, at 1. Saltzman
>
>      informed the Board he holds a bachelor's degree in environmental and civil
>
>      engineering from Cornell, a master's degree from the MIT School of Civil
>
>      Engineering, and membership in the American Society of Civil Engineers. *Id.* Ex. 10,

at 1. In response, the Board issued Saltzman a "letter of concern," warning him to "take note of this issue in order to avoid future enforcement actions." *Id.* Ex. 11, at 1. The investigation lasted nine months. *Id.* Ex. 8, at 1.

➢ The Board investigated Chris Harper, a candidate for local councilperson, because he described himself in a voter pamphlet as an "Engineering Manager" and "an engineer." *Id.* Ex. 12, at 1. In response to the Board's investigation, Harper explained he holds bachelor's and master's degrees in mechanical engineering, is a licensed professional engineer in California, and served for two decades in the Navy "working with and managing Engineers and technical information." *Id.* Ex. 13, at 1. Even so, he assured the Board, "I will not use the term Engineer except to describe a Professional Engineer so licensed in the state of Oregon." *Id.* at 2. The Board thus closed the investigation "as compliance met." *Id.* Ex. 14, at 1. The investigation lasted 17 months. *See id.* Ex. 12, at 1.

➢ The Board investigated Edward Schwarz because he argued against a local ballot initiative and signed his statement "Edward Schwartz, Engineer." *Id.* Ex. 15, at 1. Schwartz explained that he holds a bachelor's degree in electrical engineering and had been a member of the Institute of Electrical and Electronics Engineers for decades. *Id.* Ex. 16, at 1. He nonetheless "apologize[d]" to the Board, promising, "I will not use the title of engineer again unless I am fully registered and accredited with OSBEELS [i.e., the Board] in the State of Oregon." *Id.* The Board closed the case by "remind[ing]" him "to ensure you maintain compliance with ORS 672 by refraining from using the title engineer." *Id.* Ex. 17, at 1. The investigation lasted 23 months. *Compare id. with* Ex. 15, at 1.

➢ On learning that Oregon State University intended to trademark the phrase "Oregon State Engineer," the Board wrote to the president of the College of Engineering "to express our concerns regarding the OSU College of Engineering's decision to use the phrase 'Oregon State Engineer' in its marketing materials, and its intent to register a trademark for that phrase." *Id.* Ex. 18, at 1. Publicizing the phrase, the Board warned, "places students and graduates at risk of breaking the law," because "[a]n engineering student or graduate who uses the title 'Oregon State Engineer' without being registered with the OSBEELS has run afoul of the law." *Id.*

➢ The Board investigated Morgan Rider because biographical listings on two state websites described her as a registered professional engineer. (Her registration had lapsed.) *Id.* Ex. 19, at 1. In response, Rider offered to change her webpages to say "environmental engineer with over 25 years experience." *Id.* Ex. 20, at 2. That did not satisfy the Board, so she changed the wording again, to "Morgan Rider has a Civil & Environmental Engineering degree from Cornell University." *Id.* at 1. At that point, the Board closed the case "due to meeting compliance with the law." *Id.* Ex. 21, at 1. The investigation lasted six months. *Compare id. with id.* Ex. 19, at 1.

➢ The Board investigated Software Technology Group because the company's website "referred to software engineering as well as mechanical and electrical engineering services" and described staff members using the title "Engineer." *Id.* Ex. 22, at 3. The company's blog also "include[d] statements such as . . . 'Engineering Nirvana.'" *Id.* A Board investigator sent the company's president screenshots of content the Board wanted him to rewrite. *Id.* Ex. 23, at 1-4. When he failed to do so, the Board fined the

company $750. *Id.* Ex. 22, at 1, 2. The investigation lasted two and a half years. *Id.* at 2-4.

➤ The Board approached the Oregon Association of County Engineers and Surveyors because it had given its "Engineer of the Year" award to someone "who is not registered with OSBEELS as a professional engineer." *Id.* Ex. 24, at 1. The Board "determined that a title act violation occurred." *Id.* Instead of opening an investigation, however, the Board informed the association that "the title of the award could be modified, or the award could be given only to a person who is a registered professional engineer with OSBEELS." *Id.* The association complied, telling the Board that "[i]n years where a recipient is not a licensed engineer, the term '**Road Official** of the Year' will be used for their award." *Id.* Ex. 25, at 1.

➤ The Board approached the American Council of Engineering Companies of Oregon because the organization's *2011 \$alary & Benefits Survey* described some occupations using "engineer staff titles." *Id.* Ex. 26, at 1. "Unfortunately," the Board advised, "your Benefits Survey is an example where misinformation may lead to sanctions." *Id.* The Board warned that it "has issued sanctions against persons for unlicensed use of the title" and "ask[ed]" the council "to consider the information it published in the Benefits Survey regarding the use of 'engineer' title by unlicensed persons in member firms." *Id.*

➤ The Board investigated Ramasurdyal Premsingh after noticing a four-year-old form on the Secretary of State's corporate database, on which Premsingh listed his business type as "Engineering and Construction." *Id.* Ex. 27, at 1. When "confronted" with this information, "Premsingh explained that his use of the term '*engineering*' was a

mistake and that on future documents he will refrain from using the term engineer or engineering with regards to the services his firm purports to offer." *Id.* On that basis, the Board closed the case "as compliance met." *Id.* Ex. 28, at 1. The investigation lasted more than five months. *Id.* Ex. 27, at 1.

➢ The Board investigated Joshua Downs because his business card listed his title as "Engineer." *Id.* Ex. 29, at 1; *see also id.* Ex. 30, at 1. In response, Downs "stated that he 'will immediately cease using my business cards with the "Engineer" title'" and "submitted a copy of his new business card showing the title Engineer had been removed." *Id.* Ex. 29, at 1. The Board issued a letter expressing "concern . . . that you represented yourself as a registered professional engineer by using the title 'engineer' without registration." *Id.* Ex. 31, at 1. "You're reminded," the Board warned him, "to ensure you maintain compliance with ORS 672 by refraining from using the title engineer." *Id.* The investigation lasted 20 months. *Compare id. with id.* Ex. 29, at 1.

➢ The Board investigated Andrew Sztymelski because his business, ABC Tool & Die Co. Engineering, Manufacturing LLC, included the word "engineering" without employing an Oregon-licensed professional engineer. *Id.* Ex. 32, at 1. In response, Sztymelski "amended the business name . . . so that it no longer contains the word 'Engineering.'" *Id.* Ex. 33, at 1. After reviewing the company's website, the Board determined that "all written references to engineering were removed." *Id.* Ex. 32, at 1. But the Board noticed "a staff photograph with the word 'engineering' on a banner in the background." *Id*. The Board investigator "spoke with Sztymelski," who "said he would remove the photograph." *Id.* Only at that point did the Board close the case "as

compliance met." *Id.* Ex. 34, at 1. The investigation lasted over 14 months. *Id.* Ex. 32,

at 1.

