William J. Ohle (OSB 913866)†
SCHWABE, WILLIAMSON & WYATT P.C.
PacWest Center
1211 SW Fifth Avenue, Suite 1900
Portland, OR  97204
Phone:   (503) 222-9981
E-mail:   wohle@schwabe.com

Samuel B. Gedge (VA Bar No. 80387)*
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, VA  22203
Phone:   (703) 682-9320
E-mail:   sgedge@ij.org

*Attorneys for Plaintiff*

†   Designated local counsel
*   Admitted *pro hac vice*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### PORTLAND DIVISION

MATS JÄRLSTRÖM,

              Plaintiff,

v.

CHRISTOPHER D. ALDRIDGE, WILLIAM
J. BOYD, DAREN L. CONE, SHELLY MC
DUQUETTE, JASON J. KENT, LOGAN T.
MILES, RON SINGH, DAVE M. VAN
DYKE, SEAN W. ST. CLAIR, AMIN
WAHAB, and OSCAR J. ZUNIGA JR., in
their official capacities as members of the
Oregon State Board of Examiners for
Engineering and Land Surveying,

              Defendants.

Case No.: 3:17-cv-00652-SB

**PLAINTIFF JÄRLSTRÖM'S REPLY IN
SUPPORT OF HIS MOTION FOR
SUMMARY JUDGMENT AND
OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

**REQUEST FOR ORAL ARGUMENT**

## TABLE OF CONTENTS

PAGE

INTRODUCTION ...................................................................................................1

ARGUMENT ........................................................................................................3

I.      Oregon's engineering-practice law and engineer-title law violate the First
        Amendment on their face ...............................................................................3

        A.      The engineering-practice law is facially invalid ...........................................3

                1.      The Board's proposed interpretation conflicts with the practice
                        law and with other statutory provisions .............................................5

                2.      Under the Board's proposed interpretation, the practice law still
                        would violate speakers' First Amendment rights ...........................9

                        a.      "Professional speech" enjoys full First Amendment
                                protection ........................................................................9

                        b.      The Board has not carried its burden to show that its
                                proposed interpretation is tailored to a sufficiently
                                important state interest .......................................................14

                3.      Beyond proposing a new interpretation, the Board does not defend
                        the practice law's constitutionality ..................................................15

        B.      The engineer-title law is facially invalid ....................................................16

                1.      The Board's proposed interpretation conflicts with the title law's
                        text and with binding state-court precedent ....................................18

                2.      The Board's proposed interpretation would allow the agency to
                        continue violating speakers' First Amendment rights ..................19

                3.      Beyond proposing a new interpretation, the Board does not defend
                        the title law's constitutionality .......................................................22

        C.      The need for facial relief is pressing...........................................................22

II.     The engineering-practice law and the engineer-title law violate the First
        Amendment as applied to the speech Mats Järlström wishes to engage in ...........26

III.    The Board's residual arguments lack merit ........................................................28

    A.    Järlström has standing to challenge all the statutory and regulatory
provisions identified in his complaint.........................................................28

    B.    The Board's appeal to judicial estoppel is misplaced...............................31

CONCLUSION.......................................................................................................................34

# TABLE OF AUTHORITIES

**PAGE(S)**

## CASES

*ACLU of Ill. v. White*,
  692 F. Supp. 2d 986 (N.D. Ill. 2010) ............................................... 12

*Aptheker v. Sec'y of State*,
  378 U.S. 500 (1964) ..................................................................... 24

*Arizona v. Tohono O'odham Nation*,
  818 F.3d 549 (9th Cir. 2016) ....................................................... 33

*Ashcroft v. Free Speech Coal.*,
  535 U.S. 234 (2002) ....................................................................... 1

*Baggett v. Bullitt*,
  377 U.S. 360 (1964) ..................................................................... 25

*Bd. of Airport Comm'rs v. Jews for Jesus, Inc.*,
  482 U.S. 569 (1987) ................................................................ 24, 25

*Bhd. of R. R. Trainmen v. Virginia ex rel. Va. State Bar*,
  377 U.S. 1 (1964) ......................................................................... 15

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*,
  657 F.3d 936 (9th Cir. 2011) (en banc) .............................. 14, 22, 32

*Conforti v. United States*,
  74 F.3d 838 (8th Cir. 1996) ......................................................... 32

*Doe v. Harris*,
  772 F.3d 563 (9th Cir. 2014) ....................................................... 27

*Edenfield v. Fane*,
  507 U.S. 761 (1993) ................................................................ 17, 21

*FEC v. Wis. Right to Life*,
  551 U.S. 449 (2007) ..................................................................... 27

*Foti v. City of Menlo Park*,
  146 F.3d 629 (9th Cir. 1998) ......................................................... 6

*Garrison v. Louisiana*,
    379 U.S. 64 (1964) ........................................................................................ 13

*Gooding v. Wilson*,
    405 U.S. 518 (1972) ................................................................................. 2, 18

*Hill v. City of Houston*,
    789 F.2d 1103 (5th Cir. 1986) (en banc), *aff'd*, 482 U.S. 451 (1987) ............. 23

*Ibanez v. Fla. Dep't of Bus. & Prof'l Regulation*,
    512 U.S. 136 (1994) ..................................................................................... 17

*Italian Colors Rest. v. Becerra*,
    878 F.3d 1165 (9th Cir. 2018) ................................................................. 30, 31

*Knight v. Browne*,
    No. 2:07-cv-00738, 2007 WL 1847245 (W.D. Wash. June 27, 2007) ............. 13

*Lair v. Bullock*,
    798 F.3d 736 (9th Cir. 2015) ........................................................................ 15

*Libertarian Party of L.A. Cty. v. Bowen*,
    709 F.3d 867 (9th Cir. 2013) ............................................................. 28, 29, 30, 31

*Mills v. Alabama*,
    384 U.S. 214 (1966) ..................................................................................... 12

*Minn. Voters All. v. Mansky*,
    138 S. Ct. 1876 (2018) ............................................................................... 2, 24

*Nat'l Inst. of Family & Life Advocates v. Becerra*,
    138 S. Ct. 2361 (2018) ............................................................ 2, 10, 11, 13, 27

*Nat'l Inst. of Family & Life Advocates v. Harris*,
    839 F.3d 823 (9th Cir. 2016), *rev'd sub nom. Nat'l Inst. of Family & Life Advocates v.*
    *Becerra*, 138 S. Ct. 2361 (2018) ................................................................... 10

*New Hampshire v. Maine*,
    532 U.S. 742 (2001) ..................................................................................... 32

*Nichols v. Scott*,
    69 F.3d 1255 (5th Cir. 1995) ........................................................................ 32

*Pickup v. Brown*,
    740 F.3d 1208 (9th Cir. 2014), *abrogated by Nat'l Inst. of Family & Life Advocates v.*
    *Becerra*, 138 S. Ct. 2361 (2018) ..................................................................... 9

*Planned Parenthood of Idaho, Inc. v. Wasden,*
    376 F.3d 908 (9th Cir. 2004) .................................................................... 3, 31

*Powell's Books, Inc. v. Kroger,*
    622 F.3d 1202 (9th Cir. 2010) ........................................... 1, 4, 5, 6, 16, 19, 23

*Reno v. ACLU,*
    521 U.S. 844 (1997) ................................................................................... 23

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.,*
    487 U.S. 781 (1988) ................................................................................... 13

*Snyder v. Phelps,*
    562 U.S. 443 (2011) ............................................................................. 12, 13

*Sorrell v. IMS Health Inc.,*
    564 U.S. 552 (2011) ................................................................................... 15

*State v. Clemente-Perez,*
    359 P.3d 232 (Or. 2015) ............................................................................... 8

*State v. Gonzalez-Valenzuela,*
    365 P.3d 116 (Or. 2015) ............................................................................... 6

*State v. Jansen,*
    108 P.3d 92 (Or. Ct. App. 2005) .................................................................. 8

*State v. Richards,*
    401 P.3d 767 (Or. 2017) ............................................................................... 8

*Susan B. Anthony List v. Driehaus,*
    134 S. Ct. 2334 (2014) ............................................................................... 28

*Topaz v. Or. Bd. of Exam'rs for Eng'g & Land Surveying,*
    297 P.3d 498 (Or. Ct. App.), *rev. denied*, 353 Or. 714 (2013) ................... 6, 18

*Turner Broad. Sys. v. F.C.C.,*
    512 U.S. 622 (1994) ................................................................................... 14

*United States v. Alvarez,*
    132 S. Ct. 2537 (2012) ............................................................................... 14

*United States v. Playboy Entm't Grp., Inc.,*
    529 U.S. 803 (2000) ................................................................................... 14

*United States v. Stevens*,
    559 U.S. 460 (2010).................................................................. 5, 15, 17, 22, 23, 33

*Valle del Sol Inc. v. Whiting*,
    709 F.3d 808 (9th Cir. 2013) ................................................................... 16

*Vt. Soc. of Ass'n Executives v. Milne*,
    779 A.2d 20 (Vt. 2001) ............................................................................. 12

*Virginia v. Hicks*,
    539 U.S. 113 (2003)............................................................................... 4, 23

*W. Helicopter Servs., Inc. v. Rogerson Aircraft Corp.*,
    811 P.2d 627 (Or. 1991) ........................................................................... 18