➤ The Board investigated Holger Sommer because a news article about Sommer's local

activism quoted him as saying "I'm an engineer so maybe I look at things a little

differently." *Id.* Ex. 35, at 1. Sommer informed the Board that "I went through a

thorough engineering training in Germany" and "was also a member of the

mechanical engineering faculty of Carnegie Mellon University." *Id.* Ex. 36, at 2. He

further said he was "appalled with the arrogance of the OSBEELS claiming

jurisdiction over the word 'Engineer.'" *Id.* Ex. 37, at 1. The Board's investigation

lasted just over two years; the agency closed the case after Sommer killed himself.

*Compare id.* Ex. 35, at 1, *with id.* Ex. 38, at 1 ("The Board now considers these

matters settled."); *see also id.* Ex. 39, at 1.

**B.      Mats Järlström's experience**

In May 2013, Mats Järlström's wife drove her Volkswagen through the intersection of

Allen Boulevard and Lombard Avenue in Beaverton, Oregon. In due course, she received a

redlight-camera ticket in the mail. Järlström Decl. ¶ 9. That sparked her husband's fascination

with traffic-light timing. *Id.*

Mats Järlström is a Swedish-born and -educated electronics engineer. *Id.* ¶¶ 1-2. He has

the equivalent of an American Bachelor of Science in electrical engineering. *Id.* ¶ 2. After

serving as an airplane-camera mechanic in the Swedish Air Force, he worked in research and

development for Luxor Electronics, before moving to the United States in 1992. *Id.* ¶¶ 2, 3.

Järlström holds a Green Card and has lived in Oregon for decades. *Id.* ¶¶ 4, 37. In the early

1990s, he headed the electronics department at Triad Speakers, in Portland, where he helped

design a new line of products, including satellite speakers and powered subwoofers. *Id.* ¶ 5. He is

now self-employed, testing audio products and repairing, upgrading, and calibrating test instruments. *Id.* ¶ 7.

Like most of the people described above, Järlström has called himself an "engineer" for much of his adult life. Below, for example, is a business card from his first private-sector job:



*Id.* Ex. 1, at 1.

Since 2013, Järlström has devoted his spare time to studying traffic-light timing. *Id.* ¶ 9. In his view, the leading mathematical formula for calculating the minimum length of yellow lights (dating to 1959) is incomplete. *Id.* ¶ 10. Put simply, although the standard formula accounts for drivers who respond to a yellow light by stopping or by continuing straight through the intersection, it does not account for the extra time it takes for drivers who slow down to make a turn. *Id.* Applying basic mathematical and physics principles, Järlström has developed a modified formula for calculating the timing of yellow lights, which is based on the 1959 model but also factors in the extra time needed for vehicles to decelerate before entering and clearing an intersection when they perform a safe, legal turn. *Id.* ¶ 12.

As a private citizen, Järlström has no power to alter traffic lights anywhere, just as he has no power to uproot stop signs or repaint pavement markings. What he has done, rather, is express his views on traffic lights publicly. For example, he has corresponded with Dr. Alexei Maradudin, one of the developers of the original 1959 formula. *Id.* ¶ 13. A news station has aired

several pieces about his theories. *Id.* In 2016, he even presented his findings at the annual meeting of the Institute of Transportation Engineers. *Id.* ¶ 14 & Exs. 2, 3.

Järlström also shared his ideas with the Board. In the first of several e-mails the agency would later rule unlawful, Järlström sent a message to the Board in September 2014. He explained that, in his view, the city engineers in his home-town of Beaverton had miscalculated the timing for the local traffic lights. *Id.* ¶ 16 & Ex. 4, at 2. He wrote, "I would like to have your support and help to investigate and present the laws of physics related to transportation engineering in the State of Oregon," and he offered to present his new theories "for your review and comments." *Id.*

A Board investigator responded two days later. He told Järlström that the Board has no authority over traffic lights but does have authority over professional-engineering laws, and that Järlström was breaking those laws by his "use of the title 'electronics engineer' and the statement 'I'm an engineer.'" *Id.* ¶ 16 & Ex. 4, at 1. Because Järlström is not an Oregon-licensed professional engineer, the investigator warned him to "stop any further references until you become registered with the Board." *Id.*

Over the following months, Järlström continued to publicize his ideas on traffic-light timing. He e-mailed Dr. Maradudin, the *60 Minutes* news program, a representative of the National Council of Examiners for Engineering and Surveying, Portland's KOIN 6 news, and the Sheriff of Washington County. *Id.* ¶¶ 18-20 & Exs. 6-7, 9. He included the Board on these e-mails (or forwarded them to the Board separately). *Id.* ¶¶ 18-20 & Exs. 6, 8, 10. The e-mails described Järlström's theories, and in some of them, he described himself using the word "engineer." *Id.* Ex. 7, at 1; *id.* Ex. 8, at 1.

In February 2015, the Board's Law Enforcement Committee opened a "law enforcement case" against Järlström. Compl. ¶ 43 (ECF 1); Answer ¶ 32 (ECF 37). The investigation dragged on for nearly two years. *See* Järlström Decl. ¶¶ 21, 27. At the end of it, the Board determined that Järlström acted unlawfully by sending e-mails to the media, government officials, fellow citizens, and the Board itself. *Id.* Ex. 14, at ¶¶ 2-7, 13-17. In some of the e-mails, Järlström shared "special knowledge" about traffic-light timing or "purported to be able to perform engineering services or work," meaning he engaged in the unlicensed practice of engineering. *Id.* Ex. 14, at ¶¶ 13-17. In other e-mails, Järlström described himself using the word "engineer," putting him in violation of the title law. *Id.* Ex. 14, at ¶¶ 15, 17.

All told, the Board's "Notice of Intent to Assess Civil Penalty" listed nine violations. Compl. ¶ 77; Answer ¶ 55. And while the Board informed Järlström that it intended to impose a total penalty of $500, it also made clear that "the Agency may impose a maximum civil penalty of $1,000 per violation against Jarlstrom without amending its notice." Järlström Decl. Ex. 14, at ¶ 22. That meant Järlström could face $9,000 in penalties without warning. He paid the $500. *Id.* ¶ 26.

### C.    Procedural background

**1.**    Järlström then filed this lawsuit, requesting prospective declaratory and injunctive relief. In his complaint, Järlström explained that he wanted to resume sharing his ideas about traffic-light timing with the academic and scientific communities, policymakers, government officials, and the world at large. Compl. ¶¶ 86-89. He also explained that he wanted to continue calling himself an "engineer." *Id.* ¶¶ 93-99. Yet the Professional Engineer Registration Act makes it illegal for Järlström to communicate his ideas. The law also makes it illegal for him to truthfully call himself an "engineer." And as alleged in Järlström's complaint, both the practice

law and the title law violate not only his rights, but the First Amendment rights of many others. *Id.* ¶¶ 1-2, 56-61, 113, 124, 135, 145. Järlström thus requested both facial and as-applied relief.