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ..................................................................................... 26

## STATUTES AND RULES

Fed. R. Civ. P. 8(c)(1)................................................................................... 32

Or. Rev. Stat. § 174.010 ................................................................................. 7

Or. Rev. Stat. § 183.482(7) ........................................................................... 33

Or. Rev. Stat. § 646.608(1)(b) ...................................................................... 22

Or. Rev. Stat. § 646.608(1)(c) ....................................................................... 22

Or. Rev. Stat. § 646.608(1)(e) ....................................................................... 22

Or. Rev. Stat. § 672.005(1)(a) ..................................................................... 3, 5

Or. Rev. Stat. § 672.005(1)(b) ..................................................................... 3, 5

Or. Rev. Stat. § 672.007(1) ........................................................................... 16

Or. Rev. Stat. § 672.060(5)(b) ........................................................................ 6

Or. Rev. Stat. § 672.255(1)(d) ........................................................................ 8

Or. R. Civ. P. 19(B) ...................................................................................... 32

Or. Admin. R. 137-003-0665(3) .................................................................... 33

Or. Admin. R. 820-001-0015(3)(b)................................................................ 32

Or. Admin. R. 820-001-0015(4)(b)................................................................ 32

Or. Admin. R. 820-010-0730(3)(a)................................................................ 19

## OTHER AUTHORITIES

Appellees' Br., *Powell's Books, Inc. v. Kroger*,
    Nos. 09-35153, 09-35154, 2009 WL 6303813 (9th Cir. Sept. 25, 2009) ........................ 18

Karli Petrovic, *8 Intel Engineers Breaking the Mold*, iQ by Intel (Sept. 17, 2015),
    https://tinyurl.com/ycq2xutg .......................................................................... 21

Lawrence H. Tribe, *American Constitutional Law* § 12-29 (2d ed. 1988) .................................... 9

Letter from Kodi Jean Verhalen, P.E., Esq., F.NSPE to *Washington Post* (June 9, 2017),
    https://tinyurl.com/yd9esdas ......................................................................... 21

Or. State Bd. of Exam'rs for Eng'g & Land Surveying, *Latest News Stories*,
    https://tinyurl.com/y9ht7vly .......................................................................... 33

Richard H. Fallon, Jr., *Making Sense of Overbreadth*, 100 Yale L.J. 853 (1991) ........................ 23

Tom Foremski, *'iQ by Intel' – experimental online magazine curated by a workforce of
    thousands*, ZDNet (May, 16, 2012) ................................................................. 21

## CERTIFICATE OF COMPLIANCE

This Reply in Support of Plaintiff's Motion for Summary Judgment and Opposition to Defendants' Motion complies with the applicable word-count limitation under LR 7-2(b), 26-3(b), 54-1(c), or 54-3(e) because it contains 9,850 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

/s Samuel B. Gedge
Samuel B. Gedge (VA Bar No. 80387)*
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, VA  22203
Phone: (703) 682-9320
Fax:     (703) 682-9321
E-mail: sgedge@ij.org

* Admitted *pro hac vice*

## INTRODUCTION

Oregon's Professional Engineer Registration Act violates the First Amendment in two ways. The engineering-practice law defines "practice of engineering" so broadly that it restricts all sorts of protected "opinions," "critique[s]," "reports, commentary, . . . testimony," "recommendations," "calculations and conclusions" relating to engineering topics. *See* Pl.'s Summ. J. Mem. 17-18 (ECF 72); Gedge Supp. Decl. Ex. 62, at 56:21-56:31. The engineer-title law makes it unlawful for people to accurately describe themselves using the word "engineer," unless they are Oregon-licensed professional engineers. With good reason, the Oregon State Board of Examiners for Engineering & Land Surveying has long conceded that these laws are "broad." Gedge Decl. Ex. 4, at 2 (ECF 74-4); Gedge Supp. Decl. Ex. 63, at 2. And the Board's record of relentless—and ongoing—First Amendment violations "provides a textbook example of why [the federal courts] permit facial challenges to statutes that burden expression." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 244 (2002).

The Board's response and cross-motion makes no effort to defend the practice and title laws as written. Instead, the Board stakes its defense on entirely new readings of the statutes. To rule in the Board's favor, therefore, the Court would need to conclude, first, that the challenged laws are "readily susceptible" to the Board's new interpretations, and, second, that those interpretations would narrow the laws in a way that makes them constitutional. *See Powell's Books, Inc. v. Kroger*, 622 F.3d 1202, 1208 (9th Cir. 2010) (citation omitted).

The Board's proposed interpretations fail both these metrics. The Board's new view of the practice law—which would limit its scope to activities "for hire" or "for another person" — cannot be squared with the law's text and structure. Nor would that reading make the practice law constitutional. The Board's proposed interpretation seeks to maneuver the law into the Ninth

Circuit's "professional speech" doctrine. But even construed that way, the law would still violate the First Amendment. Not only is the Board unable to say what it means by "professional speech"—itself a red flag—but the Supreme Court repudiated the professional-speech doctrine three weeks ago. *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371-75 (2018).

The Board's effort to rewrite the title law fails for similar reasons. On its face—and as enforced for decades—the title law bans anyone, in any setting, from publicly describing herself as an "engineer" without a Board-issued professional-engineer license. As with the practice law, the Board does not dispute that a law of this breadth violates the First Amendment. Instead, the Board attempts to wedge the law into a zone where the government has more "leeway" to ban words; according to the Board, the title law should now be understood to ban, not *all* unauthorized uses of the word "engineer," but only "misleading commercial speech." Defs.' Summ. J. Mem. 3, 27 (ECF 79). That interpretation is foreclosed by binding state precedent: The Oregon Court of Appeals has already construed the title law to extend it far beyond commercial speech, and that precedent controls the law's meaning. *See, e.g.*, *Gooding v. Wilson*, 405 U.S. 518, 525 n.3 (1972). In any event, the Board's proposed interpretation would leave the title law as constitutionally infirm as it is now.

This Court should reject the Board's invitation to rewrite Oregon's laws. Not only would adopting the Board's limiting constructions fail to make the laws constitutional, they would "introduce[] confusing line-drawing problems" and "pose[] riddles that even the State's top lawyers struggle to solve." *See Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1889, 1891 (2018). The correct approach is simpler: "It is enough . . . to observe that the plain meaning of the statute[s] is unconstitutional, and that any constitutional construction is not 'readily apparent.'"

*Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 932 (9th Cir. 2004). The Court should grant

facial relief to that effect. As discussed in Järlström's opening brief—and ignored in the Board's

response—the Court should also grant as-applied relief by converting the agreed preliminary

injunction into a permanent one.[1]

## ARGUMENT

### I.    Oregon's engineering-practice law and engineer-title law violate the First Amendment on their face.

####     A.    The engineering-practice law is facially invalid.

As detailed in Järlström's opening brief, Oregon's engineering-practice law covers "any

professional service" and any "creative work" that "requir[es] engineering education, training

and experience." Or. Rev. Stat. § 672.005(1)(a). The law also encompasses "[a]pplying special

knowledge of the mathematical, physical and engineering sciences" to professional services or

creative work like "consultation," "investigation," "testimony," or "evaluation" relating to

"processes, works or projects." *Id.* § 672.005(1)(b).[2] The Board has in the past conceded that this

law is "very broad." Gedge Decl. Ex. 4, at 2 (ECF 74-4). And the undisputed record confirms

---

[1] This opposition to the Board's cross-motion for summary judgment incorporates Järlström's summary-judgment memorandum and the evidence accompanying that memorandum.

[2] Sections 672.005(1)(a)-(b) read in full:

> (1) "Practice of engineering" or "practice of professional engineering" means doing any of the following:
>
>> (a) Performing any professional service or creative work requiring engineering education, training and experience.
>>
>> (b) Applying special knowledge of the mathematical, physical and engineering sciences to such professional services or creative work as consultation, investigation, testimony, evaluation, planning, design and services during construction, manufacture or fabrication for the purpose of ensuring compliance with specifications and design, in connection with any public or private utilities, structures, buildings, machines, equipment, processes, works or projects.

that the law restricts "a substantial amount of constitutionally protected speech." *Powell's Books, Inc. v. Kroger*, 622 F.3d 1202, 1208 (9th Cir. 2010). The Board punished Mats Järlström for sending e-mails about traffic lights. Pl.'s Summ. J. Mem. 20. It punished Dale La Forest for criticizing a power plant. *Id.* 20-21. It is actively investigating Suji Somasundaram for critiquing a landfill project. *Id.* 21, 25. Time and again—and often with specific reference to Section 672.005(1)—the Board has stated that the practice law covers all manner of "critique[s]," "reports, commentary, and testimony," "recommendations," "calculations and conclusions" on engineering topics. *See id.* 17-18; *see also* Gedge Supp. Decl. Ex. 62, at 56:21-56:31 ("It seems like if you are forming an opinion substantial enough to refute the professional opinion of a professional engineer, that itself might be the practice of engineering."). From "the text of the law" and from "actual fact," the law is substantially overbroad. *Virginia v. Hicks*, 539 U.S. 113, 122 (2003) (brackets omitted).