One month after this lawsuit began, the Board consented to entry of a preliminary injunction, which protects Järlström's right to talk about traffic lights and describe himself as an "engineer." Under the preliminary injunction, Järlström's right to call himself an "engineer" is absolute; he "may describe himself publicly and privately using the word 'engineer' throughout the pendency of this litigation." Agreed Prelim. Inj. ¶ 2 (ECF 34). As for Järlström's speech about traffic lights, the injunction is hardly less qualified. He can safely "study, communicate publicly about, and communicate privately about his theories relating to traffic lights." *Id.* ¶ 1. The only caveat is that the injunction does not secure Järlström's right to communicate about traffic lights in "a paid employment or contractual relationship relating to the timing of traffic lights with a governmental or other entity that changes or implements or has final approval to change or implement traffic-light timing without the review and acceptance of responsibility by an Oregon-licensed professional engineer." *Id.* Put more simply, Järlström can convey his ideas—anywhere, anytime, to anyone—except if he is hired as the decisionmaker over how specific traffic lights are timed.

     **2.**     After agreeing to the preliminary injunction, the Board asked this Court to close the case. The Board invited the Court to enter "a judgment in favor of Plaintiff . . . that grants relief on his constitutional claims on an as-applied basis but otherwise grants no relief." Defs.' Mot. Entry J. 2. In other words, the Board favored a judgment that would restrict its power to punish Järlström but would leave it free to enforce the challenged laws against everyone else. *See* Pl.'s Resp. Defs.' Mot. Entry J. 9 (ECF 50).

This Court denied the Board's motion. Even though the Board "admit[s] liability on Plaintiff's as-applied challenges," the Court reasoned, the need for facial relief "persists" if a challenged law "threatens more types of conduct than the plaintiff presents." Opinion & Order 2, 7. Based on the record, the Court could not determine whether facial relief would be appropriate, so it permitted the case to go to discovery. *Id.* 7.

**3.**     Last month, the Board promulgated a rule that "clarifies" how it interprets some phrases in the statutory definition of "practice of engineering," including "creative work" and "professional service." Stip. Facts ¶ 6 & Ex. 8, at 1; *see also* page 4-5, above (discussing statutory text). The rule also "clarifies the way the Board interprets the terms 'engineer' and 'purports to be able to perform' as used in" the title law. Stip. Facts Ex. 8, at 1. The rule introduces the following underlined passages:

> "Professional service" or "professional services," as used in ORS 672.005, means providing labor in a commercial context or professional relationship, paid or unpaid, that does not produce a tangible commodity, but that requires a high level of training and proficiency.
>
> "Creative work," as used in ORS 672.005, applies to work provided in a commercial or professional context, paid or unpaid.
>
> ***
>
> "Engineer," when used alone and not as part of the phrases "professional engineer" or "registered professional engineer," in ORS 672.002, and in conjunction with ORS 672.007(2)(b) and 672.020 or 672.046, refers to when the word "engineer" is used to claim or imply that an individual is registered to perform engineering work in Oregon.
>
> "Purports to be able to perform," as used in ORS 672.007, refers to purporting within the context of an offer, bid, advertisement, client relationship, or claim to a building official.

*See id.* Ex. 8, at 2.[2]

At the outset of the rulemaking process, the Board stated that its "clarification[s]" have no effect on the kinds of speech that are punishable under the practice law and the title law. *Id.* ¶ 3 & Ex. 3, at 1, 2 ("The language clarifies what is already lawful and required currently.").

### ARGUMENT

With the benefit of discovery, it is plain that the engineering-practice and engineer-title laws violate the First Amendment on their face. Far from an anomaly, the Board's enforcement action against Mats Järlström followed from the plain text of the statute. Moreover, Järlström's experience is startlingly common; the practice and title laws have "numerous other potential applications that are unconstitutional." Opinion & Order 7 (ECF 60) (quoting *Lind v. Grimmer*, 30 F.3d 1115, 1122 (9th Cir. 1994)). These First Amendment harms are both widespread and real, and they can be fully addressed only through facial relief (Section I, below). The Court should also grant Järlström the as-applied relief he seeks by converting the preliminary injunction into a permanent one (Section II, below).

I.    **Oregon's engineering-practice law and engineer-title law violate the First Amendment on their face.**

A.    **The engineering-practice law is facially invalid.**

On pain of civil and criminal sanctions, people cannot air "critique[s]," "reports, commentary, and testimony," "recommendations," or "calculations and conclusions" about engineering topics in Oregon unless they have a Board-issued, professional-engineering license.

---

[2] The rule also states that "testimony" means "a formal affirmation to a client or employer, paid or unpaid, of the quality or correctness of design or work provided, and excludes testimony in a court of law or before a public body." Stip. Facts Ex. 8, at 2.

Järlström Decl. Ex. 15, at ¶¶ 14, 17 (order)[3]; La Forest Decl. Ex 1, at 17 (order); Gedge Decl. Ex. 1, at 12 (minutes). A law this broad violates the First Amendment on its face. In the First Amendment context, a statute is unconstitutional "if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *United States v. Stevens*, 559 U.S. 460, 473 (2010). That is because "overbroad" laws risk silencing "others not before the court," *Jews for Jesus, Inc. v. Port of Portland,* No. 3:04-cv-00695-HU, 2005 WL 1109698, at *13 (D. Or. May 5, 2005), *aff'd*, 172 F. App'x 760 (9th Cir. 2006), and thus threaten a continuing First Amendment harm even if they might apply constitutionally some of the time. For that reason, courts often grant facial relief because of the challenged law's effect on third parties. *See, e.g.*, *Bd. of Airport Comm'rs v. Jews for Jesus, Inc.*, 482 U.S. 569, 574 (1987); *see generally Powell's Books, Inc. v. Kroger*, 622 F.3d 1202, 1208 (9th Cir. 2010) (describing the "familiar sequential analysis" for overbreadth challenges).

These principles apply with full force here. Whatever interests Oregon may have in regulating the design of a landfill or the noise impact of a power plant, the government has no legitimate interest in restricting who can *critique* a landfill or who can *comment* on a power plant. Yet Oregon's practice law paints the civil engineer and the local activist with one brush, requiring the same state-issued license for each. The law regulates all manner of fully protected speech (Section 1, below), and it is susceptible to no "limiting construction that would render it constitutional." *Powell's Books, Inc.*, 622 F.3d at 1208 (Section 2, below). Worse, the Board continues to enforce the law against fully protected speech. For these reasons, the practice law is overbroad and unconstitutional.

---

[3] Last August, the Board purported to "withdraw[]" the order against Järlström. Järlström Decl. Ex. 17, at 1. It also sent him a check for $500. *Id.* at 2.