Nowhere in its brief does the Board defend the practice law as written. *See* Defs.' Summ. J. Mem. 12-22. Instead, it proposes to rewrite the law from the ground up. "When the applicable statutory construction methodology is correctly applied," the Board argues, "it is plain that Oregon's practice statutes target only the professional practice of engineering." *Id.* 2. Yet the Board's reasoning is anything but plain. To begin, the Board appears to propose that the statutory phrases "creative work" and "professional service" be construed to cover only engineering-related activities "for hire" or "for another person who has requested it." *Id.* 15. That, the Board contends, limits the practice law to what the agency describes as "the professional practice of engineering" (*id.* 2, 12, 14, 17, 20), or the "practice of the profession of engineering" (*id.* 2, 15, 16, 19), or "the actual practice of engineering" (*id.* 13). So construed—the Board continues—the practice law covers only what the Board calls "professional speech." *Id.* 2, 19. And because

"[t]he Ninth Circuit has clearly ruled that states have the authority to regulate professional speech" (*id.* 2), the Board concludes that its proposed interpretation makes the practice law constitutional.

The reasons why the Board's theory fails are simpler. First, the Board's proposed interpretation conflicts with the practice law itself; for that reason alone, it is not one this Court can adopt (Section 1, below). Second, the interpretation would not "make [the practice law] constitutional." *See Powell's Books, Inc.*, 622 F.3d at 1208-09. Instead, the Board's position rests on the discredited "professional speech" doctrine and would give the Board free rein to violate First Amendment rights going forward (Section 2, below). For these reasons, the Board's limiting construction cannot be adopted. And because the Board makes no effort to defend the practice law's constitutionality as it applies beyond "professional speech," the failure of its proposed interpretation "decides the constitutional question." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (Section 3, below).

### 1.    *The Board's proposed interpretation conflicts with the practice law and with other statutory provisions.*

The Board proposes that the statutory definition of "practice of engineering" be limited to "the professional practice of engineering." Defs.' Summ. J. Mem. 2, 12, 14, 17, 20; *see also* Or. Rev. Stat. § 672.005(1)(a)-(b). What the Board means by that phrase is far from clear. What is clear, however, is that the Board's proposed interpretation distinguishes between "simple speech" and speech "for hire" or "for another person who has requested it." Defs.' Summ. J. Mem. 15. "[S]imple speech" would no longer qualify as "creative work" or "professional service," *see* Or. Rev. Stat. § 672.005(1)(a)-(b), meaning it would not be the "practice of engineering." Speech that is "for hire" or "for another person," by contrast, would still be covered. Defs.' Summ. J. Mem. 15.

The practice law cannot support that reading. While the federal courts may of course "consider" the Board's proposed interpretations, *Foti v. City of Menlo Park*, 146 F.3d 629, 639 (9th Cir. 1998), the courts "cannot rewrite the statute to conform to constitutional limitations," *Powell's Books, Inc.*, 622 F.3d at 1207. That principle controls here. The Board's interpretation is "precluded by the plain language of the [statute],'" *id.* at 1214 (citation omitted), and for that reason it cannot be adopted.

      **a.**      To construe the practice law to cover only activities "for hire" or "for another person," the Board relies almost exclusively on dictionary definitions. But "a dictionary definition . . . should not be relied on . . . without critically examining how the definition fits into the context of the statute itself." *State v. Gonzalez-Valenzuela*, 365 P.3d 116, 122 (Or. 2015). Here, the Board's proposed interpretation fails because it conflicts with both the Professional Engineer Registration Act and the text of Sections 672.005(1)(a)-(b).

      *First*, reading the practice law as the Board suggests would create serious structural problems. That is because the Professional Engineer Registration Act specifically exempts some—but not all—do-it-yourself engineering projects from the practice law's coverage. Under Section 672.060(5), the practice law does not apply if "a person . . . practice[s] engineering on his own property and affect[s] exclusively that property." *See Topaz v. Or. Bd. of Exam'rs for Eng'g & Land Surveying*, 297 P.3d 498, 504 (Or. Ct. App.), *rev. denied* 353 Or. 714 (2013) (discussing Section 672.060(5)). At the same time, Section 672.060(5) makes clear that the practice law *does* apply if a do-it-yourself project affects "the safety or health of the public, including employees and visitors." Or. Rev. Stat. § 672.060(5)(b).[3]

---

[3] Section 672.060(5) reads in full:

      ORS 672.002 to 672.325 do not apply to the following:

The Legislative Assembly would not have drawn these distinctions if, as the Board now proposes, the threshold definition of "practice of engineering" covers only work "for hire" or "for another person." Under the Board's proposed interpretation, the do-it-yourself projects Section 672.060(5) exempts would not trigger the practice law in the first place. It would be similarly illogical for the Legislative Assembly to have carved out from that exemption those do-it-yourself projects that affect health and safety. Since those projects would also not be "for another person" or "for hire," the practice law (by the Board's reading) would not cover them at all. These structural conflicts confirm that the Board's proposed interpretation is not one the Legislative Assembly would have intended or that the state courts would accept. *See* Or. Rev. Stat. § 174.010 (directing courts to "give effect to all" provisions in a statute); *see also* Defs.' Summ. J. Mem. 11 (noting that Oregon interpretive principles apply).

*Second*, the Board's proposed interpretation creates problems within Sections 672.005(1)(a)-(b). As construed by the Board, the separate phrases "professional service" and "creative work" duplicate each other. Each phrase means virtually the same thing: engineering-related activities that are "for another person who has requested it" (for "professional service") or "for hire" (for "creative work"). Defs.' Summ. J. Mem. 15. By failing to give each phrase its own distinct meaning, the Board's new interpretation thus breaks with Oregon's "cardinal rule of

---

* * *

(5) An individual, firm, partnership or corporation practicing engineering or land surveying:

(a) On property owned or leased by the individual, firm, partnership or corporation, or on property in which the individual, firm, partnership or corporation has an interest, estate or possessory right; and

(b) That affects exclusively the property or interests of the individual, firm, partnership or corporation, unless the safety or health of the public, including employees and visitors, is involved.

statutory construction": "to give significance and effect to every part of a statute." *State v. Clemente-Perez*, 359 P.3d 232, 239 (Or. 2015) (citation omitted). That cannot have been the Legislative Assembly's intent.

  **b.**  The Board's secondary arguments are also without merit. The Board asserts, for example, that "[t]he placement of the statutes . . . in the Oregon Revised Statutes in the context of other professional regulations is . . . indicative of legislative intent." Defs.' Summ. J. Mem. 16. But "[i]t is the office of legislative counsel, not the lawmakers themselves, that decides where in the Oregon Revised Statutes a particular enacted law will be placed." *State v. Jansen*, 108 P.3d 92, 94 (Or. Ct. App. 2005). Whether or not the practice law is characterized as a professional regulation, moreover, its overbreadth makes it unconstitutional.

  The Board also suggests that the practice law should be confined to whatever engineering "branches" the Board decides to regulate. Defs.' Summ. J. Mem. 16. But the statutory provisions the Board cites do not limit the practice law; they simply authorize the agency to select the disciplines for which "examinations are offered." *See, e.g.*, Or. Rev. Stat. § 672.255(1)(d). That is how the Board could punish Järlström for unlicensed traffic engineering after telling him that "Transportation is not a discipline offered by OSBEELS." Järlström Decl. Ex. 5, at 4 (ECF 73-5).

  The Board's reliance on legislative history is equally misplaced. "[L]egislative history cannot substitute for, or contradict the text of, [a] statute." *State v. Richards*, 401 P.3d 767, 772 (Or. 2017) (citation omitted). And in any case, the Board's 1973 hearing transcript—peppered with over 115 notations of "indiscernible"—provides no support for the Board's position. *See* Beatty-Walters Decl. Ex. 2 (ECF 80-2). If anything, the materials suggest that lawmakers and stakeholders voiced repeated "concern[s]" with "broadening the bill." *Id.* Ex. 4, at 2 (ECF 80-4);

*see also id.* Ex. 5, at 3 (ECF 80-5) (similar). Put simply, the practice law's text and structure preclude the Board's proposed interpretation, and nothing in the legislative history changes that.

> ### 2.    *Under the Board's proposed interpretation, the practice law still would violate speakers' First Amendment rights.*

The Board's proposed interpretation fails for a second, independent reason: Not only does the interpretation conflict with the statute, it would not make the practice law constitutional. "[A] court can adopt an adequate saving construction only if the surviving portion of the statute clearly and unambiguously restricts conduct that is not privileged by the first amendment—and only such conduct." Lawrence H. Tribe, *American Constitutional Law* § 12-29, at 1030 (2d ed. 1988); *see also id.* at 1031 n.9. In proposing its new interpretation, however, the Board misses that mark by a wide margin. The Board's narrowing construction serves one purpose—to limit the practice law's scope to what the Board describes as "professional speech." But "professional speech" is not the cure-all the Board suggests. The Supreme Court repudiated the professional-speech doctrine three weeks ago, and contrary to the Board's view, classifying speech as "professional" does not give the agency "ample authority" to restrict it. Defs.' Summ. J. Mem. 22. Restrictions that single out "professional" speech must satisfy the same First Amendment scrutiny as any other speech restrictions—and the Board has not even attempted to carry that burden.