> **1.    The practice law poses a serious danger to the First Amendment rights of countless speakers.**

**a.**    On its face, the practice law is—in the Board's words—"very broad." Gedge Decl. Ex. 4, at 2. The term "practice of engineering" covers, first, "any professional service" or any "creative work" that "[r]equir[es] engineering education, training and experience." Or. Rev. Stat. § 672.005(1)(a). It also captures "[a]pplying special knowledge of the mathematical, physical and engineering sciences to such professional services or creative work as [1] consultation, [2] investigation, [3] testimony, [4] evaluation, [5] planning, [6] design and [7] services during construction, manufacture or fabrication for the purpose of ensuring compliance with specifications and design." *Id.* § 672.005(1)(b). The only limit on this second subpart is that the "special knowledge" be applied "in connection with" any public or private utilities, or structures, or buildings, or machines, or equipment, or "processes, works or projects." *Id.*; *see also* Or. Admin. R. 820-040-0030 (defining "traffic engineering" in similarly broad terms).

As a result, the practice law requires a license for anyone who expresses a technical opinion, in Oregon, about virtually any creation of humankind. Voicing "technical conclusions based on observations, using specialized knowledge"—one Board member has explained—is the practice of engineering "as per the statute." Gedge Decl. Ex. 40, at 1:00:15-1:00:30. If an unlicensed passerby were to voice "calculations and conclusions" about whether a construction site is safe, that would violate the practice law. *Id.* Ex. 1, at 12. "[T]hat person was not examined or tested by the Board, so their qualifications are unknown." *Id.* If someone were to look at a stream and opine that it could benefit from rock edging (or "riprap") to prevent erosion, that would violate the practice law as well. *Id.* Ex. 40, at 38:50-38:55 ("Yeah, once he said riprap, he had me on the hook too, for engineering."); *see also id.* Ex. 1, at 12 ("The Committee also observed that just reporting data was not a problem, but drawing conclusions from the data and

the regulations and then making recommendations to the project design was a problem."); *id.* Ex. 41, at 1-2 (fining respondent $500, in part based on his expert testimony about whether a construction site met state OSHA regulations).

None of this is hypothetical. Järlström was sanctioned because he e-mailed his theories about traffic-light timing to other citizens, to members of the media, to his local sheriff, and to the Board itself. In the Board's words, "[b]y reviewing, critiquing, and altering an engineered [Institute of Transportation Engineers] formula, and submitting the critique and calculations for his modified version of the ITE formula to members of the public for consideration and modification of Beaverton, Oregon's and 'worldwide' traffic signals, . . . Jarlstrom applied special knowledge of the mathematical, physical and engineering sciences to such creative work as investigation, evaluation, and design in connection with public equipment, processes, and works." Järlström Decl. Ex. 15, at ¶ 14. Under the practice law, Järlström acted unlawfully by "offer[ing] his engineering work directly to members of the public multiple times, including: the Sheriff of Washington County, a local television station, Alex Marududin, 60 Minutes, the National Council of Examiners for Engineering and Surveying, and the Board." *Id.* at ¶ 20.

Järlström's experience is all too common; the practice law "significantly compromise[s] recognized First Amendment protections of parties not before the Court." *Jews for Jesus, Inc.*, 482 U.S. at 574 (quoting *City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 801 (1984)). Dale La Forest, for example, faced a four-year investigation and a $1,000 fine because he argued that a power plant would be too loud for a nearby neighborhood. La Forest Decl. Ex. 1, at 1-4, 18. Based on the practice law, the Board concluded that La Forest "appl[ied] special knowledge of the mathematical, physical, and engineering sciences to such professional services or creative work as consultation, investigation, [and] testimony, in connection with public or

private utilities, structures, buildings, machines, equipment, processes, works and projects." *Id.*
Ex. 1, at 4. Like Järlström, La Forest thus engaged in the unlicensed practice of engineering. Not
only that, but his speech warranted the maximum civil penalty, because "[m]aking public
statements about a major public works project without licensure has the potential to allow for
significant impact to the welfare of the residents." Gedge Decl. Ex. 42, at 4.

Even today, the practice law continues to "compromise rights of third parties." *See* Defs.'
Mot. Entry J. 3. Last month, for example, the Board's Law Enforcement Committee voted to
open a case based on a "technical memorandum" authored as part of a grassroots campaign to
oppose a Yamhill County landfill. Gedge Decl. Ex. 5, at 1-2, 4. Like the neighborhood group in
La Forest's case, "Stop the Dump Coalition" sought out-of-state help to oppose the landfill
developer. Its experts wrote a memorandum that criticized both the landfill's proposed expansion
and the analyses submitted by the landfill's representatives. *Id.* Ex. 43, at 1-7. As part of its
advocacy effort, Stop the Dump Coalition submitted that memorandum to a government agency.
*Id.* Ex. 44, at 2 ("We want to inform as many agencies as possible about the permitting of landfill
expansion in a dangerous location."). Immediately, it ended up in the hands of the Board—which
has spent the better part of two years investigating whether the memorandum is the unlicensed
practice of engineering. *Id.* Ex. 5, at 1. At its most recent meeting, the Law Enforcement
Committee "concluded that . . . the 2016 technical memorandum did meet the definition of
engineering." *Id.* at 4. The Board is now proceeding against the author personally. *Id.*

**b.**     From both "the text of the law" and "actual fact," the practice law regulates a
substantial amount of speech the First Amendment protects. *See Virginia v. Hicks*, 539 U.S. 113,
122 (2003) (citations and brackets omitted). Whatever engineering projects Oregon might
constitutionally be able to regulate, those activities are dwarfed by the universe of opinions,

conclusions, recommendations, critiques, analyses, and advocacy that are also caught up in the practice law's "very broad" net. *See* Gedge Decl. Ex. 4, at 2. The government "has no proprietary interest in the words and concepts of the general field of engineering when professional work is not afoot." *N.M. Bd. of Licensure for Prof'l Eng'rs and Prof'l Surveyors v. Turner*, 303 P.3d 875, 881 (N.M. App. 2013); *cf.* Answer ¶ 82 ("Defendants admit that the Board's regulation of Mr. Jarlstrom's speech was not narrowly tailored to the compelling state interest of safeguarding life, health, and property . . . ."). Yet Oregon's practice law stakes out just such a claim. Järlström, La Forest, Suji Somasundaram (the author of the landfill memorandum), and others, offer stark examples of an overbroad law being used to suppress speech. And as the Board's expert witness let slip in La Forest's case, "there are potentially a large number of cases like this." Gedge Decl. Ex. 45, at 1. Contrary to the Board's assurances, the record thus confirms a "realistic danger" to third parties' First Amendment rights. *See Taxpayers for Vincent*, 466 U.S. at 801.