> ### a.    **"Professional speech" enjoys full First Amendment protection.**

The Board's proposed interpretation starts and ends with the mistaken premise that the agency has "ample authority" to regulate what it describes as "professional speech." *Id.* 2, 22. "Professional speech," the Board asserts, is speech "within the confines of a professional relationship." *Id.* 9 (quoting *Pickup v. Brown*, 740 F.3d 1208, 1228 (9th Cir. 2014), *abrogated by Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018)). And while

content-based speech restrictions are ordinarily subject to strict scrutiny, the Board reads Ninth

Circuit precedent to hold that restrictions on "professional speech" trigger intermediate scrutiny

or even rational-basis review. *Id.* 9-10 (citing *Nat'l Inst. of Family & Life Advocates v. Harris*,

839 F.3d 823 (9th Cir. 2016), *rev'd sub nom. Nat'l Inst. of Family & Life Advocates v. Becerra*,

138 S. Ct. 2361 (2018)). The Board thus stakes its narrowing construction on the notion that "the

Ninth Circuit has clearly ruled that states have the authority to regulate professional speech." *Id.*

2.

The Board is incorrect; last month, the Supreme Court rejected the Ninth Circuit's

professional-speech doctrine root and branch. *Nat'l Inst. of Family & Life Advocates*, 138 S. Ct.

at 2371-75. The Supreme Court underscored that it has never "recognized 'professional speech'

as a separate category of speech." *Id.* at 2371. Instead, the Court reaffirmed, "[s]peech is not

unprotected merely because it is uttered by 'professionals.'" *Id.* at 2372. And while the Board

sees a constitutionally significant "distinction" between "professional" speech and "simple"

speech, Defs.' Summ. J. Mem. 13, the Supreme Court made clear that no such distinction exists.

"[N]either California [the defendant in that case] nor the Ninth Circuit," the Court reasoned, "has

identified a persuasive reason for treating professional speech as a unique category that is exempt

from ordinary First Amendment principles." *Nat'l Inst. of Family & Life Advocates*, 138 S. Ct. at

2375.

In fact, there is good cause not to water down protections for "professional speech." For

obvious reasons, "[s]tates cannot choose the protection that speech receives under the First

Amendment." *Id.* Yet the professional-speech doctrine gave states the power to do just that.

Because "'[p]rofessional speech' is . . . a difficult category to define with precision," *id.*, the

doctrine has often let regulators sidestep heightened First Amendment scrutiny by picking and

choosing what speech to label "professional." *See id.* In this way, the doctrine gave states "unfettered power to reduce a group's First Amendment rights by simply imposing a licensing requirement." *Id.*; *see also id.* ("All that is required to make something a 'profession,' according to these courts, is that it involves personalized services and requires a professional license from the State.").

That phenomenon is on full display here. On the strength of labels like "professional," "profession," and "practice," Defs.' Summ. J. Mem. 2, 12, 13, 14, 15, 16, 17, 19, 20, 22, the Board claims a free hand to regulate all manner of protected speech. For example, the Board's new interpretation of the practice law would leave it free to punish:

- ➤ "[S]omebody who gives advice to their -- their church or council elders, or what have you." Dec. 4, 2017 Hrg. Tr. 6:25-7:02 (ECF 70).

- ➤ Mats Järlström, if he gives "free advice" about his traffic-light theories to anyone. *Id.* 10:25-11:17.

- ➤ Järlström, if he speaks about his traffic-light theories on a panel (depending on "his relationship to the panel" and whether "he's being paid"). *Id.* 10:01-10:12.

- ➤ Järlström, if he were to speak on behalf of a traffic-light advocacy organization. *See id.* 8:18-9:07.

- ➤ Dale La Forest, for publicly criticizing a power plant on behalf of a neighborhood group. La Forest Decl. Ex. 1 (ECF 75-1); Defs.' Summ. J. Mem. 21 n.11.

- ➤ Suji Somasundaram, for critiquing a landfill-expansion project as part of a grassroots advocacy effort. Pl.'s Summ. J. Mem. 21, 25; Defs.' Summ. J. Mem. 21, n.11.

All these examples reflect speech "at the heart of the First Amendment's protection." *Snyder v. Phelps*, 562 U.S. 443, 451-52 (2011) (citation omitted). Yet for the Board, it is enough to label the speech "professional," or "advice," or "work" to devalue that protection. Dale La Forest, for example, was investigated for four years and fined $1,000 because he criticized a power plant on behalf of a neighborhood group. Pl.'s Summ. J. Mem. 5, 20-21. His comments and testimony were paradigmatic First Amendment activity; "[a]ny group or person 'engaged in trying to persuade . . . [government] action is exercising the First Amendment right of petition.'" *ACLU of Ill. v. White*, 692 F. Supp. 2d 986, 992 (N.D. Ill. 2010); *see also Vt. Soc. of Ass'n Executives v. Milne*, 779 A.2d 20, 24 (Vt. 2001) ("This is no less true because lobbyists are often paid to petition the government on behalf of others."). But the Board harnessed the professional-speech doctrine to write off La Forest's First Amendment rights entirely. Because his "reports, commentary, and testimony" were the work of a "professional," the Board ruled, his speech was "clearly not protected." La Forest Decl. Ex. 1, at 17 (ECF 75-1); *see also* Defs.' Summ. J. Mem. 21 n.11.

The Board's ongoing investigation into Suji Somasundaram is similar. Somasundaram wrote a memo criticizing a controversial landfill-expansion project, which was submitted to Oregon state agencies on behalf of a grassroots advocacy group. Pl.'s Summ. J. Mem. 21, 25. Again, the First Amendment could not more clearly apply. "Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs." *Mills v. Alabama*, 384 U.S. 214, 218 (1966). In the Board's view, however, the First Amendment provides Somasundaram little or no protection. Under the professional-speech doctrine, the Board submits, the First Amendment requires only that the agency label his memo "engineering

work on behalf of others who requested that the work be performed." Defs.' Summ. J. Mem. 21 n.11.

For another example, consider the Washington board's investigation against Roger Knight (which the Board's motion describes with approval). *See id.* 21. Much like La Forest and Somasundaram, Knight submitted public comments to a local government, on behalf of homeowners, in which he criticized a proposed housing development. *Id.* The court agreed that Washington's engineering-practice law—the model for Oregon's (*id.* 18)—"*does* threaten to punish Knight for the 'speech' he undertook in writing his two letters." *Knight v. Browne*, No. 2:07-cv-00738, 2007 WL 1847245, at *2 (W.D. Wash. June 27, 2007). Even so, the court declined to entertain Knight's First Amendment claims. Because he wrote the public comments on behalf of others, his speech could be classified—and punished—as the unlicensed "practice of engineering." *Id.*; *see also id.* at *3 ("The statute merely prohibits the unauthorized *practice* of engineering, not the unauthorized *discussion* of engineering.").[4]

These examples drive home why "[s]tate labels cannot be dispositive of [the] degree of First Amendment protection." *Nat'l Inst. of Family & Life Advocates*, 138 S. Ct. at 2375 (quoting *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796 (1988)). All the speech described above—Järlström's, La Forest's, Somasundaram's, and Knight's—is core advocacy about public affairs. It is "more than self-expression; it is the essence of self-government." *Snyder*, 562 U.S. at 452 (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74-75 (1964)). Yet even under its new interpretation of the practice law, the Board claims full power to regulate and punish these types of speakers as "professionals." As the Supreme Court's ruling in *National*

---

[4] Knight proceeded *pro se*. On appeal, his IFP status was revoked—and the appeal dismissed for failure to pay docketing fees—after the district court certified that "the courts need not spend additional time considering his frivolous case." *See* Order, *Knight v. Browne*, No. 2:07-cv-00738 (W.D. Wash. Nov. 27, 2007).

*Institute of Family & Life Advocates* confirms, the First Amendment cannot be circumvented so easily.

> **b.    The Board has not carried its burden to show that its proposed interpretation is tailored to a sufficiently important state interest.**

Beyond reciting the word "professional," the Board offers no reason why its new reading sufficiently tailors the practice law to a sufficiently important state interest. As a result, there is no record on which to conclude that the interpretation would narrow the law in a way that makes it constitutional. "When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 944 (9th Cir. 2011) (en banc) (quoting *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 816 (2000)). And whatever the level of First Amendment scrutiny, the Board has defaulted on that burden here. Under strict scrutiny, "[t]he First Amendment requires that the Government's chosen restriction on the speech at issue be 'actually necessary' to achieve its interest." *United States v. Alvarez*, 567 U.S. 709, 725 (2012) (plurality opinion). Even under intermediate scrutiny, the Board still would have had to "demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Turner Broad. Sys. v. F.C.C.*, 512 U.S. 622, 664 (1994) (plurality opinion).

Whichever of these standards applies, the Board does not even approach it. The Board asserts that the state has a "compelling interest in protecting the life, health, and property of Oregon's residents." Defs.' Summ. J. Mem. 20. But the Board offers no argument or evidence that this interest is served by a practice law that—even as reinterpreted—would extend to the sort

of public comments and testimony described above. The following two sentences are the entirety

of the Board's explanation for why its proposed interpretation is tailored to its claimed interest:

> Oregon's practice statute is narrowly drawn to protect Oregon's substantial
> interests. Because the "practice of engineering" definition is properly construed to
> regulate only the professional practice of engineering, it does not reach further
> than necessary to protect Oregon's interests.