In this way, the practice law resembles many other enactments the courts have invalidated on overbreadth grounds. In *United States v. Stevens*, for example, the Supreme Court invalidated a federal law that banned depictions of animal cruelty because the law swept broadly enough to cover hunting magazines. 559 U.S. at 476, 482. Whatever depictions Congress might legitimately ban, the Court reasoned, the statute "create[s] a criminal prohibition of alarming breadth." *Id.* at 474. Likewise in *Board of Airport Commissioners v. Jews for Jesus, Inc.*, the Court invalidated a resolution that banned "First Amendment activities" in an airport terminal. 482 U.S. at 574. And in 2010, the Ninth Circuit invalidated Oregon's "anti-luring" statute because it extended to such works as *The Joy of Sex* and *The Handmaid's Tale*. *Powell's Books, Inc.*, 622 F.3d at 1210-11.

Oregon's practice law suffers from the same defect as all those laws: It goes far beyond whatever the state might legitimately regulate and "reaches the universe of expressive activity." *See Jews for Jesus, Inc.*, 482 U.S. at 574. Like the statutes in *Stevens*, *Jews for Jesus*, and *Powell's Books*, the practice law's "presumptively impermissible applications . . . far outnumber any permissible ones." *Stevens*, 559 U.S. at 481. Any number of people, like Järlström, have strong views about engineering projects, public-works programs, and technological matters. Järlström, for example, is interested not just in traffic-light timing, but in related transportation issues, like the use of autonomous vehicles. Järlström Decl. ¶ 33. New roads, and buildings, and landfills, and power plants, get developed all the time. People criticize these projects, suggest improvements, and voice objections. They form grassroots groups, like the Stop the Dump Coalition. If the issues are complex, they team up with experts, so they can better oppose the often-sophisticated interests aligned against them. *See* La Forest Decl. ¶ 3.

None of this is new. Nearly two centuries ago, Alexis de Tocqueville marveled at the "clamor" and "tumult" of ordinary Americans, who would drop everything to "discuss the possibility of building a church," or "discuss the plan for a road or a school," or "consult about some local improvements." *Democracy in America* 242 (J.P. Mayer ed.; George Lawrence, trans., 1969). In Oregon, however, this tradition of civic engagement is illegal, and the Board stands ready to bring down the full weight of the government on anyone who missteps. Because the practice law "abridges the freedom to engage in a substantial amount of lawful speech," *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 256 (2002), it is overbroad and unconstitutional.

**2.    *There is no limiting construction of the practice law that would make it constitutional.***

To date, the Board has not seriously defended the practice law's breadth. The Board admits its past enforcement against Järlström violated his First Amendment rights. Answer ¶¶ 79,

82-83, 89, 92-93. And as discussed, it is clear that "the statute's very existence will inhibit free expression." *Taxpayers for Vincent*, 466 U.S. at 799. That should be the end of the matter: The practice law is facially overbroad, and the Court should declare it invalid.

Saddled with a profoundly flawed statute, however, the Board's preferred solution is for this Court to rewrite it. In September, the Board asked the Court to effectively redraft the law by enjoining enforcement (against Järlström alone) "except in the context of professional or commercial speech." Defs.' Proposed J. ¶ 2 (ECF 43-1). Järlström voiced concern at the time that this language would "leave[] the Board virtually unchecked power to resume violating [his] First Amendment rights in the future." Pl.'s Resp. Defs.' Mot. Entry J. 4 (ECF 50). And at the December hearing, those concerns were borne out; the Board could not answer even basic questions about what would qualify as "commercial" or "professional." Dec. 4, 2017 Hrg. Tr. 8:13-12:17 (ECF 70).

Undeterred, the Board last month finalized a rule that purports to "clarify" its interpretation of the practice law in even more uncertain terms. Stip. Facts ¶ 6 & Ex. 8, at 1. As used in the definition of "practice of engineering," the Board now says, the phrase "creative work" should be understood to mean "work provided in a commercial or professional context, paid or unpaid." *Id.* Ex. 8, at 2. (The phrase "professional service" is defined similarly. *See id.*) This language raises the same questions the Board was unable to answer in December. If anything, it is *more* opaque; what, for example, is an "unpaid" commercial context?

At the same time, two points are clear. First, the Board's latest "clarif[ication]" contradicts the text and structure of the practice law. Not only would the Board's interpretation of "creative work" make the statutory phrase "professional service" redundant, it would also make redundant a statutory exception for do-it-yourself engineering projects. Or. Rev. Stat.

§ 672.060(5). So as a matter of statutory construction, the Board's reading is not one the federal

courts can accept. *See Powell's Books, Inc.*, 622 F.3d at 1215.

     Second, even if the Board's clarification were a plausible one, the practice law still

would violate people's First Amendment rights. For years, the Board has used the terms

"commercial" and "professional" to justify punishing clearly protected speech. Answer Br.,

*Topaz v. Or. Bd. of Exam'rs for Eng'g & Land Surveying*, 2011 WL 8270852, at *3-4, *25-26

(Or. Ct. App. Dec. 8, 2011); La Forest Decl. Ex. 1, at 17. So last month's announcement that the

Board will continue to punish speech it views as "commercial" or "professional" is more of the

same.

     In fact, the Board has already declared that its clarification has no effect on what speech

it will punish. *See* Stip. ¶ 3 & Ex. 3, at 1 ("The language clarifies what is already lawful and

required currently."). And true to its word, the Board continues to enforce its unconstitutional

law in unconstitutional ways. During last month's review of the "Stop the Dump" memorandum,

the Board's Law Enforcement Committee determined that "the whole thing is engineering"

because it conveyed "conclusions" criticizing a landfill-expansion project. Gedge Decl. Ex. 46,

at 1:18-1:30. The Board ignored its "clarified" view of the practice law and applied the broad

statutory text just as it always has:

> Pursuant to, I mean, expert testimony, it's peer review, that is specifically stated
> in our statutes, 672.005 sub-one (a) and (b), and so this is unlicensed practice per
> ORS 672.020 is my opinion, because they're not registered, those folks are not
> registered in the state.

*Id.* at 1:30-1:58. This ongoing enforcement activity confirms the obvious: The practice law

restricts speech, and the Board will not stop violating people's First Amendment rights until this

Court requires it to do so.

B.      **The engineer-title law is facially invalid.**

The title law violates the First Amendment on its face also, for two reasons. First, like the

practice law, it restricts all manner of public discourse that the government has no power to

regulate. Second, it is a paradigmatically content-based speech ban that fails strict scrutiny (and

any other level of First Amendment review). The state has taken a word that means many things

("engineer"), it has decreed that the word can mean only *one* thing ("Oregon-licensed

professional engineer"), and it punishes whoever deviates from that idiosyncratic definition. The

Board cannot possibly carry its burden to justify such a law.