*Id.* 20.

The First Amendment demands more than the Board's say-so. "[A] State cannot

foreclose the exercise of constitutional rights by mere labels," *Bhd. of R. R. Trainmen v. Virginia*

*ex rel. Va. State Bar*, 377 U.S. 1, 6 (1964) (citation omitted), but labels are all the Board offers.

Whatever the level of scrutiny, "[i]n the First Amendment context, fit matters." *Lair v. Bullock*,

798 F.3d 736, 748 (9th Cir. 2015) (citation omitted). And if anything, the Board's public-safety

interest brings focus to the mismatch between that interest and the practice law. No matter how

many La Forests, Somasundarams, Knights, and Järlströms participate in campaigns to criticize

public-works projects, Oregon's high-rises, stadiums, bridges, and hospitals will remain

standing. *See* Defs.' Summ. J. Mem. 20. Nuclear reactors will not melt down. *See id.* Airplanes

will not fall out of the sky. *See id.* At most, these types of speakers might persuade a state or

local agency that their ideas are worth exploring. That possibility does not justify restricting their

speech; it is a reason to protect it. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 576 (2011)

("[T]he fear that speech might persuade provides no lawful basis for quieting it.").

### 3.    Beyond proposing a new interpretation, the Board does not defend the practice law's constitutionality.

The failure of the Board's proposed interpretation "decides the constitutional question."

*See Stevens*, 559 U.S. at 481. Like the federal government in *Stevens*, the Board's only defense

against overbreadth has been to offer a limiting construction of the challenged law. As discussed

above, that limiting construction is "contrary to the plain language of the statute." *See Valle del Sol Inc. v. Whiting*, 709 F.3d 808, 818 n.3 (9th Cir. 2013). It also would not cure the practice law's unconstitutionality. Because the Board makes no effort to defend the practice law as written, the law should thus be held facially invalid for the reasons—all unrebutted—set forth in Järlström's summary-judgment memorandum.

**B.    The engineer-title law is facially invalid.**

Like the practice law, the title law also violates the First Amendment on its face. Whereas the practice law restricts who can talk about engineering topics, the title law restricts who can use the word "engineer." To most English-speakers, the word "engineer" means many different things. Pl.'s Summ. J. Mem. 29. But under Oregon's title law, the word means only one thing: "Oregon-licensed professional engineer." *Id.* 26; *see also* Or. Rev. Stat. § 672.007(1). No matter the setting, non-licensees who publicly call themselves "engineers" face investigations, civil penalties, and even criminal charges. Pl.'s Summ. J. Mem. 26-28. The law so "clear[ly]" bans their use of the word "engineer" that Board members have voiced bewilderment that anyone would even contest the issue. Gedge Decl. Ex. 51, at 33:35-33:58 (ECF 74-51) ("It seems like it's pretty clear in the rules and regulations." "Yes, you would think." "It is clear." "We all agree, but it's been a struggle, it has." "Well, they just like to fight, for some reason.").

A law that polices the English language in this way violates the First Amendment for two reasons. To begin with, the title law is overbroad; its text and the undisputed record show that the law "sweep[s] up a host of material entitled to constitutional protection." *Powell's Books, Inc.*, 622 F.3d at 1207; Pl.'s Summ. J. Mem. 26-28. Even after this lawsuit was filed, the Board's administrator conceded that the law is "very broad" and that the agency has policed the word "engineer" "since at least 1935." Gedge Supp. Decl. Ex. 63, at 2. On top of that, the law is a

content-based speech ban and fails every level of First Amendment scrutiny; put differently, the law's restriction on the word "engineer" has no legitimate sweep at all. Pl.'s Summ. J. Mem. 28-30. There is no setting in which the government can take truthful speech, declare it false, and punish the speaker. Yet by its terms, the title law does exactly that.

As with the practice law, the Board "makes no effort to defend such a broad ban as constitutional." *Stevens*, 559 U.S. at 473; *see also* Defs.' Summ. J. Mem. 22-31. Instead, the Board proposes yet another rewrite, to shoehorn the law into the "commercial speech" doctrine. By way of background, "commercial speech" means commercial advertising, and as a general rule, it enjoys strong First Amendment protection. *Ibanez v. Fla. Dep't of Bus. & Prof'l Regulation*, 512 U.S. 136, 142 (1994). At the same time, the Supreme Court has singled out a narrow category of commercial speech that is entitled to no protection at all: false advertising. As a result, states can ban speech under the commercial-speech doctrine, but only if two conditions are met: First, the speech must be "advertising" and, second, it must be "actually or inherently misleading." *Edenfield v. Fane*, 507 U.S. 761, 774 (1993) ("[A]dvertising may be banned outright only if it is actually or inherently misleading.").

With that window of unprotected expression in view, the Board ties itself into knots to limit the title law to "misleading commercial speech." Defs.' Summ. J. Mem. 3, 27. But as with the practice law, this proposal "requires rewriting, not just reinterpretation." *Stevens*, 559 U.S. at 481. Statutory text and state-court precedent foreclose the Board's interpretation (Section 1, below). And in any event, the Board's reading would leave the door open to many of the same First Amendment violations described in Järlström's opening brief (Section 2, below). As with the Board's defense of the practice law, the failure of its proposed interpretation of the title law "decides the constitutional question." *Stevens*, 559 U.S. at 473 (Section 3, below).

      1.     ***The Board's proposed interpretation conflicts with the title law's text and with binding state-court precedent.***

The Board proposes to rework the title law so that it would apply only to speech that both (1) is "commercial" and (2) "misleadingly" states that the speaker is a licensed professional engineer. Defs.' Summ. J. Mem. 23-27. These modifications cannot be adopted.

*First*, the Oregon courts have already held that the title law reaches beyond commercial speech, and the federal courts cannot second-guess Oregon courts on the meaning of Oregon law. At the Board's urging, the Oregon Court of Appeals in 2013 held that the title law extends to speech that is not even arguably "commercial." *See Topaz v. Or. Bd. of Exam'rs for Eng'g & Land Surveying*, 297 P.3d 498, 449-501 (Or. Ct. App.), *rev. denied*, 353 Or. 714 (2013) (affirming that the title law applied to retiree's complaint about home water damage). Even setting aside questions of judicial estoppel, that decision precludes the interpretation the Board asserts now. Contrary to the Board's view, the Oregon Court of Appeals' holding absolutely carries "special weight" here. *See* Defs.' Summ. J. Mem. 29. State-court decisions like *Topaz* are—as the Attorney General's Office has told the Ninth Circuit—"controlling" in these circumstances.[5] The Supreme Court has long held that "[f]ederal courts . . . follow" intermediate-court interpretations "in the absence of a conflicting decision of the Supreme Court of [the state]." *Gooding v. Wilson*, 405 U.S. 518, 525 n.3 (1972); *accord W. Helicopter Servs., Inc. v. Rogerson Aircraft Corp.*, 811 P.2d 627, 635 & n.8 (Or. 1991). Here, the Oregon Court of Appeals has construed the title law in a way that extends it beyond commercial speech. That

---

[5] Appellees' Br. 31, *Powell's Books, Inc. v. Kroger*, Nos. 09-35153, 09-35154, 2009 WL 6303813 (9th Cir. Sept. 25, 2009) ("Where a state's intermediate appellate court has already construed statutory language, the state's highest court has denied discretionary review, and the law has been unchanged for several years, federal courts regard the intermediate court's construction as controlling.").

ruling—as the Board put it at the time—is "the law of the land in Oregon." Gedge. Supp. Decl. Ex. 64, at 11:17-12:07.

*Second*, the title law targets more than just speech that "misleadingly" suggests the speaker is an Oregon-licensed professional engineer; it imposes "a per se prohibition on the use of the title 'engineer.'" *See* Defs.' Summ. J. Mem. 2-3. This has been the Board's position for decades, *see* Pl.'s Summ. J. Mem. 5-11, 26, 27, and it follows from the plain text of the statute. Section 672.007(1)(b), for example, prohibits non-licensees from using a title implying that the speaker is *either* "an engineer *or* a registered professional engineer." (emphasis added). The clear import of that language bans non-licensees from using the title "engineer" even when the title does not imply "registered professional engineer." *See generally* pages 6-8, above (discussing Oregon interpretive principles). And the Board's regulations confirm this natural reading: They provide explicitly that "[u]nless registered as a professional engineer in Oregon, no persons may . . . [h]old themselves out as an 'engineer' . . . ." Or. Admin. R. 820-010-0730(3)(a); *see also* Defs.' Summ. J. Mem. 23 (conceding that this regulation is "similar to the statutes").

> **2.    *The Board's proposed interpretation would allow the agency to continue violating speakers' First Amendment rights.***

Not only does the Board's proposed interpretation of the title law conflict with text and precedent, it would not even "make [the law] constitutional." *Powell's Books, Inc.*, 622 F.3d at 1208-09. The agency promises that the law, as reinterpreted, would no longer "categorically prohibit the use of the term 'engineer' by nonregistered individuals." Defs.' Summ. J. Mem. 24. Instead, it would apply only against people whose speech is "misleading." *Id.* 27. But that is no assurance at all, because in the Board's view, it is *always* misleading for a non-licensee to use the title "engineer." For example:

➢ When the Board voted to fine Dave Dickoff for calling himself a "mechanical engineer" and an "engineer," a Board member described his statements as "very misleading." Gedge Supp. Decl. Ex. 65, at 31:09-31:12.