1.      *The title law restricts people's use of the word "engineer" in every*
          *context imaginable.*

"In Oregon, 'Engineer' is a protected title and the use of this title requires registration

with the Board as a professional engineer under ORS 672.020." Gedge Decl. Ex. 7, at 1. Thus, it

is unlawful for non-licensees to use the word "engineer." Doing so (1) "implies that the person is

or purports to be a registered professional engineer," Or. Rev. Stat. § 672.007(1)(a); (2) "implies

that the person is an engineer or a registered professional engineer," *id.* § 672.007(1)(b); (3)

conveys that the speaker "[p]urports to be able to perform" the practice of engineering, *id.*

§ 672.007(1)(c); (4) amounts to the unlicensed practice of engineering itself, *id.* §§ 672.007(1),

.020(1); and (5) "[f]alsely represent[s] . . . that the person is authorized to practice engineering,"

*id.* § 672.045(2). Put simply, "[i]ndividuals who do not hold registration in Oregon cannot use

any variation" of the word "engineer" to describe themselves. Gedge Decl. Ex. 47, at 1. As one

Board member warned a respondent last year, "as long as we're sitting in the state of Oregon, if

you tell me you're an engineer, that's a violation of the title act." *Id.* Ex. 48, at 1:21:00-1:21:08.[4]

---

[4] Just as the title law prohibits non-licensees from describing themselves using the word
"engineer," it also prohibits non-licensees from describing themselves as "registered professional
engineers." *See* Or. Rev. Stat. § 672.007(1). While that prohibition raises its own First

Like the practice law, the title law "sweep[s] up a host of material entitled to constitutional protection." *Powell's Books, Inc.*, 622 F.3d at 1207. The law restricts—and is enforced against—everything from statements in voter pamphlets, to ballot arguments, to business cards, to e-mails, blogs, business names, citizen complaints, obscure corporate filings, webpages, even photographs. *See* pages 6-11, above (detailing 12 examples); *see also Topaz v. Or. Bd. of Examiners for Eng'g & Land Surveying*, 297 P.3d 498, 503 (Or. Ct. App.), *rev. denied*, 303 P.3d 943 (Or. 2013). Järlström, for example, broke the law "[b]y asserting to a public body in correspondence that he is an ('excellent') engineer, and asserting to the public media in correspondence that he is a ('Swedish') engineer." Järlström Decl. Ex. 15, at ¶ 15. Even writing "an article [in] a trade journal" would be illegal, if the article "discuss[es] an Oregon project," is "submitted from an Oregon address," and refers to the author as an engineer or a professional engineer. *See* Gedge Decl. Ex. 49, at 6-7.

In fact, the title law is limited only by the Board's imagination. Board members acknowledge that "thousands" of employees at Intel break the law daily. *Id.* Ex. 48, at 1:21:25-1:21:47 ("I mean, we're fairly certain that there are dozens [interjections: 'hundreds,' 'thousands'] of Intel engineers who are handing out their cards willy-nilly."). Another Board member has observed that "I think, when we start digging into this, you're going to find that almost every commercial building contractor is going to have somebody that they call a 'project engineer,' who is not an engineer; and I think it's incredibly, incredibly common." *Id.* Ex. 50, at 41:55-42:08; *see also id.* at 39:06-39:30 ("very very common"). "TV and radio stations all have

---

Amendment concerns, this case does not challenge the law's restriction on non-licensees' describing themselves as "licensed" or "registered" professional engineers. *See* Compl. ¶¶ 126-46.

people they call engineers too, that are not engineers." *Id.* at 39:45-39:55. According to one Board member, "the State of Oregon" itself is the worst offender. *Id.* Ex. 51, at 00:40-01:05.

The Board's enforcement history thus underscores what is clear from the statute's text: The title law "reach[es] a substantial amount of constitutionally protected speech," *Powell's Books, Inc.*, 622 F.3d at 1213, which the state has no basis for regulating. That makes it facially unconstitutional.

### 2.  *The title law is an impermissible content-based restriction on speech.*

Of course, the title law suffers from a more foundational problem: In every application, it restricts speech based on content. The Board admits, for example, that its past enforcement against Järlström "included a content-based restriction on speech." Answer ¶¶ 99, 110. But that is true *every* time the title law is enforced. People with a Board-issued license can describe themselves using the word "engineer." People without a Board-issued license cannot. Policing a particular word in this way is a content-based restriction on speech, *see Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2230 (2015), which fails strict scrutiny or any other standard of First Amendment review.

For this reason, the title law's defect is not so much its breadth but that it exists at all. Subject to narrow, well-established exceptions, "[t]he First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *United States v. Alvarez*, 567 U.S. 709, 716 (2012) (plurality opinion) (citation omitted). Yet the title law serves *only* to stop specific people from using a specific word because the state fears that they will convey a specific message. That is why, more often than not, the Board's title-law cases end with investigators pressuring people into rewriting their websites, or reprinting business cards, or renaming achievement awards, or deleting photos. *See* pages 6-11, above.

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND SUPPORTING MEMORANDUM - 28

In this way, the title law unconstitutionally regulates the English language. Like many words, "engineer" signifies many different things, from software programmer, to train driver, to waste-disposal technician, to inventor. *See, e.g.*, Andrea Beaty, *Rosie Revere, Engineer* (2013); U.S. Dep't of Labor, Bureau of Labor Statistics, *Occupational Employment and Wages, May 2017: 53-4011 Locomotive Engineers*, https://bit.ly/2s1Uxxw. The Board even celebrates the state animal, the beaver, as "one of Oregon's most admirable engineers of intelligence, industry, and ingenuity." Gedge Decl. Ex. 52, at 1. But when it comes to the title law, none of that matters. The law assigns "engineer" a single meaning: state-licensed professional engineer. That definition is so unusual that leading dictionaries do not include it. Even so, anyone who deviates from it in Oregon faces investigations, civil liability, and even criminal prosecution.

The Board cannot possibly carry its burden to justify this restriction. *See Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 944 (9th Cir. 2011) (en banc) ("When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions.") (citation omitted). As a starting point, the government has no freestanding interest in prohibiting even knowing, brazen falsehoods. *See Alvarez*, 567 U.S. at 722-23. With that as the default rule, the government certainly cannot take speech that is not false, *decree* it false, and then ambush whoever strays from the government's favored meaning. Under the First Amendment, public discourse cannot be controlled in this way. Nor can private discourse. Nor can commercial advertising. *See 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 503-04 (1996) (Op. of Stevens, J.); *Ocheesee Creamery LLC v. Putnam*, 851 F.3d 1228, 1238-40 (11th Cir. 2017). There is no setting in which Oregon's restriction on the word "engineer" comports with the First Amendment. That is why the law cannot constitutionally be applied to Mats Järlström or to the thousands of other Oregonians who are engineers but not

"PEs." *See generally* Paul M. Spinden, *The Enigma of Engineering's Industrial Exemption to Licensure: The Exception That Swallowed a Profession*, 83 UMKC L. Rev. 637, 638-39 (2015) (footnotes omitted) ("[A]n overwhelming majority of engineers—somewhere around eighty percent—do not pursue licensing as a professional engineer."). The law is clear and there is no dispute of material fact: Restricting use of the word "engineer" is unconstitutional.