➢ The Board has repeatedly announced that "the Board and the public expect people who use the title of engineer to be registered as professional engineers." *Id.* Ex. 66, at 1; *see also id.* Ex. 67, at 1 ("This agency and the public expect that a company or person using the title of engineer to be qualified and registered as such.").

➢ The Board warned a company that an employee's title "Project Engineer" "falsely represented to the public that he was qualified as a professional engineer." *Id.* Ex. 68, at 1.

➢ The Board informed the owner of a company called "Bear Production Engineering" that "it would appear you are making a representation to the public as being legally qualified to engage in the practice of engineering." Ex. 69, at 1; *see also id.* Ex. 66, at 1 ("[Y]our firm's name and your title implies that you are a registered professional engineer.").

➢ The Board has regularly stated that "using the title 'engineer' without registration" represents that the speaker is "a registered professional engineer." Gedge Decl. Ex. 31, at 1 (ECF 74-31) ("[Y]ou represented yourself as a registered professional engineer by using the title 'engineer' without registration."); *see also id.* Ex. 17, at 1 (ECF 74-17) (same).

Given this long-standing position that the two titles are synonymous, the Board's offer to target only "misleading" speech raises more questions than answers. Would it be misleading for

Morgan Rider to go back to calling herself an "environmental engineer"? *See* Pl.'s Summ. J. Mem. 8. Would it be misleading for Järlström to call himself an "engineer" on his résumé? Järlström Decl. ¶ 34 (ECF 73). On a flyer? *See id.* On an e-vite? *See id.* Would it be misleading for the Oregon Association of County Engineers and Surveyors to give its "Engineer of the Year" award to a non-licensee? *See* Pl.'s Summ. J. Mem. 9. For Josh Downs to put "engineer" back on his business card? *See id.* 10. For ABC Tool & Die Co. Manufacturing LLC to revert to "ABC Tool & Die Co. Engineering, Manufacturing LLC"? *See id.* Would it be misleading for Intel to celebrate its female employees as part of the #ILookLikeAnEngineer campaign?[6] Under the Board's view that "engineer" means "registered professional engineer," all this speech could be deemed "misleading"—and punishable—under the Board's proposed interpretation of the title law.

These questions also reflect a broader problem with the law. The ban on the title "engineer" is invalid not just because it blunders into private e-mails and core political speech; the ban is invalid in *every* setting—commercial and non-commercial—because it is not "actually or inherently misleading" for people without a PE license to describe themselves using the word "engineer." *See Edenfield*, 507 U.S. at 774. Even the National Society of Professional Engineers recognizes "a clear distinction between an engineer and a licensed professional engineer." Letter from Kodi Jean Verhalen, P.E., Esq., F.NSPE to *The Washington Post* (June 9, 2017), https://tinyurl.com/yd9esdas. Indeed, most engineers in America have no need for a PE license. *See* Pl.'s Summ. J. Mem. 29-30. So Oregon's ban on the title "engineer" is a solution in search of a problem—and one that violates the First Amendment along the way. If a "shyster" were to

---

[6] *See* Karli Petrovic, *8 Intel Engineers Breaking the Mold*, iQ by Intel (Sept. 17, 2015), https://tinyurl.com/ycq2xutg; *see also* Tom Foremski, *'iQ by Intel' – experimental online magazine curated by a workforce of thousands*, ZDNet (May 16, 2012) (explaining that *iQ by Intel* is "aimed at consumers"), https://tinyurl.com/y9dtj247.

"hoodwink" customers into thinking he is a licensed professional engineer, Defs.' Summ. J. Mem. 13, 23, Oregon has laws in place to punish fraudulent or unlawful business practices, *see, e.g.*, Or. Rev. Stat. § 646.608(1)(b)-(c), (e). But just as it cannot ban nouns like "inventor," "designer," "entrepreneur," or "thought leader," the state cannot simply declare the word "engineer" off-limits.

### 3.    *Beyond proposing a new interpretation, the Board does not defend the title law's constitutionality.*

As with the practice law, the Board's "entire defense" of the title law rests on construing the law in a way text and precedent do not permit. *See Stevens*, 559 U.S. at 473. Because the Board makes no effort to defend the law's actual breadth, the Court should grant Järlström the facial relief requested in his summary-judgment motion.

### C.    **The need for facial relief is pressing.**

Järlström's summary-judgment motion is supported by an undisputed—and unprecedented—factual record. A First Amendment plaintiff "need not necessarily introduce admissible evidence of overbreadth," *Comite de Jornaleros de Redondo Beach*, 657 F.3d at 944, but, here, the challenged laws' overbreadth is shown *overwhelmingly* through admissible evidence. Järlström's motion cites over a dozen Board enforcement actions that have infringed— or are currently infringing—speakers' First Amendment rights. Pl.'s Summ. J. Mem. 5-11, 20-22, 25, 27. The motion cites Board meetings, letters, e-mails, and briefs—spanning over a decade—all of which confirm that the challenged laws mean exactly what they say. *Id.* 3, 5, 17-20, 25, 26, 27-28. Even the motion's hypotheticals are drawn from the Board's own words. *Id.* 3, 19, 26, 27; *see also* page 4, above. The motion cites declarations and documentary evidence showing that the laws are chilling people's speech. Pl.'s Summ. J. Mem. 31-32. The motion cites declarations and documentary evidence showing that targets of the Board's unconstitutional

actions often lack the resources to vindicate their rights. *Id.* 32-33. The motion even cites evidence that complainants—and the Board itself—leverage the challenged laws in arbitrary and discriminatory ways. *Id.* 33-34.

The Board addresses none of this evidence. *See* Defs.' Summ. J. Mem. 7. "[A] few anecdotal examples of a mistaken application of a statute," the Board maintains, "will not suffice to invalidate a statute." *Id.* 8. But besides the statutory text, the Board's own words and enforcement practices are the obvious way to show "a realistic danger of, and a substantial potential for, the unconstitutional application of the [challenged laws]." *Hill v. City of Houston*, 789 F.2d 1103, 1110 (5th Cir. 1986) (en banc), *aff'd*, 482 U.S. 451 (1987); *cf. Stevens*, 559 U.S. at 485 (Alito, J., dissenting) ("In determining whether a statute's overbreadth is substantial, we consider a statute's application to real-world conduct, not fanciful hypotheticals."). In fact, the record here is far more developed than in other, similar cases. In *Jews for Jesus*, for instance, the Supreme Court "invalidated a facially overbroad enactment before the state courts had ever applied it." *See* Richard H. Fallon, Jr., *Making Sense of Overbreadth*, 100 Yale L.J. 853, 873 (1991). *Powell's Books* was similar. *See* 622 F.3d at 1215 (noting the state's "stand down approach"). Here, by contrast, the record shows that the practice and title laws are exploited relentlessly to punish protected speech. From both "the text of the law" and "actual fact," the laws are substantially overbroad. *Hicks*, 539 U.S. at 122 (brackets omitted).

The Board's inability to cabin the laws' scope only spotlights the need for facial relief. One of the "considerations" favoring facial relief is the lack of a "clear line" between permissible and impermissible applications. *See Reno v. ACLU*, 521 U.S. 844, 884 (1997); *cf.* Fallon, *supra*, at 893 ("Overbreadth medicine makes sense only when a cure would be difficult to effect through narrowing judicial constructions."). The Board's brief confirms there are no clear lines

here. In trying to explain the scope of the practice law, for example, the Board ends up right where it began: "The plain and ordinary meaning of professional service is the engagement of a person to perform work that a person practicing a particular profession would perform." Defs.' Summ. J. Mem. 14; *see also id.* 15 (similar). The Board found itself similarly at a loss at the December hearing; it stood firm on its power to restrict "professional speech," but conceded that the scope of that power is "hard to define." Dec. 4, 2017 Hrg. Tr. 6:16; *see also id.* 9:17-9:18 ("I think the board has to exercise a lot of caution in this area . . . ."); *id.* 9:21 ("[N]o question, it's difficult.").

For all these reasons, denying facial relief would come with real costs. Not only would the Board's "murky" interpretations leave it free to continue violating people's rights, *Bd. of Airport Comm'rs v. Jews for Jesus, Inc.*, 482 U.S. 569, 576 (1987), they would also "inject an element of vagueness into the statute's scope and application," *Aptheker v. Sec'y of State*, 378 U.S. 500, 516 (1964). Adopting the Board's "vague limiting construction" would thus give to the Board alone "the power to decide in the first instance whether a given activity" can be punished. *See Bd. of Airport Comm'rs*, 482 U.S. at 576; *see also Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1889, 1891 (2018) (rejecting interpretation that "introduces confusing line-drawing problems" and "poses riddles that even the State's top lawyers struggle to solve"). That would leave speakers in Oregon no better off than they are now. The Board's enforcement docket is proof that the agency remains poised to crack down on engineering-related speech. *See* Pl.'s Summ. J. Mem. 21, 25. But since even the Board cannot say what its proposed interpretations cover, Oregonians will continue to have no idea whether and when they can safely voice opinions about engineering issues. Only "extensive adjudications, under the impact of a variety of factual situations, would bring the [challenged laws] within the bounds of permissible

constitutional certainty." *Bd of Airport Comm'rs*, 482 U.S. at 575 (quoting *Baggett v. Bullitt*, 377 U.S. 360, 378 (1964)).