> **3.      There is no limiting construction of the title law that would make it constitutional.**

As with the practice law, the Board's stance on the title law has become much more cryptic since this lawsuit was filed. Last month's rule change, for example, introduces two sentences that "clarify" the title law as follows:

> "Engineer," when used alone and not as part of the phrases "professional engineer" or "registered professional engineer," in ORS 672.002, and in conjunction with ORS 672.007(2)(b)[5] and 672.020 or 672.046[6], refers to when the word "engineer" is used to claim or imply that an individual is registered to perform engineering work in Oregon.

> "Purports to be able to perform," as used in ORS 672.007, refers to purporting within the context of an offer, bid, advertisement, client relationship, or claim to a building official.

Stip. Facts ¶ 6 & Ex. 8, at 2.

As with the practice law, the Board introduced these clarifications by announcing that they in no way alter the statute's scope. *See id.* ¶ 3 & Ex. 3, at 1 ("The language clarifies what is already lawful and required currently."). On top of that, the Board still has a rule on the books that preserves the unconstitutional status quo. Or. Admin. R. 820-010-0730(3)(a) ("Unless registered as a professional engineer in Oregon, no persons may; (a) Hold themselves out as an 'engineer' . . . .").

---

[5] Or. Rev. Stat. § 672.007(2)(b) defines the practice of land surveying, not engineering.

[6] Or. Rev. Stat. § 672.046 does not exist.

As a result, it is not at all clear whether—or how—the Board intends to argue that its clarifications have any effect on the First Amendment analysis in this case. *Cf.* Mar. 14, 2018 Hrg. Tr. 10:13-10:15 (ECF 66) (Court: "[P]laintiff will have the opportunity to pin down defendants' legal positions at summary judgment."). In any event, the Board's newest vision of the title law is not a plausible reading of the statutory text. The statute, for example, prohibits non-licensees from using a title implying *either* "that the person is an engineer *or* a registered professional engineer." Or. Rev. Stat. § 672.007(1)(b) (emphasis added). And (at the Board's urging) Oregon state courts have already construed "purports to be able to perform" in a way that forecloses the Board's new view. *Topaz*, 297 P.3d at 503 (holding that Section 672.007(1)(c) applied to retiree's complaint about home-water damage). Like the practice law, the title law's vice is not that it needs "clarification"; its vice is that it methodically targets speech the First Amendment protects.

### C.    The need for facial relief is pressing.

For the reasons discussed above, the practice law and the title law are facially invalid based on a straightforward application of First Amendment precedent. As a practical matter, moreover, important considerations favor facial relief here.

*First*, both the practice law and the title law are deterring people "from exercising their rights." *Gooding v. Wilson*, 405 U.S. 518, 521 (1972). Dale La Forest, for example, testifies that he would hesitate before getting involved in future activism campaigns in Oregon. La Forest Decl. ¶ 20. And in many title-law investigations, the Board closes cases only after respondents censor themselves. *See* pages 6-11, above. In short, countless men, women, and businesses in Oregon are deliberately silencing themselves to avoid attracting the Board's attention.

Marcela Alcantar's experience illustrates the point. Alcantar emigrated from Mexico, learned English, earned a civil-engineering degree, and launched a successful contractor business

in Portland. Rachel Ritchie, *Marcela Alcantar's Incredible Journey*, Portland Monthly (Mar. 2, 2015), https://bit.ly/2IByJPp. For years, she has used her success to try to "motivate young women and minorities." Gedge Decl. Ex. 53, at 1. Yet even though Alcantar does not call herself an "engineer," her civic engagement has prompted two separate Board investigations because *other* people have used that word to describe her. The first investigation arose because a "Middle School Girls conference" identified her (their keynote speaker) as a "civil engineer." *Id.* Ex. 54, at 1. The second arose from the *Portland Monthly* article cited above, whose byline originally used the word "engineer." *Id.* Ex. 55 at 1.

Neither investigation led to penalties. But understandably, Alcantar has curtailed her community outreach. "[I]t appears that in telling my story I might be open to more allegations, which I do not want," she told the Board during its most recent investigation. *Id.* Ex. 53, at 2. She even turned down an interview request from the American Society of Civil Engineers' magazine, explaining that she was afraid competitors would "report me to the board for misrepresentation." *Id.* at 11. By their "very existence," therefore, the Board's laws have silenced a woman whose speech would be valuable to listeners. *See Taxpayers for Vincent*, 466 U.S. at 799. Oregon is worse off because Marcela Alcantar—like La Forest, Järlström, and many others—cannot share her ideas. *See Hicks*, 539 U.S. at 119.

*Second*, few respondents have the resources to defend themselves against the Board on an as-applied basis. As the Supreme Court has recognized, "[m]any persons, rather than undertake the considerable burden (and sometimes risk) of vindicating their rights through case-by-case litigation, will choose simply to abstain from protected speech." *Id.* The record here bears that out. For many people, it makes no economic sense to go to court to fend off the Board. Dave Dickoff, for example, was fined $500 for describing himself as a "mechanical engineer" while

helping his daughter defend against an adverse-possession lawsuit. Gedge Decl. Ex. 56, at 2-3; Dickoff Decl. ¶¶ 3-11. (He had recently retired after decades as a licensed professional engineer. Dickoff Decl. ¶ 2.) "[G]iven the amount of the fine," he explains, "it just wouldn't have been worth it to spend the time and money to defend myself against the board." *Id.* ¶ 12. Dale La Forest accepted a default judgment too, because "I couldn't invest the time and money it would take to travel from my home in California to the hearing in Oregon." La Forest Decl. ¶ 13. Strikingly, when Stephen Topaz—a septuagenarian retiree—opted to defend himself in court, Board members disparaged his decision as "dumb" and "stupid." Gedge Ex. 57, at 16:35-17:28; *see also id.* at 18:30-18:35 ("I hope I don't get like that when I get old."); Topaz Decl. ¶¶ 9-17 (describing burdens of four years of investigation and litigation).

*Third*, the practice and title laws invite arbitrary and discriminatory enforcement. When La Forest spoke out against the power plant, he was reported to the Board by the plant's lead professional engineer. La Forest Decl. ¶¶ 9-10. Dickoff was turned in by a lawyer on the opposite side of an acrimonious lawsuit. Dickoff Decl. ¶¶ 3, 8. And even when complaints are not filed, the Board's laws are a tool for intimidation. In 2015, for instance, an anonymous professional engineer denigrated Marcela Alcantar as a "token minority," accused her of "portray[ing] yourself as an engineer to school age children," and threatened a "report to OSBEELS." Gedge Decl. Ex. 53, at 9.