That delay would create its own First Amendment harms, for "the chilling effect of the [laws] on protected speech in the meantime would make such a case-by-case adjudication intolerable." *Id.* at 576. That is especially so here, where *meantime* would almost certainly translate to *forever*. No matter how obvious the First Amendment violations, most respondents lack the time and money to defend against the Board. *See* Pl.'s Summ. J. Mem. 32-33. For years, the Board has acknowledged the grave First Amendment questions presented by its laws.[7] But even though respondents have raised the issue, none has ever successfully vindicated his or her First Amendment rights. Most are silenced or punished with default orders, "letters of concern," or pointed e-mails. And the Board's words and actions make clear that it will continue exploiting its laws to the hilt "unless and until" the courts intervene. Gedge Decl. Ex. 2, at 2:30:42-2:31:30 (ECF 74-2). Without facial relief, Järlström's constitutional rights—and the rights of many other people—will continue to be infringed. The Court should thus (1) declare the practice law facially overbroad and (2) declare the title law's restriction on the title "engineer" either facially overbroad or invalid in all its applications. *See generally* Dec. 4, 2017 Hrg. Tr. 15:01-15:06 (Court: "So why not just, kind of, get it over with now and save your office the trouble of having to litigate this again and save the board the angst of trying to get it right?" Board Counsel: "I think that's an option that the Court has here. . . . ").

---

[7] *See* Gedge Decl. Ex. 2, at 2:30:42-2:31:30 (ECF 74-2) ("This is the typical gambit of attorneys who don't understand title acts or who just want to fight against them. I mean, ultimately, the potential challenge to title acts in general is the First Amendment issue, right? Our courts continue to decline to address that, here in Oregon. So unless and until that happens, there's no reason not to enforce that statute.").

**II.     The engineering-practice law and the engineer-title law violate the First Amendment as applied to the speech Mats Järlström wishes to engage in.**

Järlström's summary-judgment motion also details why he is entitled to as-applied relief, in the form of a decree that makes permanent the agreed preliminary injunction now in place. Pl.'s Summ. J. Mem. 34-36. His motion and accompanying declaration lay out in detail the types of speech he intends to engage in. *Id.*; Järlström Decl. ¶¶ 28, 30-35. The motion explains that all his planned speech is protected by the First Amendment. Pl.'s Summ. J. Mem. 35-36. The motion also explains why the agreed preliminary injunction is well-suited to protecting his speech. *Id.*

The Board all but ignores Järlström's request for as-applied relief. It again "concede[s] that plaintiff is entitled to relief on his as-applied challenge." Defs.' Summ. J. Mem. 1. But it continues to pair that concession with a "form of judgment" that does not secure the as-applied relief Järlström seeks. *Id.* 1 n.2. That sleight of hand lacked merit last year, *see* Pl.'s Resp. Defs.' Mot. Entry J. 3-8 (ECF 50), and it lacks merit now.

*First*, the Board's brief does not even begin to rebut the as-applied relief Järlström requests. Järlström could not be clearer in his position: "[T]he Court should convert the as-applied preliminary injunction into a permanent one." Pl.'s Summ. J. Mem. 36; *see also* Dec. 4, 2017 Hrg. Tr. 18:16-19:15. But the Board's brief ignores the agreed preliminary injunction. That silence is dispositive. "The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008) (citation omitted). And the Board nowhere explains why the "likelihood of success" that supports the agreed preliminary injunction does not translate to "actual success" now. The Board identifies not one instance in which speech protected by the preliminary injunction could

constitutionally be restricted. Nor does the Board identify a single scenario in which it could constitutionally punish Järlström for the activities he wishes to engage in. *See* Järlström Decl. ¶¶ 28, 30-35. If, having agreed to the preliminary injunction, the Board believed that it could constitutionally restrict activities protected by that decree, it bore the burden to identify those activities and prove its case with evidence. *See FEC v. Wis. Right to Life*, 551 U.S. 449, 464-65 (2007) (opinion of Roberts, C.J.) (discussing government's burden of proof in as-applied challenges); *see also Doe v. Harris*, 772 F.3d 563, 570 (9th Cir. 2014) (discussing government's burden in opposing injunctive relief in First Amendment cases). Its failure to do so decides the issue. Järlström's sworn testimony about his planned activities is undisputed, the Board has made no effort to show that it can constitutionally restrict these activities, and the Board has not explained why the agreed preliminary injunction was appropriate in May 2017 but not today.

*Second*, the Board again offers its preferred form of judgment as a substitute as-applied decree. Defs.' Summ. J. Mem. 1 n.2. As Järlström explained last October, however, the judgment's "carve-out for speech in the 'context' of 'professional or commercial speech' makes [the Board's] concessions all but worthless." Pl.'s Resp. Defs.' Mot. Entry J. 6; *see also id.* 14-15 (explaining that judgment's uncertain scope would make it "inconsistent with Rule 65"). The Supreme Court's decision in *National Institute of Family & Life Advocates* ratifies Järlström's concerns. Not only did the Supreme Court confirm that the professional-speech doctrine does not exist, it noted that "'[p]rofessional speech' is . . . a difficult category to define with precision." 138 S. Ct. at 2375. Against this backdrop—and for all the reasons discussed above, (pages 9-25)—the Board's proposed judgment cannot possibly satisfy Järlström's plea for as-applied relief.

Of the two as-applied decrees before the Court, the Board's is discredited and Järlström's is unrebutted. To protect Järlström's rights fully, the Court should thus convert the as-applied preliminary injunction into a permanent one.[8]

## III.    The Board's residual arguments lack merit.

The Board bookends its brief with two procedural arguments, the first on standing and the second on judicial estoppel. Both are without merit.

### A.    Järlström has standing to challenge all the statutory and regulatory provisions identified in his complaint.

The Board's standing argument slices and dices the statutory and regulatory provisions Järlström challenges; in the Board's view, Järlström has standing to contest only those sub-provisions the Board explicitly cited in the final order it entered against him last year. Defs.' Summ. J. Mem. 6-7. The Board points to no authority for this proposition, and with good reason: It conflicts with First Amendment standing precedent at a basic level. As Järlström has already made clear, he is not trying to re-litigate the Board's enforcement case against him; he is seeking prospective relief to protect against *future* First Amendment violations. *See, e.g.*, Pl.'s Resp. Defs.' Mot. Entry J. 4.

"[A]n actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law" in this way. *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2342 (2014). Rather, First Amendment challenges like Järlström's "'present unique standing considerations' such that 'the inquiry tilts dramatically toward a finding of standing.'" *Libertarian Party of L.A. Cty. v. Bowen*, 709 F.3d 867, 870 (9th Cir. 2013). When a plaintiff like Järlström seeks forward-looking relief, "[i]t is sufficient for standing purposes that the plaintiff intends to engage in a course of conduct arguably affected with a constitutional interest and that

---

[8] The Board does not dispute that Järlström satisfies the equitable elements for injunctive relief.

there is a credible threat that the challenged provision will be invoked against the plaintiff." *Id.*
(citation omitted). The Board does not deny that this standard is met for all the provisions
Järlström challenges, and the record confirms that it is.

*First*, Järlström "intends to engage in a course of conduct arguably affected with a
constitutional interest." *See id.* His declaration lays out a "concrete plan" (*id.* at 871) to convey
his traffic-light theories and to describe himself using the word "engineer." He details the
activities he has begun under the protection of the preliminary injunction. Järlström Decl. ¶¶ 30-
32, 34. And he articulates concrete plans to continue speaking out in ways that will expose him
to enforcement. Over the past year, he has started to become a recognized authority on traffic-
light issues, *see, e.g., id.* ¶ 32, and he intends to continue speaking out in many ways. For
example:

> ➤ He is "planning to arrange opportunities to speak about [his] theories, either
>   through [the Transportation Research Board] or [the Institute for Transportation
>   Engineers] or a local university or through seminars or lectures [he] set[s] up
>   [him]self. If there is enough interest, [he would] even be interested in being
>   compensated for these kinds of events, even if it's just covering travel costs, room
>   rentals, and things of that nature." *Id.*

> ➤ He is exploring opportunities to partner with foundations or grassroots groups to
>   develop white papers and other reports on traffic-light issues. *Id.* ¶ 33.

> ➤ He is interested in pursuing "opportunities to be an expert witness in lawsuits
>   challenging traffic-light schemes." *Id.*

> ➤ He "want[s] to be free to describe [him]self using the word 'engineer' in whatever
>   context [he] want[s]," including in articles, biographical stubs on papers, his

résumé, his website, e-mails, business cards, and seminars (and flyers, e-vites, or ads publicizing his seminars). *Id.* ¶ 34; *see also id.* ¶ 35.