In unguarded moments, the Board's members reveal a similar tendency to single out speakers whose ideas or credentials they deem unworthy of respect. In voting to investigate Järlström, Board members and staff derided him as a "Swedish constitutional scholar" and "a one-man band to correct Oregon and the nation's wrongs relative to red lights . . . ." *Id.* Ex. 58, at 24:22-24:37, 26:08-26:22. And months earlier, when Järlström asked the Board to "clarify

Oregon law and how it relates to me," not one person at the agency responded to him. Gedge Ex. 59, at 1; Järlström Decl. ¶ 17. Instead, the Board's chief administrative officer circulated his inquiry to colleagues with one word: "Wow!" Gedge Ex. 59, at 1.

La Forest's experience was similar. In voting to impose the maximum civil penalty, Board members ridiculed him as a "fraud"; suggested that officials "didn't really value what he had to say"; and speculated (wrongly) that his educational background and surname were fictitious. *Id.* Ex. 60, at 5:22-6:50; *see also id.* at 6:05-6:13 ("Is he going to show up with a different name than 'La Forest,' and we'll see 'Dale Cedar' soon?"). Upon approving entry of the final default order, Board members belittled his "crusade" to defend himself. *Id.* Ex. 61, at 00:00-00:39.

*****

For all the reasons discussed above, the practice law and the title law are facially unconstitutional. And as the record confirms, this case "provides a textbook example of why [the federal courts] permit facial challenges to statutes that burden expression." *Free Speech Coal.*, 535 U.S. at 244. Time and again, the Board uses its laws to hurt men and women who have done nothing wrong. The laws' more insidious effects cannot be measured; it is impossible to know how many speakers are muzzling themselves rather than risk Board sanctions. Only a judgment of facial invalidity will begin to set things right.

## II. Oregon's engineering-practice law and engineer-title law violate the First Amendment as applied to the speech Mats Järlström wishes to engage in.

Järlström is also entitled to the security of an as-applied judgment. The Board concedes, rightly, that he is "entitled to as-applied relief" on both his Speech Clause claims and his Petition Clause claims. Defs.' Reply Supp. Mot Entry J. 1-2 (ECF 52); *see also* Defs.' Mot. Entry J. 4. At the outset of the case, moreover, the Board consented to entry of a preliminary injunction

tailored to protect Järlström's rights specifically. That preliminary injunction has been in force for the past year, and the proper way to resolve the as-applied aspect of this case is to convert it into a permanent injunction.

Converting the preliminary injunction into a permanent one would afford Järlström the as-applied relief he seeks. First, it ensures that he can communicate his ideas about traffic lights under virtually any circumstances. Agreed Prelim. Inj. ¶ 1. As long as he is not deciding how a traffic light is timed, he can "study, communicate publicly about, and communicate privately about his theories." *Id.* He can send e-mails, write papers, give lectures, comment at public meetings, and speak one-on-one with scientists, officials, policymakers—anyone. He can even get paid. Järlström's mission has never been about getting rich, but "virtually every means of communicating ideas in today's mass society requires the expenditure of money." *Buckley v. Valeo*, 424 U.S. 1, 19 (1976) (per curiam). So to better publicize his message, he is exploring funding opportunities, like grants and stipends, which will help him communicate with a broader audience. Järlström Decl. ¶¶ 32-33.

He is pursuing other avenues as well. In November, he consulted on a local-news report about Beaverton's traffic-light system. *Id.* ¶ 30. Earlier this month, he registered with the Transportation Research Board, a step towards getting his studies peer-reviewed. *Id.* ¶ 32. He anticipates that a piece relating to his theories will soon be published in the magazine of the Royal Statistical Society and the American Statistical Association. *Id.* He continues to make headway with experts in the field, including in Oregon. *Id.* ¶ 30. And over the coming year, he is planning to arrange lectures or seminars to share his theories. *Id.* ¶ 32. All these activities are protected by the First Amendment and by the preliminary injunction.

Second, the preliminary injunction secures Järlström's right to "describe himself publicly and privately using the word 'engineer.'" Agreed Prelim. Inj. ¶ 2. As the Board tacitly conceded by agreeing to it, this protection is common-sense: Järlström *is* an engineer, so he can *say* he's an engineer. That statement is true no matter where he says it—in an article, in an e-mail, in a pamphlet, on a business card, on a website, at a lecture, in an ad announcing a lecture, or in conversation. There is no setting in which the government can declare the word "engineer" off-limits to Järlström, and the title law's restriction on his use of that word fails every level of First Amendment scrutiny. *See* page 29, above. That is why the preliminary injunction categorically protects his right to describe himself using the word "engineer."

Put simply, the preliminary injunction secures activities that Järlström cares deeply about and that the First Amendment protects. Järlström has no interest in setting the timing for specific traffic lights. Järlström Decl. ¶ 33. He wants to talk, to write, and to convince people his ideas have merit. *Id.* As for the word "engineer," he wants to keep doing what he has done for his entire adult life: say who he is. *Id.* ¶ 34. Last summer, in fact, he wrote an essay for the Institute of Electrical and Electronics Engineers titled "I Am an Engineer." *Id.* Ex. 16. Only the security of the preliminary injunction let him do that without fear of punishment.

Järlström's desire to communicate his ideas will not disappear with the close of this case. Nor will his desire to describe himself as an "engineer." That is why he needs a clear decree that secures his right to continue with all these activities once the case is over. To ensure that Järlström's rights under the Speech and Petition Clauses are fully protected, the Court should convert the as-applied preliminary injunction into a permanent one.

## CONCLUSION

Plaintiff's motion for summary judgment should be granted; the engineering-practice and engineer-title laws should be declared facially unconstitutional and unconstitutional as applied to Plaintiff; and the preliminary injunction now in force should be converted into a permanent one.

Dated: May 29, 2018.

Respectfully submitted,

/s Samuel B. Gedge

William J. Ohle (OSB 913866)†
Jill S. Gelineau (OSB 852088)
SCHWABE, WILLIAMSON & WYATT P.C.
PacWest Center
1211 SW Fifth Avenue, Suite 1900
Portland, OR  97204
Phone: (503) 222-9981
Fax:    (503) 796-2900
E-mail: wohle@schwabe.com
        jgelineau@schwabe.com

Kelly M. Walsh (OSB 993897)
SCHWABE, WILLIAMSON & WYATT PC
700 Washington Street Suite 701
Vancouver, WA  98660
Phone: (360) 694-7551
Fax:    (360) 693-5574
E-mail: kwalsh@schwabe.com

Samuel B. Gedge (VA Bar No. 80387)*
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, VA  22203
Phone: (703) 682-9320
Fax:    (703) 682-9321
E-mail: sgedge@ij.org

Wesley Hottot (WA Bar No. 47539)*
Institute for Justice
600 University Street, Suite 1730
Seattle, WA  98001
Phone: (206) 957-1300
Fax:    (206) 957-1301
E-mail: whottot@ij.org

*Attorneys for Plaintiff*

† Designated local counsel

* Admitted *pro hac vice*