The Board contests none of this testimony, suggesting (in a footnote) only that Järlström's plans are "hypothetical." Defs.' Summ. J. Mem. 30 n.14. But Järlström's plans are at least as "concrete" as those of other First Amendment plaintiffs. *See, e.g.*, *Italian Colors Rest. v. Becerra*, 878 F.3d 1165, 1174 (9th Cir. 2018); *Libertarian Party of L.A. Cty.*, 709 F.3d at 871. Järlström describes "when, to whom, where, [and] under what circumstances," he would communicate about traffic lights and describe himself as an "engineer." *See Italian Colors Rest.*, 878 F.3d at 1174 (citation omitted). "This is enough to show a concrete plan," *id.*, and nothing in the Board's brief suggests otherwise.

*Second*, there is a credible threat that all the challenged provisions will be invoked against Järlström. In fact, the Board's answer explicitly *reserves* power to investigate and punish him under every one of the provisions it says he lacks standing to challenge. *Compare* Compl. ¶¶ 90-92, 100-102 (ECF 1), *with* Answer ¶¶ 68-69, 74-75 (ECF 37). What is more, each of those provisions either: (1) has been enforced against Järlström[9]; (2) has been cited to communicate a specific warning to Järlström;[10] (3) has been enforced against people whose speech would be similar to Järlström's[11]; or (4) is materially identical to provisions the Board concedes Järlström

---

[9] Järlström Decl. Ex. 15, at ¶ 15 (ECF 73-15) (citing Or. Admin. R. 820-010-0730(3)(a)). The Board's motion states incorrectly that it did not enforce Or. Admin. R. 820-010-0730(3)(a) against Järlström. Defs.' Summ. J. Mem. 7.

[10] Järlström Decl. Ex. 4, at 1 (ECF 73-4) (citing Or. Rev. Stat. § 672.007(1)(a)-(c)); *id.* Ex. 11, at 1 (referencing "ORS 672.007(1)").

[11] Gedge Decl. Ex. 46, at 1:30-1:58 (ECF 74-46) (treating "672.005 sub-one (a) and (b)" as interchangeable in voting to investigate Suji Somasundaram; *id.* Ex. 22, at ¶ 3 (ECF 74-22) (fining respondent "under ORS 672.007(1)(a) through (c)," and citing "OAR 820-010-0720(3),"

has standing to challenge.[12] Other First Amendment cases have proceeded on far less. *See, e.g.*, *Italian Colors Rest.*, 878 F.3d at 1173-74; *Libertarian Party of L.A. Cty.*, 709 F.3d at 871-72.

### B.    The Board's appeal to judicial estoppel is misplaced.

The Board's final argument encapsulates why Järlström is entitled to all the relief he seeks. The Board's motion "abandon[s]" years of rulings and interpretations. Defs.' Summ. J. Mem. 31. It disclaims a holding the agency pressed on the Oregon Court of Appeals only five years ago. *See* page 18, above. It advances at least one argument that conflicts with the state's litigating position before the Ninth Circuit. *See* page 18 & n.5, above. It even tries to claw back the preliminary injunction the agency agreed to last summer. *See* pages 26-28, above. Remarkably, however, the Board crowns its motion with an appeal to "judicial estoppel." Despite all the other about-faces, the Board contends, Oregonians can trust that the agency "will forever be bound by the interpretation of the statutes it advances here." Defs.' Summ. J. Mem. 31.

This assurance carries little weight. As an initial matter, judicial estoppel has no place in the constitutional analysis. As discussed, the Board's proposed interpretations of the practice and title laws conflict with statutory text and (for the title law) binding state-court precedent. For that reason, the interpretations are not ones this Court can adopt—estoppel or no. *Cf. Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 932 (9th Cir. 2004) ("[T]he limitation of federal courts to 'reasonable and readily apparent' interpretations of state statutes is an important one."). The judicial-estoppel doctrine is not a tool for the Board to rewrite state law in federal

---

for using the title "engineer"); *id.* Ex. 56, at ¶ 2 (ECF 74-56) (fining Dave Dickoff under "Section 672.007(1)" for calling himself a "mechanical engineer" and an "engineer").

[12] Defs.' Summ. J. Mem. 23 (acknowledging that Or. Admin. Rs. 820-010-0730(a) and (c) are "similar to" Sections 672.007(1)(c), 672.020(1), and 672.045(2).

court. *Compare Comite de Jornaleros de Redondo Beach*, 657 F.3d at 963 (Kozinski, C.J.,

dissenting), *with id.* at 946-47 (en banc majority opinion).

In practice, moreover, judicial estoppel would offer no security to future targets of Board

enforcement:

*First*, the doctrine is hardly the "bar[]" the Board suggests. *See* Defs.' Summ. J. Mem. 31.

Some federal courts, for example, have indicated that judicial estoppel does not protect non-

parties. *Nichols v. Scott*, 69 F.3d 1255, 1272 n.33 (5th Cir. 1995). Others have suggested that

"estoppel will rarely work" against at least some government litigants. *Conforti v. United States*,

74 F.3d 838, 841 (8th Cir. 1996). And even when it applies, the doctrine precludes only "clearly

inconsistent" positions. *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001). Here, the Board's

current position appears to be that it can punish whatever it labels "professional," "commercial,"

or "misleading." *See* pages 11-13, 15, 19-22, above. With that as the benchmark, respondents

would be hard-pressed to show clear inconsistency in the future.

*Second*, most targets of Board enforcement will never have the chance to invoke judicial

estoppel. The Board appears to avoid bringing cases against people who might be "fighter[s]."

Gedge Supp. Decl. Ex. 70, at 4:13-5:23. And even for the fighters who slip through, few will

know to invoke judicial estoppel. The doctrine is an affirmative defense, *see* Fed. R. Civ. P.

8(c)(1); Or. R. Civ. P. 19(B), which may be "waived" if not raised in response to the Board's

initial notice of intent, *see* Or. Admin. R. 820-001-0015(3)(b), (4)(b). And there is no reason to

think future respondents will know to plead this defense. For its part, the Board has certainly

taken no steps to acquaint Oregonians with its new interpretations. Apart from Järlström, the

Board does not appear to have alerted any other past respondents that they had been subjected to

"mistaken" enforcement action. *See, e.g.*, Dickoff Decl. ¶ 16 (ECF 76). The Board does not

appear to have "withdrawn" any other orders or refunded any other fines. *See, e.g.*, *id.* ¶¶ 14-15.
The Board seems not to have even mentioned its new interpretations in its quarterly newsletter.
*See* Or. State Bd. of Exam'rs for Eng'g & Land Surveying, *Latest News Stories*,
https://tinyurl.com/y9ht7vly.

  *Third*, the Board's appeal to judicial estoppel is simply "*noblesse oblige*" repackaged. *See*
*Stevens*, 559 U.S. at 480. Judicial estoppel, the Board contends, renders its "positions in this
case . . . far more than a promise." Defs.' Summ. J. Mem. 31. But in truth, the Board alone would
decide whether to be judicially estopped in future enforcement cases. The Board, after all, is the
final decisionmaker in its agency adjudications. *See* Or. Admin. R. 137-003-0665(3). And its
decisions on questions of judicial estoppel would be effectively unreviewable; respondents
appeal Board orders about once a decade and the Oregon Court of Appeals would likely "review
the [Board's] decision whether to invoke judicial estoppel for an abuse of discretion." *Arizona v.*
*Tohono O'odham Nation*, 818 F.3d 549, 558 (9th Cir. 2016); *accord* Or. Rev. Stat. § 183.482(7).
As a practical matter, deciding this case as the Board proposes would simply leave the agency to
police itself. Even for an agency without the Board's record, that is no way to resolve First
Amendment claims. The federal courts cannot uphold—much less rewrite—"an unconstitutional
statute merely because the Government promise[s] to use it responsibly." *Stevens*, 559 U.S. at
480.

## CONCLUSION

Plaintiff's motion for summary judgment should be granted and Defendants' motion denied; the engineering-practice and engineer-title laws should be declared facially unconstitutional and unconstitutional as applied to Plaintiff; and the preliminary injunction now in force should be converted into a permanent one.

Dated: July 17, 2018.                    Respectfully submitted,

                                         /s Samuel B. Gedge
William J. Ohle (OSB 913866)†            Samuel B. Gedge (VA Bar No. 80387)*
Jill S. Gelineau (OSB 852088)            INSTITUTE FOR JUSTICE
SCHWABE, WILLIAMSON & WYATT P.C.         901 North Glebe Road, Suite 900
PacWest Center                           Arlington, VA  22203
1211 SW Fifth Avenue, Suite 1900         Phone: (703) 682-9320
Portland, OR  97204                      Fax:    (703) 682-9321
Phone: (503) 222-9981                    E-mail: sgedge@ij.org
Fax:    (503) 796-2900
E-mail: wohle@schwabe.com
        jgelineau@schwabe.com            Wesley Hottot (WA Bar No. 47539)*
                                         Institute for Justice
                                         600 University Street, Suite 1730
Kelly M. Walsh (OSB 993897)              Seattle, WA  98001
SCHWABE, WILLIAMSON & WYATT PC           Phone: (206) 957-1300
700 Washington Street Suite 701          Fax:    (206) 957-1301
Vancouver, WA  98660                     E-mail: whottot@ij.org
Phone: (360) 694-7551
Fax:    (360) 693-5574
E-mail: kwalsh@schwabe.com               *Attorneys for Plaintiff*

                                         † Designated local counsel

                                         * Admitted *pro hac vice*